ZENITH RADIO CORPORATION,
Plaintiff,

v.

MATSUSHITA ELECTRIC INDUSTRI-
AL CO., LTD., et al., Defendants.

NATIONAL UNION ELECTRIC
CORPORATION, Plaintiff,

v.

MATSUSHITA ELECTRIC INDUSTRI-
AL CO., LTD., et al., Defendants.

In re JAPANESE ELECTRONIC PROD-
UCTS ANTITRUST LITIGATION.

Civ. A. Nos. 74–2451, 74–3247.
MDL 189.

United States District Court,
E. D. Pennsylvania.

Sept. 29, 1980.

See also, D.C., 505 F.Supp. 1125; D.C., 505 F.Supp. 1313.

Blank, Rome, Comisky & McCauley by Edwin P. Rome, William H. Roberts, John Hardin Young, Arnold I. Kalman, Kathleen H. Larkin, Norman E. Greenspan, Lawrence S. Bauman, Philadelphia, Pa., for Zenith Radio Corporation and National Union Electric Corporation, plaintiffs.

Philip J. Curtis, John Borst, Jr., Glenview, Ill., for Zenith Radio Corporation, plaintiff.

Mudge, Rose, Guthrie & Alexander by Donald J. Zoeller, John P. Hederman, Thomas P. Lynch, Howard C. Crystal, Robert A. Jaffe, Shelly B. O'Neill, Mark K. Neville, Jr., New York City, Drinker, Biddle & Reath by Patrick T. Ryan, Philadelphia, Pa., for Tokyo Shibaura Elec. Co., Ltd. and Toshiba America, Inc., defendants; defense coordinating counsel.

Duane, Morris & Heckscher by Henry T. Reath, Terry R. Broderick, Philadelphia, Pa., Crummy, Del Deo, Dolan & Purcell by John T. Dolan, Arnold B. Calmann, Newark, N.J., Baker & McKenzie by Hoken S. Seki, Thomas E. Johnson, Chicago, Ill., for Mitsubishi Electric Corporation and Melco Sales, Inc.

Reid & Priest by Charles F. Schirmeister, Robert J. Lynch, New York City, L. Peter Farkas, Washington, D.C., for Mitsubishi Corporation and Mitsubishi International Corporation, defendants.

Weil, Gotshal & Manges by Ira M. Millstein, A. Paul Victor, Joel B. Harris, Kevin P. Hughes, Robert K. Hood, H. Adam Prussin, Harry M. Davidow, Jeffrey L. Kessler, Stuart Peim, Lenore Liberman, Gayle E. Hanlon, Makoto Matsuo, New York City, Morgan, Lewis & Bockius by Raymond T.

Cullen, Philadelphia, Pa., for Matsushita Elec. Indus. Co., Inc., Matsushita Elec. Corp. of America, Matsushita Electronics Corp., Matsushita Elec. Trading Co., and Quasar Electronics Corp., defendants.

Metzger, Shadyac & Schwarz by Carl W. Schwarz, Michael E. Friedlander, William H. Barrett, Stephen P. Murphy, William B. T. Mock, Jr.; Tanaka, Walders & Ritger by Lawrence R. Walders, B. Jenkins Middleton, Washington, D.C., Hunt, Kerr, Bloom & Hitchner by Charles J. Bloom, Philadelphia, Pa., for Hitachi, Ltd., Hitachi Sales Corporation of America, and Hitachi Kaden Hanbai Kabushiki Kaisha, defendants.

Wender, Murase & White by Peter J. Gartland, Gene Yukio Matsuo, Peter A. Dankin, Lance Gotthoffer, New York City, Dechert, Price & Rhoads, Philadelphia, Pa., for Sharp Corporation and Sharp Electronics Corporation, defendants.

Whitman & Ransom by Patrick H. Sullivan, Dugald C. Brown, James S. Morris,

Kevin R. Keating, Michael S. Press, New York City, Hunt, Kerr, Bloom & Hitchner by Charles J. Bloom, Philadelphia, Pa., for Sanyo Elec., Inc., Sanyo Elec. Co., Ltd., Sanyo Elec. Trading Co., Ltd., and Sanyo Manufacturing Corporation, defendants.

Arnstein, Gluck, Weitzenfeld & Minow by Louis A. Lehr, Jr., Stanley M. Lipnick, John L. Ropiequet, Chicago, Ill., for Sears, Roebuck & Co., defendant.

Rosenman, Colin, Freund, Lewis & Cohen by Asa D. Sokolow, Renee J. Roberts, Marc Rowin, Kaye, Scholer, Fierman, Hays & Handler by Joshua F. Greenberg, New York City, Wolf, Block, Schorr & Solis-Cohen by Franklin Poul, Philadelphia, Pa., for Sony Corp. and Sony Corp. of America, defendants.

Kirkland & Ellis by Thomas P. Coffey, E. Houston Harsha, Karl F. Nygren, Chicago, Ill., for Motorola, Inc., defendant.

EDWARD R. BECKER, District Judge.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Preliminary Statement | 1209 |
| II. | Rulings on Contested Legal Issues Concerning Interpretation of the Federal Rules of Evidence | 1218 |
| | A. Authentication | 1218 |
| | 1. The Standard for a Preliminary Ruling on Authentication Under Rule 104; Will Inadmissible Evidence Suffice? | 1218 |
| | 2. The Notion of Authentication and the Scope of Rule 901(a); is Authenticity More than Mere Genuineness? | 1220 |
| | 3. Methods of Authentication | 1222 |
| | a. Source of the Document | 1223 |
| | b. Characteristics of the Document Itself | 1224 |
| | c. Testimony and Interrogatory Answers | 1225 |
| | d. Similarity to Other Authenticated Documents | 1226 |
| | e. Age of the Document | 1226 |
| | 4. Self-Authentication Under Rule 902 | 1226 |
| | 5. "Best Evidence" Rule | 1227 |
| | B. Qualification as a Business Record Under Rule 803(6) | 1228 |
| | 1. The Impact of Rule 104(a); Will Inadmissible Evidence Suffice? | 1229 |
| | 2. The Requirement that the Records be Kept in the Course of a Regularly Conducted Business Activity and that it was the Regular Practice of that Business Activity to Make the Record | 1231 |
| | 3. The Requirement of Qualification by a Custodian or Other Qualified Witness | 1233 |

TABLE OF CONTENTS—Continued

Page

4. The Import of Rule 33(c) Production ..................... 1236

5. The Personal Knowledge and Trustworthiness Requirements ... 1237

C. Qualification as Admissions by Party – Opponent under Rules 801 801(d)(2)(B), (C) and (D) ................................... 1238

1. "Non-Hearsay" – The Treatment of Admissions in the F.R.E. .. 1239

2. An Admission Must be an Assertion ....................... 1240

3. Adoptive Admissions ................................... 1243

4. Authorized Statements ................................. 1245

5. Vicarious Admissions .................................. 1246

6. Admissions of a Subsidiary Corporation Offered Against the Parent Corporation ................................... 1247

D. 804(b)(1) Former Testimony .............................. 1248

1. Unavailability ...................................... 1248

 a. Introduction 1248
 b. Inability to Procure Attendance Under Rule 804(a)(5) 1249

2. Similarity of Motive ................................. 1251

3. The Meaning of "Predecessor in Interest" ................. 1252

E. Statements Against Interest Under Rule 804(b)(3) ............. 1255

1. Unavailability ...................................... 1256

 a. Inability to Procure Testimony Under Rule 804(a)(5) 1256
 b. Lack of Memory Under Rule 804(a)(3) 1256

2. Statement Against Interest — The Requirements of Rule 804 (b)(3) ............................................. 1256

F. The Residual Hearsay Exceptions: Rules 803(24) and 804(b)(5) ..... 1261

1. Introduction ....................................... 1261

2. The "Near-Miss" Problem ............................. 1262

3. The Requirement of Making Reasonable Efforts to Procure Other Evidence ..................................... 1264

4. Trustworthiness .................................... 1265

G. The Problem of Internal Hearsay .......................... 1265

1. Hearsay Within Hearsay ............................. 1265

2. Hearsay Within Admissions ........................... 1266

III. The Yajima Diaries – DSS 48–50 .............................. 1267

A. Introduction ......................................... 1267

B. Plaintiffs' Foundation for Authentication and Admissibility Under One of the Exceptions to the Hearsay Rules .................. 1268

C. Defendants' Response .................................. 1268

D. Authentication (F.R.E. 901) ............................. 1270

E. Business Record Status (F.R.E. 803(6)) ..................... 1270

1. The Regular Practice Requirement ..................... 1270

2. Requirement of Firsthand Knowledge and Contemporaneity ... 1273

3. The Trustworthiness Proviso .......................... 1273

F. Admissions of a Party Opponent .......................... 1273

G. Statements Against Interest ............................. 1275

H. The Residual Hearsay Exceptions ........................ 1276

I. Internal Hearsay (Rule 805) ............................. 1276

TABLE OF CONTENTS—Continued Page

*IV. The Yamada Diary, DSS 51 ...................................... 1277
 V. The Yamamato Diaries, DSS 52–54 ............................... 1280
 VI. The Okuma Diary, DSS 55 ...................................... 1283
 VII. The Tokizane Diary, DSS 56–57 ................................ 1285
 VIII. JFTC Testimony, DSS 58–74 .................................... 1286
 A. Introduction ............................................ 1286
 B. Authentication .......................................... 1287
 C. Admissibility as Former Testimony – Rule 804(b)(1)....... 1288
 1. Unavailability....................................... 1288
 2. Similarity of Motive to Develop the Testimony ....... 1288
 a. Contentions of the Parties 1288
 b. Similarity of Issues and Purpose 1290
 c. Other Differences in Circumstances 1290
 d. Export References 1291
 3. Predecessor in Interest ............................. 1292
 4. Authentication References ........................... 1292
 D. Other Hearsay Exceptions, Admissions, and Internal Hearsay ..... 1293
 IX. JFTC "Protocols," DSS 75–92 .................................. 1294
 X. The "Shimizu Memorandum" – DSS 95 ............................ 1297
 XI. Toshiba Internal Memoranda – DSS 96, 97 and 98 .............. 1299
 XII. "Minutes" of the EIAJ Officers' Meetings – DSS 1027 and DSS 1028 ... 1301
 XIII. The EIAJ Statistics Committee 1966 (or Japan Victor Document)—DSS
 1029 ....................................................... 1303
 XIV. TV Export Council Meetings – DSS 1030–1034 (Production by Matsushi-
 ta)......................................................... 1310
 XV. Conclusion.................................................. 1313

* Since the internal organization of Part IV and subsequent parts of this Opinion are essentially the same as that of Part III, we omit subheadings for all subsequent parts except Part VIII, relating to Former Testimony, which is organized differently.

---

## I. *Preliminary Statement*

This is the second in a series of opinions which will address the myriad issues raised during the course of a lengthy pretrial evidentiary hearing in this complex antitrust case. The anatomy and scope of the case has been described in our opinion on subject matter jurisdiction, filed April 14, 1980, 494 F.Supp. 1161. The nature and scope of the

1. That opinion deals with the admissibility of various public records and reports and is cited hereafter as "Public Records Opinion."

2. *See generally* Public Records Opinion at 88–94 (describing Japanese Antimonopoly Law and JFTC procedures). The "Six–Company Case," Case No. 6 of 1966, was brought against six respondents, all of which are defendants in this case: Sanyo Electric Co., Ltd.; Tokyo Shibaura Electric Co., Ltd. (now known outside Japan as Toshiba Corporation); Hayakawa Electric Co., Ltd. (now known as Sharp Corporation); Hitachi, Ltd.; Matsushita Electric Industrial Co., Ltd. ("MEI"); and Mitsubishi Electric Corporation ("MELCO" or "Melco"). The "raids" mentioned in the text occurred in November, 1966, during the JFTC investigation and are conceded by the parties to have been

evidentiary hearing has been described in the first opinion in the current series, filed on August 7, 1980, 505 F.Supp. 1125.[1] This opinion will consider admissibility of three major groups of documents: (1) materials seized by the Japanese Fair Trade Commission (JFTC) in "raids" on the offices of several of the defendants here who were respondents in the so–called "Six Company Case";[2] (2) testimony and statements or

legal under Japanese law. On December 14, 1966, the JFTC charged the six respondents with violations of the Japanese Antimonopoly law by issuing a document called a "recommendation," which bears the legend "No. 17 of 1966." The six companies were charged with holding meetings known as the Tenth-Day Group and the Palace Group, at which they allegedly agreed on retail list prices, retail and wholesale profit margins, and rebates in connection with the sale of television receivers in the domestic Japanese market. The JFTC held a total of 39 hearings in the case between January 31, 1967, and June 7, 1969. On June 9, 1970, the hearing examiners issued a "Draft of Decision" in which they found that the respondents had engaged in the violations charged, but that the violations ceased in 1967. The JFTC did not adopt this Draft of Decision, how-

"protocols" given by officials of the respondent companies during the course of the JFTC proceedings in the "Six Company Case"; and (3) materials produced in discovery from the files of the Japanese defendants and others relating to activities in Japan of Japanese manufacturers of consumer electronic products or of associations of manufacturers. There were virtually no documents in these categories whose admissibility was agreed upon, and all of the documents were the subject of heated dispute about their admissibility.

In the course of the pretrial evidentiary hearing, we also considered the admissibility of a host of materials produced in discovery from the files of defendants and of American purchasers of Japanese–made consumer electronic products relating to certain import transactions. We do not rule on the admissibility of any of those documents in this opinion. However, the legal questions involved in determining the admissibility of the import–related documents are essentially the same as those considered herein.[3] As a result, the legal rulings in Part II, *infra*, will relate as well to the import transaction documents. To the extent that rulings on the admissibility of particular import–related documents are necessary, we will make them in our forth-

coming opinion deciding the defendants' motion for summary judgment on proof of conspiracy.

Before we proceed further, some explanation is in order as to our reasons for writing a long opinion about admissibility of the documents relating to activities in Japan, while reserving admissibility rulings relative to import related documents. When we first addressed defendants' summary judgment motions in April 1979, we were compelled to postpone consideration of those motions addressing plaintiffs' conspiracy claims because of the amorphous state of the record. At that time plaintiffs were invoking in support of these claims not only the entire JFTC record of some 6300 pages, but also an unlimited number of documents from among the millions of documents produced for inspection during discovery. It was clear to all concerned that out of this huge record there were a limited, though yet unidentified, number of critical documents whose admissibility it was important to determine and that, at all events, it was impossible for us to decide the summary judgment motions in the absence of a more discrete record. We concluded that what was first required was the filing of plaintiffs' Final Pretrial Statement (FPS), with preclusive effect.[4] We later decided that a

ever. On July 27, 1978, the JFTC entered an Order to Terminate dismissing the case, which stated:

> Whereas, examining the draft of decision on the basis of the case records as well as the statements of objection, etc., although it may be noted that the respondents had discussed together the retail cash list prices and wholesalers' and retailers' margin rates of color television sets and black–and–white television sets, this Commission has not been able to reach a conclusion up to the present because of the factual and legal problems involved in this case.
>
> Moreover, as the acts which are the subject matter of the hearing proceedings ended in January of 1967, thus already showing a lapse of more than ten years, the factual background cannot be expected to be further clarified even if the hearing proceedings were reopened at this time while, in addition, from the point of view of maintaining order in competition, the practical benefit of continuing the hearing proceedings has now been lost. Moreover, any further prolonging of the disposition of this case is also considered

> to be undesirable from the point of view of legal stability.

The plaintiffs offer in this case evidence from the JFTC record which was produced to them by the defendants in accordance with the Federal Rules of Civil Procedure.

3. The principal basis upon which plaintiffs seek admission of the import related documents are F.R.E. 803(6), the business records exception to the hearsay rules, F.R.E.'s 803(24) and 804(b)(5), the so–called residual hearsay exceptions, and F.R.E. 804(b)(3), the statements against interest exception, all of which are dealt with extensively herein. Moreover, the factual patterns which affect admissibility *vel non* under the proper construction of these rules are very much the same for the import related documents as they are for the documents considered in the opinion.

4. The FPS was required by Pretrial Order 154, *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 478 F.Supp. 889, 946 (E.D.Pa.1979), *rev'd on other grounds*, 631 F.2d 1069 (3d Cir. 1980).

second step was necessary—the holding of pretrial evidentiary hearings at which we could focus clearly on plaintiffs' key documents and also rule on admissibility since summary judgment motions are to be determined on the basis of admissible evidence. *See* Rule 56(e).

Even before the FPS was filed, the emanations from the JFTC proceedings pervaded the case. During the course of many pretrial conferences, and in the initial summary judgment briefs, we were constantly confronted with plaintiffs' allegations that the documents seized by the JFTC during the course of the Six Company Case were laden with evidence of conspiratorial activities by the defendants, in both the domestic Japanese and the export markets. The most frequently cited sources were the three diaries of Seiichi Yajima, an official of Toshiba Corp. The significance of Yajima's diaries was underscored when the FPS was finally filed, for it contained no less than 600 references to them.

The FPS was similarly suffused with references to other documents which had their source in the JFTC proceedings, many of which were likewise represented as demonstrating the existence of a broad based unitary conspiracy to destroy the American consumer electronic products industry by a low price predatory export conspiracy funded or "war—chested" by conspiratorial high prices in Japan. Because of the extremely broad and allegedly damning implications of the JFTC material as portrayed in the FPS, it became evident to us that the intensive scrutiny of all of the critical documents was a condition precedent to any full and fair decision on the summary judgment motions.

On the other hand, the references to import—related documents were, generally, more limited in character. What is reflected in most of the import related documents is a practice on the part of the Japanese manufacturers to give rebates to the American importers. These rebates had the effect of reducing the actual price paid by importers below the "check—price" divulged to American customs authorities and to the Japanese Ministry of International Trade and Industry (MITI). The existence of the rebate practice is not disputed by most of the defendants (although they do dispute plaintiffs' allegations of customs fraud). While the plaintiffs contend (and defendants deny) that a variety of inferences may be drawn from these documents that point to concerted activity by defendants and their co—conspirators in furtherance of a predatory export scheme, the important point here is that the fact of the rebate payments is not generally in issue. As a result, the admissibility *vel non* of most of these documents is not significant for the Rule 56 motion.

We will thus consider—and at some length because of its importance—the admissibility of Mr. Yajima's diary. Also to be considered at some length, because they are alleged to be of similarly great import are the diaries of Messrs. Yamamoto and Yamada, both employees of Hitachi; Mr. Okuma, an employee of MELCO; and Mr. Tokizane, an employee of Matsushita. During the course of the Six Company Case proceedings, Mr. Yajima and a number of other officials of Japanese companies were interviewed and gave statements, referred to herein as "protocols." They also gave formal testimony at hearings before the JFTC. In plaintiffs' submission, the protocols and testimony contain significant evidence of conspiratorial activity by defendants, and also authenticate the diaries under Federal Rule of Evidence 901 and qualify them as business records within the meaning of Federal Rule of Evidence 803(6).[5] These matters will also be treated at length, as will certain of the materials produced in discovery relating to the activities in Japan of Japanese manufacturers or manufacturers' associations.

The evidence whose admissibility is treated in this opinion is not only of critical importance to plaintiffs' case in chief, but it also forms a major part of the factual basis for the opinions of their expert witnesses,

---

**5.** We abbreviate "Federal Rules of Evidence" hereinafter as "F.R.E."

the admissibility of which we will consider in a subsequent opinion. In plaintiffs' submission, the documents coming from Japan demonstrate that the Japanese consumer electronic products manufacturers, including the seven manufacturing defendants, Matsushita (MEI), Toshiba, Hitachi, Sanyo, Melco, Sharp, and Sony, entered into conspiratorial arrangements, effectuated through a series of monthly meetings involving mid–level to top–level management, the purpose of which was to fix prices in Japan at a high level in order to finance the predatory export campaign to destroy the American consumer electronics products industry to which we have referred. The documents themselves, for the most part, are said to set forth accounts in a variety of forms of what transpired at the meetings of the various "conspiratorial groups," principally the so–called "Tenth Day Group," but including higher echelon groups as well.

Textually, the protocols, testimony and other writings indicate that there were meetings of Japanese consumer electronics products executives, and that at those meetings they discussed predictions of domestic demand, the establishment of domestic "bottom prices," i. e. minimum suggested retail sales prices, and appropriate domestic wholesale profit, retail profit, and "rebate" margins in the retail distribution chain. There are scattered references in the documents to "export," though, for the most part, the executives attending the meetings had no responsibility for export matters.

The protocols, which were prepared by JFTC investigators and signed by the witnesses, are straightforward, readily comprehensible, narrative statements. The testimony is similarly clear, and is developed through question and answer in a manner which is generally similar to that employed to develop testimony in the U.S. legal system.[6] The diaries and memoranda are another matter. The diaries all appear to have been written solely for the diarist, with the notations written in a kind of shorthand or code which the writer presumably himself can understand, but which no one else could fully understand except for occasional excerpts. As defendants correctly note, they are a "hodge podge" of notes in which the author has not explained with any degree of clarity what he meant, to what he was referring, or even where he was when he wrote them. While plaintiffs have clarified a few of the references in the diaries by cross reference to JFTC testimony or protocols, only an infinitesimal part has been thus explained. One would have to engage in the rankest of speculation to make sense out of the vast bulk of the diaries.

One cannot tell with any certainty where entries begin and end. There are many time gaps in the notebooks or diaries, and only a portion of the "conspiratorial meetings" otherwise demonstrated to have taken place are recorded in them. There are all kinds of arrows and innumerable symbols and notations and references which are unintelligible to the translators, who report those references as "illegible." Many of them are written in a code which only a cryptographer could solve.

There is both intrinsic and extrinsic evidence that many of the diary entries reflect occurrences at meetings which the diarists did not attend, but rather about which they were informed by others. The diaries plainly contain numerous instances of second and third level hearsay. Because of the manner in which the diaries are kept, however, it is not possible to sort out which entries are based upon the diarists' personal knowledge and which are based upon hearsay. There is no evidence of regular or continuous habit on the part of any of the diarists in making their notebook entries or checking them systematically. There is no evidence that the diaries were ever communicated (or intended to be communicated) to anyone else. Given this general description, it is obvious that the admissibility of the diaries would be in sharp dispute.

---

**6.** As will be seen, however, portions of the protocols and testimony are not based on the witnesses' personal knowledge. Plaintiffs' and defendants' experts agree that the Japanese legal system does not exclude hearsay evidence in civil cases or in JFTC proceedings.

The evidentiary hearings focused only upon the important documents in the case. Some, including the diaries, were considered in enormous depth, in argument lasting hour after hour. During the course of argument, plaintiffs would advance many reasons why the particular document was authenticated, why it was a business record or an admission or a statement against interest, and so forth, referencing a host of matters in the voluminous record. The defendants would respond, and all would join in extensive colloquy with the court on each point.

Unlike our procedure in connection with the public records and reports, we did not address at the hearings matters of relevancy and its limits (F.R.E. Article IV). There are serious relevancy issues with respect to many of these documents; however, with one exception, we will defer relevancy considerations, including those under Rule 403, until our opinion on the summary judgment conspiracy motions.[7] We also defer until then the determination as to whether the plaintiffs have produced evidence *aliunde* of a conspiracy which would render their evidence admissible against coconspirators under Rule 801(d)(2)(E).[8]

The admissibility of the referenced JFTC materials has been fought on a number of battlegrounds. First, the defendants have challenged the authenticity of much of the proffered material, asserting that the plaintiffs have failed to meet their burden of establishing authentication under F.R.E. 901 and 902. Defendants urge that the notion of authentication does not implicate merely the genuineness of the subject document, but also involves additional layers of foundation. In order for a diary to be authenticated within the meaning of Rule 901, for example, defendants argue that plaintiffs must not only establish its genuineness, but also, to the extent that it is proffered as a faithful account of what transpired at meetings attended by the diarist, must establish personal knowledge by the diarist of the recorded events.

The remaining disputed issues relate to Article VIII of the FRE, the hearsay rules. The principal hearsay objection is defendants' contention that none of the diaries or memoranda are records of regularly conducted activity within F.R.E. 803(6), the "business records" exception to the hearsay rule. This contention is advanced in four aspects: (1) that plaintiffs have failed to qualify the materials as business records by the testimony of a "custodian or other qualified witness" as required by 803(6); (2) the documents do not meet the requirement that they were kept in the regular course of business and that it was the regular practice of the business to make the record; (3) the plaintiffs have failed to establish the "personal knowledge" required under 803(6); and (4) the materials are untrustworthy. Defendants characterize the diaries and memoranda as an unintelligible hodge podge of materials which inherently cannot qualify as business records, especially in the absence of a witness to explain them. Plaintiffs rejoin that a "custodian or other qualified witness" is not necessary and that they have adequately qualified the documents through circumstantial means, including analysis of the documents themselves, cross–validation by way of comparison with other documents, and the fact of production of the documents by defendants under F.R.Civ.P. 33(c) or 34.[9]

---

7. We do consider the relevancy of plaintiffs' proffer of certain documents as non–assertive conduct or verbal acts under Rule 801(a)-(c), since this matter is closely linked to the admissibility of those documents under the hearsay rule and its exceptions.

8. *See Government of the Virgin Islands v. Dowling*, 633 F.2d 660 at 665 (3d Cir. 1980); *United States v. Continental Group, Inc.*, 603 F.2d 444 (3d Cir. 1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980); *United States v. Trowery*, 542 F.2d 623 (3d Cir.

1976), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977). *Cf. United States v. Cryan*, 490 F.Supp. 1234 (D.N.J.1980).

9. This latter contention is a subject of much dispute, and runs through the foundational aspect of the evidentiary problems. The plaintiffs virtually assert an estoppel against defendants to deny the authenticity or foundation for admissibility of documents by virtue of certain interrogatory answers. The defendants respond that under the Federal Rules of Civil Procedure, their broad production of docu-

Alternatively, the plaintiffs seek admissibility of some of the diaries and memoranda under F.R.E. 801(d)(2)(B), (C) & (D) as admissions against the company which employed the declarant. In each such instance, defendants object that the requisite foundation has not been laid on the grounds that the requirements of subsections (B), (C) & (D) have not been met. Moreover, admission of the diaries is resisted on the grounds that in each case they were not communicated to anyone within or outside the company and hence do not qualify under the rules for authorized or vicarious admissions. Defendants also argue that the diaries do not constitute "assertions" within the meaning of Rule 801(a), hence cannot be admissions, and that they cannot in any event qualify as admissions because they are rambling, conjectural, and suppositious statements, rather than specific, clear, and concise ones.

Plaintiffs also seek admission of the diaries and memoranda under Rule 803(1), as present sense impressions, under Rule 803(5) as recorded recollection, and under 803(24) and 804(b)(5), the residual or "catchall" exceptions, on the grounds of their supposed truthworthiness. They apparently also assert them to be statements against interest under 804(b)(3). The defendants deny the applicability of 803(1) and 804(b)(3) to the diaries for a variety of reasons, substantive and foundational. Defendants also argue that the foundational requirements of the residual exceptions are not met (or have been waived) because of plaintiffs' failure to try to secure equally or more probative evidence by other reasonable means (i. e. depositions of the diarists and memo writers). They further assert that the materials lack the circumstantial guarantees of trustworthiness required by 803(24) and 804(b)(5). Finally, they argue that the residual exceptions are not intended to be available in situations otherwise provided for by the rules, an argument which they dub the "near miss" doctrine.[10]

The protocols are said by plaintiffs to be admissible as statements against interest under F.R.E. 804(b)(3), under the residual exceptions, and as admissions of a party opponent under 801(d)(2)(C) and (D). Plaintiffs' reliance on F.R.E. 804(b)(3) requires a showing under 804(a) of unavailability of the declarant. While there is no dispute as to Mr. Yajima's unavailability, since he died in 1968, defendants strongly contend that all of the other declarants are available because, under 804(a)(5), their attendance or testimony could easily have been procured. More specifically, defendants represent that virtually all of the diarists and persons who attended the alleged conspiratorial meetings are alive and well and still employed by their respective companies and that they have been available for discovery or trial depositions for years.

Defendants also contend that the requirements of 804(b)(3) are not met because the statements and testimony given in the JFTC proceeding were not against the pecuniary or proprietary interest of any witness whose statement of testimony is proffered, much less "so far" contrary to his interest, or "so far" subjecting him to civil or criminal liability that a reasonable man in his position would not have made the statement unless he believed it to be true, the requirement of Rule 804(b)(3). They also assert that plaintiffs have advanced no evidence of *consciousness* of contrariety to interest, another requirement of 804(b)(3). Defendants add that even if the witnesses' statements tended to subject their employers to civil or criminal liability, the posture of the employers does not matter for Rule 804(b)(3) purposes.

The JFTC transcripts are said to be admissible as former testimony under 804(b)(1), as well as under 804(b)(3) and (5) and 801(d)(2). Defendants object to the introduction of the JFTC testimony mainly

---

ments carries with it none of the consequences claimed by plaintiffs.

**10.** The questions relative to various memoranda and "minutes of meetings" produced in dis-

covery are similar to those affecting the diaries, and we do not treat these other documents separately in the Preliminary Statement.

on the grounds that they did not have a similar motive to develop the testimony by direct, cross, or redirect examination as is required by Rule 804(b)(1), since the issues in that case were very different from this one. The defendants also object to admission of the testimony under the other hearsay exceptions for the reasons already stated with respect to the protocols and diaries.

Defendants argue that neither the protocols nor the testimony are admissions because the persons making them were neither authorized to make a statement concerning the subject, nor were the statements made concerning a matter within the scope of their agency or employment. Finally, defendants oppose the notion that the residual hearsay exceptions are available in these circumstances. First they invoke the so–called "near miss" doctrine under which the residual exception cannot be invoked if the proffered hearsay fits within the framework but fails to qualify under a specific hearsay exception. Second, they challenge the trustworthiness of these materials. Third, they assert that more probative evidence could have been procured by reasonable efforts.

In connection with each of our determinations, whether under the authentication rules or the hearsay rules, we must determine whether admissible evidence is required to support the factual findings which are the underpinnings of the ruling on the admissibility of the evidence proffered. Rule 104(a) provides that in making determinations of preliminary questions concerning the admissibility of evidence, the court is not bound by the Rules of Evidence, except with respect to privileges. Under Rule 104(b), entitled "Conditional Relevancy," however, the jury rather than the court makes the ultimate determination of admissibility, hence admissible evidence is required. The parties dispute the need for admissible evidence in the qualification process not just in connection with authentication, but also at the subsequent levels, e. g. qualification as a business record. The plaintiffs argue that admissible evidence is not required in the qualification process, relying principally on 104(a), while the defendants maintain that it is.[11]

The foregoing is a catalog of the more significant legal questions which have arisen during the course of our hearings over the JFTC and cognate materials. As we have noted, similar questions have arisen in connection with the materials produced in discovery in connection with import transactions. Still other interesting legal questions have arisen which we shall enumerate as we proceed through our discussion. Because virtually all of these questions have been raised with respect to each document, the discussion of each will perforce be many layered, though we hope not labyrinthine.

We have observed about the diaries the difficulty that anyone other than the diarist would have in understanding them. It is of course obvious that there are indeed persons who could eliminate that difficulty and decipher any code–like references in any diary: either the diarist himself, or, in his absence, someone present at the meeting whose proceedings are supposedly recorded in the diary, or someone contemporaneously familiar with the content of the diary or memo and the diarist's recording practices. However, the plaintiffs, despite their role as proponents of the documents, hence bearers of the burden to qualify them, have not proffered the testimony in any form of any such person. Moreover, they have made it clear that they have no intention of doing so, before or at trial. Rather, they prefer to qualify the documents circumstantially and to offer selected (though voluminous) excerpts therefrom in connection with the summary judgment motions and at trial.

11. A related question which surfaced in the dialogue over business records is whether, if something is qualified as a business record as against one defendant, it is thus qualified as against all. Put differently, and to paraphrase Gertrude Stein, is it the case that "a business record is a business record is a business record," or must the record be qualified as against each defendant? The answer to this question of course turns on whether admissible evidence is required under Rule 104.

The litigation strategy we have described is not our supposition, but rather the plaintiffs' clear statement. Edwin P. Rome, Esquire, plaintiffs' lead counsel, has confirmed the strategy again and again. For instance, he noted during the course of the evidentiary hearings:

> I assume personally, Your Honor, whatever onus there may be about the fact that we chose quite deliberately, and I state it of record, we chose quite deliberately not to undertake to depose persons in a foreign language when we had documents that in our view documented and explicated a conspiracy to violate American law.

PTO 268 at 143–44 (June 27, 1980). There are numerous similar statements by Mr. Rome in the voluminous pretrial record in this case.[12]

This litigation strategy was maintained in the face of repeated warning from the defendants that they intended to challenge the admissibility of the diaries, memoranda, protocols, and testimony. This warning came not only during the course of our numerous pretrial conferences, but even in Melco's motion for summary judgment, filed April 1978, well before the close of discovery. In that motion, Melco spent many pages detailing the kinds of evidentiary foundational deficiencies we deal with herein. Yet the plaintiffs, all the while insisting they were ready for trial, declined to take depositions of those who might shed light upon the documents. For example, at the pretrial conference of June 14, 1978, six months before the close of plaintiffs' discovery period, plaintiffs' counsel stated to the Court:

> MR. McELROY: We said a long time ago, and Ed Rome has repeated throughout, that the plaintiffs in this case are ready to go to trial upon reasonable advance notice. We believe that discovery in the case to date is sufficient for us to get to a jury and to get a verdict. Likewise, we believe that, and it follows, that we believe we have had enough discovery, we have enough evidence to defeat a motion for summary judgment. We don't need further discovery in order to respond to [Melco's counsel] Mr. Reath's motion.

PTO 107 at 21.

Indeed, the plaintiffs were challenged on several occasions by the Court as to why, having proceeded with this case for close to a decade, and having inspected literally millions of documents, they had failed to take depositions for the purpose of laying foundation for the admissibility of the challenged JFTC materials.[13] It was pointed out that such foundational depositions are regular fare in complex cases, *i. e.*, it is the custom for counsel to take them.[14] Mr. Rome consistently responded that it was his considered decision not to do so. The plaintiffs did take depositions of some Japanese executives in connection with the motions relative to personal jurisdiction and venue.[15]

---

12. We note that plaintiffs' strategy does not reflect sloth or any lack of experience on the part of plaintiffs' counsel. Plaintiffs' lead counsel, Edwin P. Rome, is one of the ablest antitrust lawyers in the United States. A brilliant and eloquent advocate, Mr. Rome tried some of the pioneering antitrust cases in the motion picture industry and has assembled a stellar litigation team whose efforts have been prodigious, as well as of the highest quality.

13. We also sharply questioned plaintiffs as to why, given the magnitude of their claims and the existence of so much fodder for examination, they had failed to take depositions, for substantive purposes, of a single Japanese executive who attended any of the allegedly conspiratorial meetings which are at the core of the plaintiffs' case. We noted that we found it difficult to conceive of counsel pursuing that strategy in a case with purely U.S. roots.

14. Defendants have taken them in this very case. For another example see the pretrial order governing non–party discovery in the Uranium Antitrust Litigation, which makes specific reference to "depositions ... taken solely for the limited purpose of ... authenticating documents produced by such non–party." Joint Pretrial Order No. 8 at 2–3, *In Re Uranium Antitrust Litigation*, M.D.L. 342 (N.D. Ill. Nov. 13, 1979).

15. Although plaintiffs have occasionally complained about the cost and cumbersomeness (due to translation problems) of taking depositions in Japan in the Japanese language, they have abandoned any reliance upon such problems as their rationale for not taking deposi-

That foundational (or substantive) depositions of Japanese executives were feasible is demonstrated by the repeated and uncontroverted representations of defense counsel that, with the exception of Mr. Yajima who died in 1968, all of the diarists and all persons whose names were focused upon during the evidentiary hearings are alive and well in Japan, still employed by their companies, and that they have been available for depositions for many years.

It is important to note that our observations about plaintiffs' strategy are not merely retrospective, for it is clear that plaintiffs intend to call no witnesses from Japan to lay foundation for admissibility at trial either. Not only have they so conceded, but had they intended to do so they would have been obliged to list those witnesses in their preclusive F.P.S., which they have not done.

The defendants' explanation for plaintiffs' litigation strategy is not gentle. They state it in their "Memorandum of Certain Defendants in Support of their Position that Materials from the JFTC Proceeding Are Not Admissible in Evidence" (pp. 3–4) as follows:

Indeed, it seems clear that it was precisely because the Japanese materials do not constitute records of the only two matters that could make them properly probative in this case, that plaintiffs chose not to follow the normal route of taking depositions to lay a proper foundation for their introduction. Plaintiffs knew that such depositions would not be helpful to their case and that, at the end of such discovery, while they might have come up with admissible evidence regarding discussions of "bottom prices" by six companies for two years (1965–1966), they would not come up with any admissible evidence of the creation of a U.S. export invasion fund or of a United States predatory price agreement. They, therefore, seized upon the ploy of attempting to introduce the materials without proper foundations–and without any

opportunity by the other side to cross examine–and arguing to the jury that all kinds of wild inferences can be drawn from a handful of cryptic and basically incomprehensible "export references" found in materials which were obviously not written to record export activities. Since plaintiffs' direct case will last for some months, the jury will be hopelessly prejudiced by such tactics before the first of the defendants could even be heard.

In furtherance of this approach, plaintiffs adopted the tactic of piling into the FPS hundreds of thousands of materials and spuriously arguing that they are all evidence of conspiracy, so that they could create the argument that it would be extremely burdensome for them to lay foundations in the normal way, even though their PPTM and summary judgment briefs show that they are, in fact, relying on a relatively small number of such Japanese materials.

Defendants conclude with a little homily:

Fortunately, as we will demonstrate below, our Rules and evidentiary precedents, which are rooted in basic fairness and due process, do not allow for such a result. Evidence must be shown–through the establishment of a foundation in prescribed ways–to be proper and reliable before it can be thrown before a jury and begin to affect that jury's mind.

Of course, the legal aspect of their homily is quite correctly stated. And while we do not endorse defendants' rhetoric, we do note that we find a kernel of truth in defendants' evaluation of plaintiffs' litigation strategy.

The volume of material before us for consideration is staggering. We refer not only to the large number of documents (and the large volume of document pages), but also the extensive briefs and other submissions of the parties. It was represented to us during the hearings that, at that juncture, some 85 or more lawyers and paralegals were working close to full time on the case (75 for the defendants). Scores of

tions. They concede, as they must, that given the magnitude of the litigation they have insti-

tuted and maintained, cost factors provide no excuse. PTO 268 at p. 143.

memoranda relating to admissibility were filed during the hearings, and it is difficult to digest all of that material so as to write a worthy opinion. We shall do our best.

Because the plaintiffs have not produced the conventional evidentiary foundation, *i. e.* testimony of a custodian or other qualified witness, it is necessary that we evaluate the subject documents on the basis of the circumstantial factors called to our attention by plaintiffs' counsel at our evidentiary hearings. Doing so will be a tedious process, requiring us, in the case of each document, to review plaintiffs' foundation and defendants' response and then to apply the applicable legal standards to determine admissibility. We are aided materially in this regard by the post–hearing submissions of the parties which summarize the plaintiffs' foundation and defendants' response on each document, and we draw heavily upon those submissions. After a point there will be some degree of repetition in the factual patterns, enabling us to simply incorporate earlier discussion by reference. However, because of the importance plaintiffs attributed to each of the critical documents taken up in this opinion, we cannot, in fairness, unduly truncate or abbreviate our description of plaintiffs' foundational proffer or defendants' response. All of this makes for a very long opinion for which we apologize but which we cannot avoid. This is because of our obligation to the parties in this very important case to which they have devoted so much time and expense, and also to the Court of Appeals which will ultimately review it and will need a full statement of the reasons for our major rulings.

For the variety of reasons which follow, we conclude that neither the diaries, memoranda or "minutes of meetings" nor discrete portions thereof are admissible in evidence; that the JFTC testimony is admissible against the defendants in the Six Company Case only, except for any so–called "export" and war–chesting "references," which are, with minor exceptions, inadmissible; and that the protocols are admissible against the employer of the maker of the protocol.

In terms of opinion structure, we shall follow the same course here as we did in the first opinion in this series. In Part II, we shall set out the legal principles applicable to the evidentiary questions we must decide, resolving the disputes between plaintiffs and defendants on legal issues. We shall take up all of the sections of the F.R.E. claimed by the parties to have bearing upon whether any of the documents were authenticated or admissible under one of the exceptions to the hearsay rules. As will be seen, there is hardly a section or subsection of Article VIII (hearsay) or Article IX (authentication) of the F.R.E. that escaped their advocacy. The number of rules invoked is largely a function of plaintiffs' circumstantial mode of laying foundation, as opposed to doing so by direct testimony. Because of these myriad issues and the fact that some of them are of first impression, this discussion will be extremely detailed. Then, in Part III, we shall describe the documents at issue and then apply the legal principles to the documents, determining their admissibility *vel non.* Fortunately, the breadth of the Part II discussion will cut "across the board" and will obviate the necessity for further legal discussion in Part III.

II. *Rulings on Contested Legal Issues Concerning Interpretation of the Federal Rules of Evidence*

A. *Authentication*

The requirements for authenticating documents are set forth in Article IX of the F.R.E. The general provisions of Rule 901(a) provide:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

1. *The Standard for a Preliminary Ruling on Authentication Under Rule 104; Will Inadmissible Evidence Suffice?*

Plaintiffs and defendants differ as to whether admissible evidence is necessary to

authenticate evidence. Defendants say "yes" and plaintiffs say "no." We begin with the Advisory Committee's Note to Rule 901, which states expressly that the requirement of showing authentication falls in the category of "relevancy dependent upon fulfillment of a condition of fact," and is thus governed by the procedure set forth in Rule 104(b), and not that set forth in Rule 104(a). Rule 104, titled "Preliminary Questions," provides in pertinent part:

(a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

(b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.....

(e) Weight and credibility. This rule does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility.

The Advisory Committee Note to Rule 104(b) makes plain that preliminary questions of *conditional relevancy* are not determined solely by the judge, for to do so would greatly restrict the function of the jury as the trier of fact. If, for instance, there were serious questions in this case as to whether Mr. Yajima's diary was a forgery, it is obvious that a question of evidence so critical could not be decided solely by the court. Under the aegis of Rule 104(b), the judge makes a preliminary determination whether the foundation evidence is sufficient to permit a factfinder to conclude that the condition in question has been fulfilled. If so, according to the Advisory Committee Note:

... the item is admitted. If after all of the evidence on the issue is in, pro and con, the jury could reasonably conclude that fulfillment of the condition is not established the issue is for them. If the evidence is not such as to allow a finding, the judge withdraws the matter from their consideration.

In *United States v. Goichman*, 547 F.2d 778, 784 (3d Cir. 1976), the Court of Appeals formulated this principle as follows:

[T]he showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility. Rather, there need be only a prima facie showing, to the court, of authenticity, not a full argument on admissibility.

Thus, once a *prima facie* showing has been made to the court that a document is what its proponent claims, it should be admitted. At that point the burden of going forward with respect to authentication shifts to the opponent to rebut the *prima facie* showing by presenting evidence to the trier of fact which would raise questions as to the genuineness of the document.[16] The required *prima facie* showing of authentication need not consist of a preponderance of the evidence. Rather, all that is required is substantial evidence from which the trier of fact might conclude that a document is authentic. As the court in *Goichman, supra*, stated:

[I]t is the jury who will ultimately determine the authenticity of the evidence. not the court. The only requirement is that there has been *substantial evidence* from

---

**16.** Much is made by the plaintiffs of the fact that defendants, despite the "hard line" taken by some of them on matters of authentication, have not come forward with any evidence to refute plaintiffs' showing with respect to various documents. It is in fact true that defendants have come forward with no evidence countering plaintiffs' claim of authentication of the various documents. However, that does not alter the plaintiffs' burden.

which they could infer that the document was authentic.

*Id.* (emphasis added).[17]

■ The plaintiffs contend that in determining whether an adequate *prima facie* showing has been made, the court may consider inadmissible evidence. We disagree. Under Rule 104(b), authentication must be established by the "introduction of evidence." By using this language, the Rule plainly contemplates that the jury's determination of authenticity will be made only on the basis of admissible evidence. We find nothing in either Rule 104 or the Advisory Committee Notes to suggest that the jury may consider inadmissible evidence in this regard, except to the extent that evidence may be admitted "subject to" the introduction of subsequent (admissible) evidence of its authenticity.

■ So then, while the court's power to "consider" inadmissible evidence under Rule 104(a) is clear, the substantive determination which the court is required to make on the issue of authentication is whether *admissible* evidence exists which is sufficient to support a jury finding of authenticity. For it would be a pointless exercise for a judge to rely upon inadmissible evidence to fulfill the substantial evidence requirement when the trier of fact can only consider *admissible* evidence that a proffered document is authentic.[18] Accordingly, we hold that under Rule 104(a), Rule 104(b), and *Goichman,* our task in ruling on authenticity is limited to determining whether there is *substantial admissible evidence* to support

a finding of authentication by the trier of fact.[19]

Since only admissible evidence can form the basis for the determination of authentication, the degree to which plaintiffs rely on using some of the documents they have submitted to authenticate other documents creates problems of circularity, and in some cases it is more logical to determine other aspects of admissibility before reaching the 901 determination. This will be considered *infra* with regard to specific categories of documents.

### 2. The Notion of Authentication and the Scope of Rule 901(a); is Authenticity More Than Mere Genuineness?

■ Another important issue addressed in argument and briefs is the intended scope of Rule 901(a) and, in particular, the meaning of the last phrase which defines authentication as a finding "that the matter in question is what its proponent claims." In contrast to the position of the plaintiffs, who equate authentication with genuineness, the defendants contend that the scope of authentication is determined by the claims made by the proponent of a document and encompasses all of what the proponent "*must* claim it is in order to use it as he wishes to"[20] (emphasis in original). They argue that the subject documents' "logical status as evidence, and hence their authenticity, could be established only by showing that they are accurate and reliable

17. Although the defendants have offered no evidence to rebut the authenticity of the documents, we need not consider any such evidence at the preliminary stage. The substantial evidence standard, unlike a preponderance standard, requires no balancing of the evidence. The Court must only conclude that a prima facie showing has been made in order to admit the documents. It is for the trier of fact to consider the rebuttal evidence and balance it against the authenticating evidence in order to arrive at a final determination on authentication.

18. Weinstein notes in his discussion of Rule 901 that:
 since the jury will not be able to evaluate the authenticity of a document unless it has ad-

missible testimony before it, the court should consider whether the jury could find the document authentic before it admits it on the basis of inadmissible evidence.
5 Weinstein's Evidence ' 901(b)(1)[01] at 901–22 (1978) [hereinafter cited as "Weinstein"].

19. As a corollary of this holding, we acknowledge that some documents may be authenticated only as against certain parties, since the authenticating evidence for those documents may be admissible only against certain parties.

20. Defendants' Memorandum Concerning Admissibility Under Fed.R.Evid. 104 and Fed.R. Evid. 901, p. 3.

accounts ...." [21] (of the allegedly conspiratorial meetings reported), otherwise "they are not probative" [22] and thus not what their proponent claims. Since authentication is but a "special aspect of relevancy," Advisory Committee Note to Rule 901(a), this is an appealing argument. After all, the plaintiffs claim that Yajima's diary should be admitted to portray the agreements made at certain meetings. What does it matter then that the diary is not a forgery, if it is not an accurate and reliable account of what transpired at the meetings Yajima purported to record?

The problem with defendants' argument is that it reads the language of 901 to subsume nearly all of the issues involved in many cases in which the issue may arise. For example, the proponent claims that many of the documents under consideration here are "business records." As the Advisory Committee Notes to 901 make clear, however, this is a completely separate determination which must be addressed outside the scope of the authentication inquiry. [23] While the Advisory Committee Notes state specifically that authentication is an aspect of conditional relevancy, they are also quite clear that it is but one kind of conditional relevancy, [24] and does not subsume all of the evidentiary foundation which must be established in order to show that a document is relevant evidence:

Authentication and identification represent a *special aspect* of relevancy. Thus a telephone conversation may be

irrelevant because on an unrelated topic or because the speaker is not identified. The *latter aspect* is the one here involved. [25]

(emphasis added) (citations omitted).

The specific illustrations under subsection (b) further support a narrow interpretation of authentication. For example, authentication can be established by expert or non-expert opinion on handwriting, F.R.E. 901(b)(2), a method which would do nothing to establish a document as the "accurate and reliable account" that defendants claim it must be in order to authenticate it.

While, as defendants urge, different showings are required in accordance with the *type* of evidence presented, in all of the cases and examples which they have cited authentication involves establishing the origin or authorship of an item, or the connection of an item to a particular individual or party. [26] In *Rhoads v. Virginia–Florida Corporation*, 476 F.2d 82 (5th Cir. 1973), upon which defendants place their strongest reliance, the authenticity of the drawings at issue had been conceded by the opposing party. The court there pointed out that:

authentication of the documents *merely established* their authorship, the proof of some human's "personal connection with a corporal object." 7 Wigmore On Evidence § 2129, at 564 (3d ed. 1940).

476 F.2d at 85 (emphasis added). The court then proceeded to discuss additional requirements for admissibility and suggested that the drawings must either be "verified"

---

**21.** *Id.* p. 4.

**22.** *Id.* p. 6.

**23.** Plaintiffs also claim that the documents establish the existence of a conspiracy, an issue certainly not reached in the authentication determination.

**24.** The Advisory Committee Notes to Rules 602 and 1008 state, for example, that a witness's personal knowledge of a matter under 602 or matters of other evidence of contents of writings, documents or photographs under Rule 1008(a), (b) and (c), are also questions of conditional relevancy.

**25.** Advisory Committee Notes to Rule 901(a).

**26.** *Medley v. United States*, 155 F.2d 857 (D.C. Cir.) *cert. denied*, 328 U.S. 873, 66 S.Ct. 1377, 90 L.Ed. 1642 (1946), cited by the defendants, does not even mention authentication, and contains no consideration of the issues involved here. Similarly there is no mention or indication that authentication is an issue in *Lathrop v. Henkels & McCoy, Inc.*, 351 F.Supp. 1052 (E.D.Pa.1972). *Coughlin v. Capital Cement Co.*, 571 F.2d 290 (5th Cir. 1978), cited by defendants, is an example of a case explicitly decided on the basis of the requirements of 803(6), but using the term "authentication" to refer to the foundation requirements under that rule. We feel that it is better practice, in order to avoid semantic confusion, to confine the use of the term "authentication" to requirements under rule 901.

by testimony of a witness, citing 3 Wigmore On Evidence § 790, at 218, or must qualify as an exception to the hearsay rule.[27] As we have noted *supra*, a finding of authentication does not establish admissibility, and any other applicable requirements must also be met.

We conclude that, notwithstanding the apparent sweep of 901, created by its use of a rather expansive locution, *i. e.*, the prescription that authentication is satisfied by evidence sufficient to support a finding that the matter in question is "what its proponent claims," the notion of authentication is a narrow one, akin to the notion of genuineness. The other foundation requirements should not be simply subsumed under the authenticity terminology, but should remain analytically distinct. We find other support for this conclusion. First, the Advisory Committee Note, subdivision (a) provides:

Also, significant inroads upon the traditional insistence on authentication and

identification have been made by accepting as at least *prima facie genuine* items of the kind treated in Rule 902, *infra*. (emphasis added). Moreover, a review of the annotations under Rule 901 confirms this view, for the cases discussing the Rule have a similarly limited scope. *See* S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 651–52 (1977) and 245–47 (1980 supp.) [hereinafter cited as "Saltzburg"]. Thus such foundation issues as personal knowledge of the declarant, which defendants urge us to treat as authentication issues, will be dealt with separately under the appropriate rules.

### 3. *Methods of Authentication*

Rule 901(b) lists several examples of methods of authentication which would meet the requirements of 901(a).[28] The Advisory Committee Notes for this subsection state that these examples are not intended to exhaust all the possibilities, "but are

**27.** The court in *Rhoads* concluded that since the proffered drawings did not qualify as either official written statements or as business records they had been properly excluded, 476 F.2d at 86.

**28.** Rule 901(b):

(b) **Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) **Testimony of witness with knowledge.** Testimony that a matter is what it is claimed to be.

(2) **Nonexpert opinion on handwriting.** Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

(3) **Comparison by trier or expert witnesses.** Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.

(4) **Distinctive characteristics and the like.** Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

(5) **Voice identification.** Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

(6) **Telephone conversations.** Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self–identification, show the person answering to be the one called, or (B) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

(7) **Public records or reports.** Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept.

(8) **Ancient documents or data compilation.** Evidence that a document or data compilation, in any form, (A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered.

(9) **Process or system.** Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

(10) **Methods provided by statute or rule.** Any method of authentication or identification provided by Act of Congress or by other rules prescribed by the Supreme Court pursuant to statutory authority.

meant to guide and suggest, leaving room for growth and development in this area of the law."

In their endeavors to authenticate the matters before us, the plaintiffs place primary emphasis on 901(b)(4), Distinctive Characteristics. They also assert, however, that the testimony and protocols from the JFTC proceedings may provide evidence of authenticity under 901(b)(1) (Testimony of a Witness with Knowledge), and that since some of the documents fall just short of the age requirements under 901(b)(8) (Ancient Documents), this subsection in conjunction with other circumstances would be sufficient to fulfill the 901(a) requirements. Once authenticity has been established for one document, 901(b)(3) may be used to authenticate other documents of a similar type.

■ Rule 903 (Subscribing Witness' Testimony Unnecessary) and the illustrations given under 901(b) make it clear that *testimony* is not essential to establish authenticity, and, as McCormick states, "authentication by circumstantial evidence is uniformly recognized as permissible."[29] Elements which tend to establish authenticity may be found both in Rule 901 itself, in the Advisory Committee Notes, and in the cases which we will outline in the following discussion. One such element is the source of a particular document, *i. e.*, the method or place of its discovery.

### a. Source of the Document

■ Plaintiffs urge that the defendants' production of certain of the documents in answer to interrogatories under Rule 33(c) is itself sufficient to establish them *ipso facto* as authentic. We disagree with this reading of the Rule.[30] Given the breadth of the discovery rules and the broad requirements for production, we feel it would undermine the liberal intent of the those rules to interpret such production as an admission of authenticity in the absence of a specific assertion by the producing party regarding the nature or authorship of the documents produced.

■ The production of the documents by the defendants may, however, provide circumstantial evidence of authenticity. McCormick notes that a *prima facie* showing of authenticity is made by the emergence of a document from public custody. He concludes that, while the circumstances of private custody are too varied to warrant an expansion of the rule in every case, "proof of private custody, together with other circumstances, is frequently strong circumstantial evidence of authenticity."[31]

In *Alexander Dawson, Inc. v. N.L.R.B.*, 586 F.2d 1300 (9th Cir. 1978), the Ninth Circuit upheld the decision of an administrative law judge admitting job application forms even though there had been no testimony regarding who had filled out the particular applications, and no witness could testify to a specific chain of custody. The circumstances surrounding their discovery,[32]

**29.** McCormick's Handbook on the Law of Evidence § 222 (2d ed. 1972) [hereinafter cited as "McCormick"]. See also *United States v. Natale*, 526 F.2d 1160 at 1173 (2d Cir. 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976); *United States v. Smith*, 609 F.2d 1294, 1301 (9th Cir. 1979).

**30.** We discuss this point more extensively at p. 1236, *infra*, in connection with the "business records" aspect of this opinion.

**31.** McCormick § 224 at 552. McCormick cites *United States v. Imperial Chemical Ind.*, 100 F.Supp. 504 (S.D.N.Y.1951), an anti–trust case where two unsigned documents were admitted. Though there was no proof of their authorship, they were from defendant's files, the subject matter was corroborated by other evidence, and the documents gave indications that they

were prepared by responsible agents of defendant. The court stated that:

> [i]ndeed, the only logical explanation of their appearance in the ICI files if they are not authentic, is that the documents are forgeries, or spurious. Such an explanation is rejected as entirely improbable.
>
> However, the weight to be given the documents, particularly to the second, is necessarily decreased. While they bear every indication that they were prepared by persons in a position to know of the matters set down, their anonymity must go to the weight to be given them. With this caveat, the two documents will be received.

**32.** Applications had been taken from the company's premises by two employees (without authority) and given to the union, who in turn

considered along with their contents[33] was held adequate to authenticate the forms. In *United States v. Natale*, 526 F.2d 1160, 1173 (2d Cir. 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976), a notebook that had been seized during the defendants' arrest for extortion was admitted at trial. The Court of Appeals enumerated among the facts supporting its authenticity: (1) the presence of the defendants at the office where the notebook was discovered; (2) that defendants had held numerous meetings with a witness in that office; and (3) that one of the defendants admitted that the office was his. This, together with evidence supplied by the notebook's contents, *see infra*, was sufficient to allow its admission into evidence.[34] We will follow the *Dawson* and *Natale* courts by treating the circumstances of their production as one element of circumstantial evidence which tends to authenticate the documents produced by the defendants.

### b. Characteristics of the Document Itself

The characteristics of the document itself are also a basis for establishing authentication, Rule 901(b)(4). The last phrase of the rule indicates, however, that characteristics of a document must be considered "in conjunction with circumstances." Although Weinstein states that a document "can be authenticated by its contents alone," it is clear, from the examples used, that he "means in light of surrounding circumstances." ¶ 901(b)(4)[01] at 901–46. All of the characteristics mentioned in 901(b)(4) are also subject to the overriding requirement of "distinctiveness" under that example.

█ The first characteristic mentioned in 901(b)(4) is "appearance." Weinstein gives as examples of the types of appearance the courts may wish to consider: a postmark, a return address, a letterhead, a signature even where affixed by a rubber stamp, typing or form which corresponds to usual practice.[35] The aspect of the document's appearance which is most relevant with respect to the JFTC documents is the fact that many of them are marked with a particular person's name in the form of a "chop," a Japanese seal which contains a stylized rendition of a person's name and is sometimes used in lieu of a signature. During the discussion of authenticity of the so-called MITI statement,[36] proffered by defendants, they urged that the "chop" affixed to the document made it the legal equivalent of a signed document. Though this contention was resisted at that time by plaintiffs, we conclude that a "chop" should be given weight equivalent to a signature. We recognize that a "chop," like a signature, may not always be genuine. Furthermore, many people with the same surname may have a common "chop," hence the "chop" does not in every case indicate authorship. The particular use of a "chop" will be considered with respect to the individual document upon which it appears. Many of the import transaction documents also have distinguishing characteristics, particularly letterheads.

A second characteristic mentioned in 901(b)(4), again subject to the distinctiveness requirement, is the contents, or substance, of the document. Contents have been used to establish authentication in a variety of ways. In *United States v. Smith*, 609 F.2d 1294 (9th Cir. 1979), hotel records of defendant's registration and charges incurred were introduced. Included in the

---

gave them to the General Counsel for the N.L.R.B.

**33.** Discussed *infra*.

**34.** See also *United States v. Zink*, 5 F.Evid.Rep. 1131, 612 F.2d 511 (10th Cir. 1980); *United States v. King*, 472 F.2d 1 (9th Cir.), *cert. denied*, 414 U.S. 864, 94 S.Ct. 37, 38 L.Ed.2d 84 (1973).

**35.** Weinstein, ' 901(b)(4)[02], 901 -51 through 901 54.

**36.** The "MITI Statement" is a document which was transmitted to the court by the Japanese Ministry of International Trade and Industry ("MITI") via diplomatic channels. The defendants urge that it supports their "sovereign compulsion" defense, an aspect of the summary judgment motions which we have not yet decided.

evidence linking the defendant to the records were independent corroboration of his presence at meetings in the hotel, the use of names used by defendant in signing records, and the use of the address which appeared on defendant's business card.[37] In *Natale, supra,* the court similarly relied upon the corroboration of the contents of the notebook involved by independent evidence. One of the entries referred to a loan made to a witness in the case, and served to authenticate the document.

In *Goichman, supra,* 547 F.2d at 783, an unsigned document entitled "History of Children's Assets," which listed the defendants' expenditures, had been produced as part of the docket record in a prior (domestic relations) proceeding. The contents of the document were corroborated by defendant's complaint in that proceeding, and the words "I" and "my" were used in conjunction with the first names of the defendant's three children. The Third Circuit held that this evidence of contents was sufficient to establish a prima facie showing of authentication.

■ If the subject matter of a document refers to knowledge which only one individual would have had, it is sufficient to authenticate the document. 7 Wigmore on Evidence § 2148 (3d ed. 1940). Weinstein disagrees with the insistence on knowledge by only a single person, however, as he states, "the force of the inference decreases as the number of people who know the details . . . increases." Weinstein, ¶ 901(b)(4)[01] at 901–46 and 47. In *United States v. Wilson,* 532 F.2d 641 (8th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), the prosecution sought to introduce a notebook which contained records of drug transactions. Though it was admitted that the author was unknown, the Court of Appeals upheld the authentication of the notebook on the grounds that only those persons acquainted with the particular transactions involved could have written the entries.[38]

■ Some of the documents involved are said to contain information allegedly known only to a limited number of individuals who attended various meetings. The plaintiffs' own showing demonstrates that the number was not all that limited. However, to the extent that information contained in documents is corroborated by other admissible evidence, and is known to a limited number of individuals, these factors may be considered in determining whether sufficient evidence exists to authenticate it.

c. *Testimony and Interrogatory Answers*

Testimony before the JFTC, to the extent that it is found admissible, may also be used to authenticate other documents. Rule 901(b)(1) specifically holds testimony sufficient to establish authenticity. Where the testimony does not deal directly with any particular document offered, it may still be helpful in proving authenticity circumstantially. Weinstein ¶ 901(b)(1)[01] at 901–22.[39] We will have occasion below to consider JFTC testimony both as circumstantial and as direct evidence of authenticity.

The answers to interrogatories may also be considered as "testimony" where they directly identify a document's source or author, corroborate the contents of particular documents, indicate the presence of a purported author at a meeting or a meeting's limited attendance, or otherwise establish the document's authenticity. While Weinstein notes that Interrogatories, Requests for Admissions and Stipulations "should be relied upon to dispose of most authentication problems before trial," ¶ 901(b)(2)[01]

---

**37.** The court in *Smith* noted that the objections concerning the identity or competency of the individual who prepared the records were relevant to evidentiary weight or credibility, but not to authenticity.

**38.** The activities were characterized by a "code" and the writer used "nicknames" of individuals involved in the conspiracy. 532 F.2d at 645.

**39.** Weinstein states that "[t]he witness's testimony need not, in and of itself, suffice to authenticate . . ." but should, however, be considered "so long as it is relevant on the issue of identification."

at 901–23, the questions and answers in most of the interrogatories here are not specific enough to constitute a concession of authenticity.

■ Since we have ruled that documents must be authenticated by admissible evidence, the admissibility of former testimony and the interrogatory answers themselves is an additional issue to be determined. Since the interrogatories may not be admissible against all defendants unless the plaintiffs' conspiracy theory is accepted, this presents a particularly difficult situation.[40] Where authentication depends on the admissibility of an interrogatory, which itself depends on the plaintiffs' establishment of a conspiracy, the documents may be admitted "subject to" such a showing.

### d. Similarity to Other Authenticated Documents

The example in 901(b)(3) allows the trier of fact to compare a document to another authenticated document in order to establish its authentication. In *Dawson, supra*, the employment applications involved were "on the same form" as applications whose authenticity was conceded. This, in conjunction with the circumstances of production, was considered sufficient to establish their authenticity, 586 F.2d at 1303. Many of the documents involved here are members of "groups" of documents, sharing similar characteristics. The authentication of one such document may serve as the basis for authenticating the others in a group on the basis of comparison, initially by the court, and ultimately by the trier of fact.

### e. Age of the Document

■ A final element to be considered in our determination of authenticity is the age

of the document. Rule 901(b)(8)(C) sets twenty years as the age requirement for "Ancient Documents." None of the documents now before us is twenty years old, although some may reach that age by the time of trial.[41] While Weinstein urges that this figure should not be regarded as an absolute necessity,[42] it is itself ten years shorter than the period under common law.[43] This is explained in the Advisory Committee Notes as being due to a shift in the underlying rationale for the rule from an emphasis on the unavailability of witnesses to an emphasis on the unlikeliness of a fraud over such an extended time period. While the Notes state that any time period is bound to be arbitrary, we feel that in the present case some additional indicia of authenticity are needed where all of the documents fall short of the twenty year limit.

### 4. Self–Authentication Under Rule 902

Rule 902 provides that certain documents are "self–authenticating" to the extent that no extrinsic evidence of authenticity is needed. Although 902(3) lists Foreign Public Documents as being of this type, the Advisory Committee Notes to 902(4) make it clear that 902(3) applies to the originals of documents and that 902(4) is the section applicable to copies. Under this section the copy must be certified as correct by either the custodian or other authorized person, and this certification must itself conform to Rule 902(3) in order to be received.[44]

■ None of the documents involved here were obtained by plaintiffs from official custody or were accompanied by this type of official certification, and thus none are "self–authenticating" under Rule 902. Since the method of authentication provided in Rule 902 is not exclusive, however, plaintiffs' failure to procure certified copies

---

**40.** Under F.R.E. 801(c), an interrogatory answer is hearsay except as to the party furnishing the answer, as to whom it is not hearsay under Rule 801(d)(2). While a deposition by written questions under F.R.Civ.P. 31 may be used against all parties present or represented or with reasonable notice, under F.R.Civ.P. 32(a), no such depositions were taken here.

**41.** It should be noted, however, that the twenty year age period for a document is dated from "the time it is offered" according to 901(b)(8).

**42.** Weinstein ¶ 901(b)(8)[01] at 901 101.

**43.** Advisory Committee Notes to Rule 901(b)(8).

**44.** Advisory Committee Notes to Rule 902(4).

does not bar authentication of the documents under Rule 901.

### 5. "Best Evidence" Rule

An issue closely related to authentication is set forth in Article X, often referred to as the "Best Evidence Rule." Rule 1002 states that the original of any writing is required, "except as otherwise provided in these rules . . ."

One such exception is stated in Rule 1003, which admits "duplicates"[45] to the same extent as the originals, provided there are no genuine questions as to authenticity and it would not be "unfair" to admit them in the circumstances. The documents involved are all duplicates and would satisfy these conditions. However, the protocols and testimony which plaintiffs offer may be viewed as public records, and there is authority which suggests that Rule 1005 supersedes Rule 1003 with respect to public documents.[46]

Rule 1005 deals specifically with Public Records, and provides two alternative methods of satisfying the "best evidence" requirements for copies of documents falling within its scope. The first is by providing a copy certified as correct in accordance with Rule 902, which as we noted *supra* has not been done with respect to any of the documents under consideration here. The second method is by presenting testimony of a witness who has compared the copy with the original. Only if neither of the foregoing can be obtained by "reasonable diligence" may other evidence of the contents be given. The plaintiffs have offered no testimony on the correctness of the copies offered, and have repeatedly asserted their intention to rest on their documentary evidence. Since "reasonable diligence" has not been exercised, the final clause of the rule is also inapplicable.

This section is one which, it turns out, was not invoked by the parties. Rather, we called it to the parties' attention as we were surveying the law after the conclusion of the evidentiary hearing, concerned that, in the welter of argument, it had in fact been invoked directly or indirectly. By letter, we inquired of the parties about its applicability. Plaintiffs replied in their letter to the Court of August 5, 1980, that:

> defendants have not objected to the admissibility of the protocols or transcripts of testimony, or any other public records (or any other document for that matter) on the grounds that they are not true and correct copies of original records lodged elsewhere.

A review of the record reveals that this contention is correct. Melco has argued that many of the documents were "copies that merely happened to be in the possession of the party" and in their July 12, 1980 brief, they listed among their objections to the testimony and protocols several points relating to the absence of certification or authenticating testimony, which are listed in our discussion of the testimony in Part VIII-B, *infra.* At no time have any defendants invoked Rule 1005, however, and none of the other defendants have made even passing reference to the issues involved under Article X. We therefore conclude that, despite the fact that defendants might have prevailed on the point, any potential issues under Rule 1005 have been waived. *See* Rule 103(a)(1). We will consider Melco's objection under the standards of Rule 901 which we have explained *supra.*

Melco has also urged that the testimony is inadmissible under Fed.R.Civ.P. 80(c), which provides:

> (c) Stenographic Report or Transcript as Evidence. Whenever the testimony of a witness at a trial or hearing which was stenographically reported is admissible in evidence at a later trial, it may be proved

---

**45.** "Duplicate" is defined in Rule 1001, and would include the photocopy reproductions involved here.

**46.** Saltzburg states that it is "an obvious point" that Rule 1003 is preempted by Rule 1005. Saltzburg at 255 (1980 supp.). Weinstein also

concludes that 1003 is preempted. 5 Weinstein ' 1005[01] at 1005-4 (1978). *Cf. Amoco Production Co. v. United States,* 619 F.2d 1383, 1389-91 (10th Cir. 1980), *rev'g* 455 F.Supp. 46 (D.Utah 1977).

**1228**

by the transcript thereof duly certified by the person who reported the testimony. Plaintiffs have provided no certification for the JFTC testimony they have proffered. There is little case law or commentary on this rule. Rules 80(a) and (b), which dealt with the appointment of stenographers to take evidence in U.S. federal courts, were abrogated by 1946 amendments to the Rules because of the Official Court Reporter Act of 1944, 28 U.S.C. § 753. *See* 7 Moore's Federal Practice Part 2 ¶ 80.01 at 80–2. Because of its original context, we believe that Rule 80(c) should be read to apply only to evidence which was stenographically reported in the United States federal courts. *See id.* ¶ 80.02 at 80–7 (rule should now be read in conjunction with Official Court Reporter Act of 1944). Ac-

cordingly, the rule has no application to the testimony before us, which was recorded in Japan.

Having concluded our discussion of authentication and related matters, we turn to what are probably the most hotly contested evidentiary points, those relating to foundation requirements under 803(6), the business records exception to the hearsay rule.

### B. *Qualification as a Business Record Under Rule 803(6)*

 It is conceded that the numerous diaries, memoranda and letters considered during the pretrial evidentiary hearings are hearsay [47] and that to be admitted they must qualify under one of the exceptions to the hearsay rule.[48] The prin-

---

**47.** Plaintiffs contend that the documents are not hearsay because they are admissions under Rule 801(d)(2). We consider this contention in its legal aspects in Part II C, *infra*. There are also some instances where the plaintiffs purport to offer documents for a non–hearsay purpose, *i. e.*, not to prove the truth of the matters contained herein. This proffer is made primarily with respect to certain of the diary entries, and the Japan Victor document. The plaintiffs contend that these notations are "verbal acts" which are evidence of the conspiracy merely by virtue of their having been made, regardless of the truth or falsity of the matters asserted therein. They also contend that certain notations in the diaries which might otherwise be "internal hearsay," *see* part II–G, *infra*, are similarly offered not for the truth of the matter asserted therein, but simply for the fact of their having been made, thereby overcoming any internal hearsay objection. *See generally United States v. Zenni*, 492 F.Supp. 464 (E.D.Ky.1980). We discuss these matters *infra*.

**48.** In addition to the hearsay exception of Rule 803(6), which we consider in this section, plaintiffs suggest that two other exceptions listed in Rule 803 are applicable to some or all of the documents: 803(1) and 803(5). These exceptions permit the admission into evidence of:

 (1) *Present sense impression.*–A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter.

 . . . . .

 (5) *Recorded recollection.*- A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the

matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

There are three principal requirements of Rule 803(1). The first requirement is that the declarant personally perceived the event described. *See* 4 Weinstein ' 803(1)[01] at 803–74 (1979). The second requirement is that the statement be an explanation or description of the event, rather than a narration. *See id.* at 803 76. The third and perhaps the most important requirement is contemporaneity of the statement and the event described. The reason for the exception for present sense impressions, as stated by the advisory committee, is "that substantial contemporaneity of event and statement negative the likelihood of deliberate or conscious misrepresentation." In *United States v. Narciso*, 446 F.Supp. 252, 285--288 (E.D.Mich.1977), a period of two hours between the event and the statement was found to be ample time for reflection, and the statement was excluded for lack of contemporaneity. In *Hilyer v. Howat Concrete Co., Inc.*, 578 F.2d 422 (D.C.Cir.1978), a period of fifteen to forty–five minutes between the event and the statement was too great to allow admission of the statement under 803(1). And in *Wolfson v. Mutual Life Insurance Co. of New York*, 455 F.Supp. 82 (M.D.Pa.), *aff'd mem.*, 588 F.2d 825 (3d Cir. 1978), the district court stated that statements made several hours after a meeting probably would not be sufficiently contemporaneous.

The requirements of Rule 803(5) are apparent from its language. First, the rule itself, as well as the Advisory Committee Note, the legislative history, and all commentators, speaks of "the witness," in contrast to the other hearsay ex-

cipal exception upon which the plaintiffs, as proponents of the evidence, rely is F.R.E. 803(6), the business records rule.[49] The Rule creates an exception from the hearsay rule for evidence which meets the following requirements:

> (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstance of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

 It is clear that business records need not be in a particular form to be admissible under Rule 803(6), which refers broadly to "a memorandum, report, record, or data compilation, in any form." There are cases which hold, for example, that personal diaries or appointment books which are kept regularly for a business purpose may be admissible under Rule 803(6). *E. g., United States v. McPartlin,* 595 F.2d 1321 (7th Cir.), *cert. denied,* 444 U.S. 833, 100

S.Ct. 65, 62 L.Ed.2d 43 (1979). We thus reject defendants' position that a personal diary, though kept for business purposes, is per se inadmissible. Other cognate documents which have been found admissible are notes made in the course of negotiations for a business opportunity, *Magnus Petroleum Co., Inc. v. Skelly Oil Co.,* 446 F.Supp. 874, 882–83 (E.D.Wis.1978), and a customer book kept by a member of a heroin importation conspiracy. *United States v. Baxter,* 492 F.2d 150, 164 (9th Cir. 1973), *petition for cert. dismissed,* 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). Of course, a diary may fail to qualify as a business record. In *Hospital Television Inc. v. Wells Television, Inc.,* 462 F.2d 417 (8th Cir.), *cert. denied,* 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972), Mr. Justice Clark, sitting specially, upheld the District Court's refusal to admit a diary of longhand notes into evidence under 28 U.S.C. § 1732(a) on the grounds that it was not a business record.

1. *The Impact of Rule 104(a); Will Inadmissible Evidence Suffice?*

 In determining whether the diaries and memoranda qualify under 803(6), we must, at the threshold, confront the question whether such a determination depends upon admissible evidence. Defendants submit that it does; plaintiffs submit that it does not. Neither the Advisory Committee Notes nor any of the commentators have specifically addressed the question whether determination of 803(6) status comes under 104(a), in which case it could be made on

---

ceptions, which speak of "the declarant." We think it plain that in the contemplation of its drafters and of Congress, Rule 803(5) applies only to the recorded recollection of a witness *who is present and testifies, and not to the* recorded recollection of an absent declarant. Moreover, the proponent of the statement must show that it was made or adopted at a time when the subject matter was fresh in the witness's memory, and that the witness now has insufficient recollection to enable him to testify fully and accurately. *United States v. Williams,* 571 F.2d 344 (6th Cir.), *cert. denied,* 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978); *United States v. Judon,* 567 F.2d 1289, 1294

(5th Cir. 1978). If these requirements are not met, the evidence must be excluded. *Id.*

Although the plaintiffs have invoked each of these sections in support of their claims of admissibility of certain documents, in no case have they laid the necessary foundation (that which we have just described), hence we shall not burden the record by further reference to these rules.

**49.** The use of the term "business records" is imprecise. Rule 803(6) uses the phrase "records of regularly conducted activity." However, because "business record" is a widely used and convenient shorthand version, we shall utilize it throughout this opinion.

the basis of inadmissible evidence, or whether it is subject to the provisions of 104(b), which on our reading requires admissible evidence. *See* p. 1219, *supra* (quoting Rule 104). Rule 104(b) applies by its terms only "[w]hen the *relevancy* of evidence depends on the fulfillment of a condition of fact" (emphasis added). The question is a close one, but with the qualification hereinafter stated, we conclude that hearsay exceptions do not raise questions of *relevancy* conditioned on fact.

■ The term "relevancy" as used in the Federal Rules of Evidence does not encompass all objections to the admissibility of evidence. Evidence may be quite relevant to the issues in a lawsuit, but still be barred as hearsay, or for other reasons. Conversely, evidence may be otherwise admissible, but barred as irrelevant. *See* Seidelson, *Conditional Relevancy and Federal Rule of Evidence 104(b)*, 47 Geo.Wash.L. Rev. 1048, 1059–1062 (1979). The Advisory Committee Note to Rule 104(a) gives several examples of evidentiary issues which are *not* matters of conditional relevancy–unavailability of a hearsay declarant and the against–interest nature of a hearsay declaration. Thus it is clear that Rule 104(b) does not generally apply to determinations of the applicability of the hearsay exceptions.

■ The determination of business record status, in particular, is one which, before the Rules, was always for the court to make; indeed, we know of no instance where that matter has been submitted to the jury. We conclude that this determination is still for the Court to make in accordance with Rule 104(a), and that we are not bound by the Rules of Evidence in making the 803(6) determination. Therefore, we may rely upon evidence which is wholly inadmissible, or is admissible only against certain parties, in determining whether or not the proffered documents meet the requirements of Rule 803(6).

■ Since the determination of business record status will not be submitted to the

jury at any point, there is no reason for us to treat our ruling on admissibility under 803(6) as a "prima facie" test. *Cf.* discussion at pp. 1218–1219, *supra.* Consequently, there is no reason to apply a lowered standard of proof to the determination. *Cf. id.* As a result, we will decide the questions relating to business record status on the basis of the preponderance of the evidence.[50]

■ As a corollary of this ruling, we hold that if the proffered documents qualify as business records, they will be admissible against all parties. The defendants have argued that a document which is qualified as a business record by evidence which is admissible only against one defendant would itself be admissible only against that defendant. Our ruling that 104(b) does not apply to 803(6) undercuts defendants' position, since the qualification of a document under 104(a) may be based on evidence which is not admissible against the party against whom the document is offered.

The defendants make forceful arguments against this position. They note, correctly, that they are entitled to attack the weight of any documents offered as business records before the jury by showing the lack of regularity of their preparation or other indicia of untrustworthiness. If admissibility as a business record is predicated upon inadmissible evidence, they submit that they should then be permitted to counter it with other inadmissible evidence. Coming full circle, they doubt the viability of the latter proposition, hence they question the validity of the former. Acknowledging the force of this position, we conclude that a strong argument can be made that the "custodian or other authorized witness" provision of 803(6) is tantamount to a requirement of qualification of a business record by admissible evidence.

■ While the question is not free from doubt, we nonetheless conclude that 104(a) applies in this area and that qualification as a business record may be based upon inadmissible evidence.

50. *See* Saltzburg at 502 (court should "find" facts relevant to hearsay exceptions).

2. *The Requirement That The Records Be Kept In the Course of A Regularly Conducted Business Activity And That It Was The Regular Practice of That Business Activity to Make the Record.*

 Rule 803(6) requires not only that a document must be "kept in the course of a regularly conducted business activity," but also that it must be "the regular practice of that business activity to make the memorandum, report, record, or data compilation" (we refer to this hereinafter as the "regular practice" requirement). It is the regular practice requirement which is mainly at issue. We address it at length because of the significant dispute between plaintiffs and defendants as to its meaning.

Defendants' approach to the language is literal, and rigorous. In defendants' submission, the rule says just what it means and means just what it says because of its underlying rationale. On their view "business records" can come in without the necessity of calling all the persons with personal knowledge of their construction precisely because their reliability is demonstrated by evidence of their making pursuant to established and routine company procedures for the systematic conduct of its business. Plaintiffs, on the other hand, despite lip service to the text of the rule, downplay the "regular practice" terminology, virtually excising notions of "routineness" from the rule, and instead appear to substitute therefor a requirement of reliability. Plaintiffs' theory is that no more need be shown to require admission of a business–related document under 803(6) than that it is business–related and that its sources of information or other circumstances indicate reliability and trustworthiness. As will be seen, we conclude that the defendants' view of the Rule is the correct one.

The regular practice requirement originated in the Business Records Act, 28 U.S.C. § 1732(a), which governed the admissibility into evidence of business records in federal courts until the Federal Rules of Evidence took effect in 1975. Rule 803(6) as submitted to Congress did not include this requirement in its text, although a comparable requirement might well have been inferred from the Advisory Committee Note, which commented that "[t]he element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation." The House Judiciary Committee restored the explicit regular practice requirement, and commented that "the additional requirement of Section 1732 that it must have been the regular practice of a business to make the record is a *necessary further assurance* of its trustworthiness." [51] (emphasis added). Thus it is plain that the regular practice requirement was taken by the House Judiciary Committee directly from existing law. Accordingly, we may appropriately consult pre–F.R.E. decisions interpreting the Business Records Act, as well as post–F.R.E. decisions, to determine the content of the requirement.

Plaintiffs argue that "Congress, in enacting Rule 803(6), intended to liberalize the business records exception rather than to restrict prior practice." [52] Although the rule did liberalize the definition of what constitutes a "business," to the extent that they argue that there is a liberalization of *foundational* requirements over prior practice, we note our disagreement. We find nothing in the Advisory Committee Notes or congressional debates suggesting other-

---

**51.** H.Rep.No. 93–650, 93rd Cong., 1st. Sess. (1973) [hereinafter cited as "House Report"], U.S.Code Cong. & Admin.News 1974, p. 7051, 7087. The Senate Judiciary Committee did not alter the House version of the rule in this respect. *See* S.Rep.No. 93–1277, 93rd Cong., 2d Sess. (1974) [hereinafter cited as "Senate Report"].

**52.** Plaintiffs' Supplemental Memorandum in Support of the Admissibility of Evidence Relating to Certain Issues Raised during the Evidentiary Hearings, at p. 5 (hereinafter Post–Hearing Supplemental Memorandum).

wise. The House Judiciary Committee's action and the requirements of 803(6) relating to personal knowledge, *see* Part II.B.5, *infra*, support our view.

In *Gordon v. Robinson*, 210 F.2d 192, 196 (3d Cir. 1954), the Court of Appeals commented:

> The legislative history of the Business Records Act clearly shows that it was not the intent of the draftsmen to make admissible all evidence, no matter how incompetent or irrelevant, merely by virtue of the fact that it appeared in a record made in the regular course of business. Rather it was Congress' purpose to admit into evidence entries of a purely clerical or routine nature not dependent upon speculation, conjecture or opinion, where "accuracy is substantially guaranteed by the fact that the record is an automatic reflection of observations" without the necessity of calling the various entrants to identify the entries as their own, as was required under the common law shop book rule.

In *Standard Oil Company of California v. Moore*, 251 F.2d 188 (9th Cir. 1957), *cert. denied*, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958), the Court of Appeals considered the admissibility of a number of memoranda, letters, and reports dealing with the pricing and marketing policies of oil companies other than the ones in whose files the writing was found. The Court of Appeals excluded the documents because of its finding that the plaintiff had failed to meet the burden of proving that the memoranda were made pursuant to any systematic or routine procedure. In so holding the Court discussed the regular practice requirement of § 1732:

> A memorandum or record cannot be considered as having been made in the "regular course" of business, within the meaning of § 1732, unless it was made pursuant to established company procedures for the systematic or routine and timely making and preserving of company records....

Concerning almost all of the items comprising the grist of interoffice memoranda and letters which were introduced, the nonexistence of any such company procedure seems almost self–evident. They were patently intended as communications between employees, and not as records of company activity. Many of them were casual and informal in nature, seeking or providing information of a kind which could be, and no doubt often was, communicated by telephone or in conference. Most of them were apparently written as a result of the exercise of individual judgment and discretion.

If there was any systematic or routine procedure being followed in the preparation and filing of such writings, the burden was upon appellee to prove it. He failed to do so, at least with regard to most such exhibits. Where this foundation was lacking, the exhibit was not admissible under § 1732.

*Id.* at 215 (footnotes omitted).[53]

The more recent decisions interpreting the regular practice requirement in Rule 803(6) have adhered to the standards articulated in *Gordon* and *Standard Oil*. *E. g.*, *United States v. Kim*, 595 F.2d 755, 761 (D.C.Cir.1979); *United States v. McPartlin*, *supra*, 595 F.2d at 1347–50; *Coughlin v. Capitol Cement Company*, 571 F.2d 290, 307 (5th Cir. 1978). We endorse these standards too. Plaintiffs rely heavily upon *McPartlin*, an action involving conspiracy to violate the wire and travel statutes arising from Ingram Corporation's bribery of city officials in connection with a sludge–hauling contract. The Court of Appeals for the Seventh Circuit upheld the trial court's determination that desk–calendar appointment diaries of William Benton, an unindicted co–conspirator, and a witness for the government, who was also a vice–president of Ingram Corporation, were admissible business records pursuant to Fed.R.Evid. 803(6). However, the *McPartlin* decision did not depart from the rule that the proponent of a business record must show that it

---

**53.** While the Advisory Committee's Note takes issue with *Moore* on one point, it is a different one, relating to whether the reporting employee must be a participant in the matters reported.

was a regular practice to make the entries in question. As a foundation for admission, Benton testified at trial that he kept the diaries and made entries in them as a regular part of his business activity as a vice–president of Ingram. Moreover, he testified that he relied upon them, thereby establishing the important element of reliability. Also worthy of note is the fact that the diaries were used at trial not independently, but for corroboration of details.

Plaintiffs, in their Post–Hearing Supplemental Memorandum, argue that the courts have permitted documents to qualify as business records without regard to whether the particular type of record was routinely made. In support of this proposition they cite several cases, mostly pre–F.R.E., none of which support their position. In *United States v. Hyde*, 448 F.2d 815, 846 (5th Cir. 1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972), the Court admitted handwritten notes on the details of a certain settlement made at a meeting at which the notewriter, Branum, was present. However Branum *testified* at trial that he *regularly* kept informal notes of transactions on note cards in such situations which he turned over to another officer of his company for safekeeping. In *United States v. Moran*, 151 F.2d 661 (2d Cir. 1945), the Court admitted a memorandum of a telephone conversation made by a bank employee. However, the court found that the memorandum was a "routine record made for the bank's business as such," *id.* at 662, thereby satisfying the regular practice requirement. *Magnus Petroleum Co. v. Skelly Oil Co., supra*, involved notes made in the course of negotiations for a business opportunity. However, based on the *testimony* of the scrivener, who was subject to cross–examination, the Court found them to be a part of a regularly conducted business activity.

█ Thus, we hold that for the diaries and memoranda to be admissible under 803(6), the plaintiffs must show [54] that their entries were made pursuant to a systematic and routine procedure for the conduct of business, one characterized by careful checking and habits of precision and regularity such as will justify confidence in the reliability of the record keeping. At the least there must be a detailed showing of the nature of the business practice creating the document, the method of record–keeping, the source of the information, and the author's reliance on it. We will review the evidence of regular practice as we proceed through the documents one–by–one in our subsequent discussion. We turn now to a cognate question, the method of establishing that regularity of practice.

### 3. *The Requirement of Qualification by a Custodian or Other Qualified Witness*

█ F.R.E. 803(6) provides that its requisites be shown "by the testimony of the custodian or other qualified witness." This provision not only places the burden of laying a proper foundation upon the proponent of the document, but appears to require that the foundation be laid in a specific way. The plaintiffs have not sought to establish that the diaries are business records by such testimony. Rather the plaintiffs have relied upon a variety of other means and contentions: (1) evidence from the protocols and to a lesser extent from the JFTC testimony; (2) the fact that the diaries, memoranda, and other materials were produced by defendants pursuant to certain answers to interrogatories in which they invoked F.R.Civ.P. 33(c); (3) alleged estoppel to deny business records status because of the text and terms of certain answers to interrogatories; (4) cross references to other diaries, documents, and answers to interrogatories in the case; and (5) evidence from the diaries and other documents themselves, *i. e.*, the fact that they refer to important business matters; relate information supposedly relied upon by the employers of the diarists; and are said to look like business records (we have dubbed this the "res ipsa loquitur" theory of business records).

---

54. *See* p. ——, *infra* (burden of proof).

Because of plaintiffs' failure to comply with the literal terms of F.R.E. 803(6) the defendants maintain that the diaries and memoranda do not qualify as business records. As evidence of the rigor of the requirement, the defendants point to the fact that the Business Record Act, 28 U.S.C. § 1732, which, as we have noted, governed the admission of business records into evidence in federal courts from 1936 until the F.R.E. became operative in 1975, contained no such requirement. They contend that this change in the law was carefully considered, and reflects a desire to be more rigorous in connection with the qualification of documents as business records, by requiring testimony of some qualified witness. *Cf.* p. ——, *supra*. The defendants cite a number of cases which, on their reading, hold that such testimony is required. *E. g., Coughlin v. Capitol Cement Company*, 571 F.2d 290 (5th Cir. 1978); *United States v. Jones*, 554 F.2d 251 (5th Cir.), *cert. denied*, 434 U.S. 866, 98 S.Ct. 202, 54 L.Ed.2d 142 (1977); *United States v. Carranco*, 551 F.2d 1197 (10th Cir. 1977). Defendants also cite a number of pre–F.R.E. cases to similar effect. *See, e. g., United States v. Rosenstein*, 474 F.2d 705 (2nd Cir. 1973); *Hagans v. Ellerman and Bucknall Steamship Company*, 318 F.2d 563, 574–77 (3d Cir. 1963).

*Coughlin*, for instance, appears to be quite specific on the point:

> There can be no doubt but that the party who seeks to introduce written evidence must in some way authenticate it. We agree that under the exception, "[t]he testimony of the custodian or other qualified witness who can explain the record-keeping of the organization is essential. If the witness cannot vouch that the requirements of Rule 803(6) have been met, the entry must be excluded."

571 F.2d at 307 (citation omitted). There are similar statements in *Hagans v. Ellerman* ("no foundation was offered to qualify the document as a record kept in the ordinary course of business . . . or that such surveys were systematically ordered for it"). *See also Lewis v. Baker*, 526 F.2d 470, 474 (2d Cir. 1975) ("All that is required is that someone who is sufficiently familiar

with business practices be able to testify that the record was made regularly as part of those business practices and that the record is a truly authentic one"); *United States v. Blake*, 488 F.2d 101, 105 (5th Cir. 1973) ("testimony must be given by a custodian"); *National Research Development Co. v. Great Lakes Carbon Corp.*, 410 F.Supp. 1108, 1113 n. 20 (D.Del.1975) (M. Schwartz, J) ("basic elements of the Federal Rules of Evidence 803(6) exception . . . are lacking in that there has been no showing by a 'custodian or other qualified witness' that the notes were either made or kept in the regular practice of investors' professional activity"). Plaintiffs, on the other hand, counter with the argument that the literal approach to 803(6) has been discarded by courts under appropriate circumstances. Plaintiffs cite a number of cases where records were qualified by courts under 803(6) in the absence of a custodian. *E. g., United States v. Hines*, 564 F.2d 925 (10th Cir. 1977), *cert. denied*, 434 U.S. 1022, 98 S.Ct. 748, 54 L.Ed.2d 770 (1978) (vehicle bill of sale); *United States v. Holladay*, 566 F.2d 1018 (5th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978) (seized gas station notebooks demonstrating themselves to be part of single entry bookkeeping system continually maintained since 1967 for purpose of accounting for receipts and disbursements held admissible under 803(6)). *Accord*, 4 Weinstein ¶ 803(6)[02] at 803–152. Plaintiffs also cite pre–F.R.E. decisions in support of their position. *United States v. Leal*, 509 F.2d 122 (9th Cir. 1975) (hotel registration forms required by Hong Kong law supported by affidavit of assistant manager); *United States v. Ragano*, 520 F.2d 1191 (5th Cir. 1975) (corporate reports required by state law admitted without testimony). Plaintiffs submit that this result is supported by the modern and flexible approach of the Federal Rules which favor the submission rather than the exclusion of probative evidence, citing F.R.E. 102.

Close examination of the cases cited by both parties reveals that none of them have come squarely to grips with the question

with which we are faced: may the proponent of materials sought to be qualified under F.R.E. 803(6) meet his burden without introducing testimony of the "custodian or other qualified witness." In the cited cases upholding exclusion there was plainly an inadequate basis to meet 803(6), whether or not live testimony was supplied.[55] In the cases admitting the documents, the court had no difficulty in finding the test met, but did not expressly resolve the question whether the evidence which qualified the document must be disregarded because of the absence of the witness. *See also E. C. Ernst, Inc. v. Koppers Co.*, 626 F.2d 324 at 330 (3d Cir. 1980) (rule satisfied by testimony of the custodian). Indeed, defendants correctly distinguish the cases relied upon by plaintiffs in this area (some but not all of which are cited in the text) on one of three grounds: (1) there was some form of testimony—or stipulation—establishing foundation; (2) unlike diaries or memoranda of meetings, the records involved in those cases were on their face routine and regular clerical or financial documents such as hotel receipts, purchase orders, financial statements, stock transfer records, or filings with government agencies; and (3) the courts did not discuss the precise issue before us.

In order to resolve this question of law, we look first to the Advisory Committee Note to Rule 803(6). After listing a number of business records statutes drafted or enacted in the 1920's and 1930's, including the federal Business Records Act, 28 U.S.C. § 1732, which was based on the so-called Commonwealth Fund Act, the committee continued:

> These reform efforts ... concentrated considerable attention upon relaxing the requirement of producing as witnesses, or accounting for the nonproduction of, all participants in the process of gathering, transmitting, and recording information which the common law had evolved as a burdensome and crippling aspect of using records of this type. In their areas of primary emphasis on witnesses to be called and the general admissibility of ordinary business and commercial records, the Commonwealth Fund Act and the Uniform Act appear to have worked well. The exception seeks to preserve their advantages.
>
> On the subject of what witnesses must be called, the Commonwealth Fund Act eliminated the common law requirement of calling or accounting for all participants by failing to mention it. [citations omitted]. Model Code Rule 514 and Uniform Rule 63(13) did likewise. The Uniform Act, however, *abolished the common law requirement in express terms*, providing that the requisite foundation testimony might be furnished by "the custodian or other qualified witness." Uniform Business Records as Evidence Act, § 2; 9A U.L.A. 506. The exception follows the Uniform Act in this respect.

(Emphasis added). There is no indication in the Advisory Committee Note that the

**55.** For instance, in *Coughlin*, the Court noted: Only two witnesses testified with respect to the agenda. J. Dan Bohannan, one of plaintiffs' attorneys, testified that he found it in the Association's files during discovery and acknowledged that it did not bear a signature. Bohannan knew nothing else about the source or authenticity of the document. Doug Riff, who was president of Olmos Rock Products Corp. and an officer of the Association in 1969, identified the agenda and stated: "I don't know who prepared it. I suppose Al Brown." Brown, the executive director of the Association, was not available to testify. 571 F.2d at 307. It is plain that the document was not qualified as a business record, notwithstanding the testimony of these two witnesses. In *Rosenstein*, defendants were convicted of conspiracy to evade and evasion of income taxes, having accomplished this by creating a dummy corporation, CTE, in Liechtenstein. Their American clients were asked to make their commission payments payable to CTE and were instructed to send the checks to an attorney, Batliner, in Liechtenstein. At trial, the government offered a CTE file into evidence through the testimony of an associate of Batliner. The Court held that the file was inadmissible under the business records exception because the witness "not only did not keep the records, he did not even know from his personal knowledge that the records were kept in Batliner's office. He did not testify to the business practice of CTE or that it was the practice of CTE to keep the documents which were introduced." 474 F.2d at 710.

Committee intended, by following the language of the Uniform Business Records as Evidence Act, to change federal law by requiring live testimony where none had been required before. To the contrary, the committee strongly endorsed the liberalization of common–law requirements as to the production of witnesses to qualify documents as business records. Moreover, the committee's adoption of the language of the Uniform Act appears to reflect a determination that the "burdensome and crippling" common–law rules should be abolished "in express terms," instead of implicitly as in the Business Records Act.

Because we believe that the Federal Rules of Evidence favor a flexible approach, see Rule 102, and in the absence of a clear indication to the contrary in the Advisory Committee Note, we opt for the view that the testimony of the custodian or other qualified witness is not a sine qua non of admissibility in the occasional case where the requirements for qualification as a business record can be met by documentary evidence, affidavits, or admissions of the parties, i. e., by circumstantial evidence, or by a combination of direct and circumstantial evidence.

▮ It is clear from the express language of F.R.E. 803(6) that before a document can be admitted into evidence a proper foundation for its admission must be laid and that the burden of laying such a foundation is on the party seeking to introduce the document. *Accord, United States v. McPartlin, supra; Standard Oil Co. of California v. Moore, supra; Hagens v. Ellerman & Bucknall Steamship Company, supra; Coughlin v. Capitol Cement Co., supra.* We hold that to meet this burden in the absence of a "custodian or other qualified witness," plaintiffs must show regularity of practice in some precise and explicit manner, either by external evidence or from the documents themselves plus surrounding circumstances. To require less would strip the regularity of practice requirement of vitality, at least in

a case such as this where what are proffered are not routine clerical or financial documents such as hotel registration forms or vehicle bills of sale or bank statements, but rather diaries and memoranda heavily laden with cryptic and half–expressed statements which cannot, we find, be interpreted without the testimony of the author explaining what he meant by each entry. We will consider plaintiffs' proffer, notwithstanding the lack of "custodian or other qualified witness," but against this rigorous standard.

### 4. *The Import of Rule 33(c) Production.*

▮ Plaintiffs contend that by producing the diaries and memoranda pursuant to F.R.Civ.P. 33(c) the defendants have conceded that they are business records. They rely in this respect upon the language of Rule 33(c), of the Civil Rules which is entitled "Option to Produce Business Records." [56] They also rely upon the wording of their interrogatories 8 and 42–44 to each of the producing defendants and their responses thereto.

The first problem with this argument is that the answers to the interrogatories make clear that the defendants are not conceding that the materials produced are business records within the meaning of 803(6). Secondly, we think that the bar and the courts would be startled if they were retrospectively to find that a production under Rule 33(c) constituted an admission that everything that was produced qualified as a record of regularly conducted activity within the meaning of F.R.E. 803(6). There is nothing in the language of Rule 33(c) which suggests that the very specific requirements of 803(6) are waived by its invocation. That invocation is considered a convenience to the bar and a means to facilitate the discovery process. The problems of federal discovery are great enough without rendering Rule 33(c) into a trap for the unwary. [57]

---

**56.** While not the basis for our conclusion, we note that 803(6) refers to "records of regularly conducted activity," not "business records," the term used in Rule 33(c). *See* n. 49 *supra.*

**57.** We have cited no cases in this segment of our opinion because we can find none that are apposite.

### 5. The Personal Knowledge and Trustworthiness Requirements

Rule 803(6) requires as a condition of admissibility that business records be "made at or near the time by, or from information transmitted by, a person with knowledge." This provision represents a change from the Business Records Act, which provided that "lack of personal knowledge by the entrant or maker" could be shown to affect weight but not admissibility. 28 U.S.C. § 1732(a) (repealed 1975).

■ This provision of the rule was intended to deal with the problem of business records which merely record information transmitted by an informant. The Advisory Committee Note comments:

> An illustration is the police report incorporating information obtained from a bystander; the officer qualifies as acting in the regular course but the informant does not. The leading case, *Johnson v. Lutz*, 253 N.Y. 124, 170 N.E. 517 (1930), held that a report thus prepared was inadmissible. Most of the authorities have agreed with the decision ... The rule ... requir[es] an informant with knowledge acting in the course of the regularly conducted activity.

The Senate Judiciary Committee stated its view that the personal knowledge requirement not be interpreted to require the identification of the particular person upon whose knowledge the record was based, so long as the proponent of the evidence could show that it was the regular practice of the activity to base its records upon information transmitted by a person with knowledge:

> It is the understanding of the committee that the use of the phrase "person with knowledge" is not intended to imply that the party seeking to introduce the memorandum, report, record, or data compilation must be able to produce, or even identify, the specific individual upon whose first-hand knowledge the memorandum, report, record or data compilation was based. A sufficient foundation for the introduction of such evidence will be laid if the party seeking to introduce the evidence is able to show that it was the regular practice of the activity to base such memorandums, reports, records, or data compilations upon a transmission from a person with knowledge, *e. g.,* in the case of the content of a shipment of goods, upon a report from the company's receiving agent or in the case of a computer printout, upon a report from the company's computer programmer or one who has knowledge of the particular record system.

Senate Report, U.S.Code Cong. & Admin. News 1974, p. 7063. Thus, in order to meet the personal knowledge requirement of the rule, plaintiffs must show either (1) that the author of the document had personal knowledge of the matters reported, or (2) that the information he reported was transmitted by another person who had personal knowledge, acting in the course of a regularly conducted activity, or (3) that it was the author's regular practice to record information transmitted by persons who had personal knowledge. In the absence of a showing of personal knowledge, made in one or more of these three ways, a document cannot qualify as a business record.

■ A related provision of Rule 803(6) denies admissibility even to evidence which meets every other requirement of the rule, if "the source of the information or the method or circumstances of preparation indicate lack of trustworthiness." The burden of showing the untrustworthy nature of evidence which is otherwise admissible under 803(6) is on the opponent of the evidence. In assessing the trustworthiness of the documents before us, we would look, *inter alia,* to factors analogous to those enumerated in our Public Records Opinion at 26–27. Thus, we might find that a document which is obviously riddled with hearsay statements which were not transmitted by a person with knowledge is so untrustworthy as to fail to qualify under the 803(6) exception. *See* Part II–G, *infra* (discussion of Rule 805).

■ We also think that a document which is unintelligible is for that reason untrustworthy if offered to prove the truth

of *one* interpretation out of many possible interpretations which could be put on the document. The requirement of trustworthiness is intended to prevent the trier of fact from deciding cases on the basis of mere speculation rather than probative evidence. When a document which is unintelligible on its face is presented to the trier of fact, it is not probative evidence, but merely an invitation to engage in unfounded speculation. In such a situation, the document itself reveals its own "method or circumstances of preparation" sufficiently to make it untrustworthy under the 803(6) proviso.

Having completed our analysis of Rule 803(6), we turn to the issues presented by plaintiffs' proffer of the documents as admissions under Rule 801(d)(2)(B), (C) and (D).

## C. *Qualification as Admissions by Party–Opponent under Rules 801(d)(2)(B), (C) and (D).*

■ In addition to asserting admissibility under 803(6), *supra*, upon which plaintiffs place primary reliance, they offer many of the documents being considered here as Admissions by Party–Opponent under Rules 801(d)(2)(B), (C) and (D):

(d) Statements which are not hearsay. A statement is not hearsay if . . .

(2) Admission by party–opponent. The statement is offered against a party and is . . . (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship . . .

Unlike statements admitted under Rule 803(6), which would be admissible against all parties, statements admitted under 801(d)(2)(B), (C) and (D) are admissible only against parties who have adopted the statement, or who bear the specified relationship to the declarant.

■ As a preliminary matter we must decide whether we are to determine admissibility under 801(d)(2) according to the provisions of 104(a) alone, *i. e.,* whether inadmissible evidence may be considered, or whether 104(b) also applies, limiting our decision to admissible evidence. *See generally* pp. 1219–1220, *supra.* While Rule 801(d)(2) is not a hearsay *exception* (see discussion *infra*), the same types of "competency" issues must be evaluated in establishing "authority," "agency," or "scope of employment" as are considered in ruling on hearsay exceptions. These issues are *not* ones of conditional relevancy within the meaning of Rule 104(b), for the reasons stated in our discussion of the interface between Rules 104 and 803(6), at pp. 1229–1230, *supra.* In accordance with our reasoning stated there, we shall determine preliminary issues of fact under Rule 801(d)(2) on the basis of both admissible and inadmissible evidence, and shall apply a preponderance of the evidence standard of proof.[58]

---

58. The decision of the court on these preliminary issues does not of course preclude the parties from raising the same issues with regard to the substantive portion of the case. For example, "scope of employment" issues may arise in conjunction with the attendance of defendants' employees at meetings of various trade associations. The preliminary determinations by the court should not affect these deliberations and the trier of fact is not bound by any such decision of the court. Only admissible evidence, of course, may be considered by the trier of fact on these ultimate issues. *See* 1 Weinstein ' 104[01] at 104–16, ' 104[02] at 104 23.

In some instances issues of "competency" may coincide with issues of relevancy. For example, under Rule 801(d)(2)(B), the statement of a non-party is admissible as an admission if a party adopts the statement. The determination of whether or not the statement was adopted by the party would not ordinarily be an issue of relevancy. However, the relevancy of a statement made in a party's presence may also depend on the party's response to the statement. For example, an otherwise irrelevant accusation of a third party may become relevant only if the party accused expressly or tacitly assented to it. Thus the factual predicate of the "relevancy" determination may coincide with that of "adoption." In such cases *both* relevancy and hearsay issues must be resolved in favor of admissibility for evidence to be received relevancy on a standard

### 1. *"Non–Hearsay"–the Treatment of Admissions in the F.R.E.*

Subdivision (d) of Rule 801 is a marked departure from the common law in that all of the statements it defines as "not hearsay" were considered hearsay under preexisting law. Saltzburg at 457. The subsection we are dealing with, (d)(2) Admission by Party Opponent, was an "exception" under the traditional hearsay rule.[59] The rationale for admitting this type of statement has been the subject of lengthy academic dispute.[60]

The Advisory Committee Notes explain the treatment of admissions in the Federal Rules as follows:

> Admissions by a party–opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. Strahorn, A Reconsideration of the Hearsay Rule and Admissions, 85 U.Pa.L.Rev. 484, 564 (1937); Morgan, Basic Problems of Evidence 265 (1962); 4 Wigmore § 1048. No

guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against–interest circumstance, and from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility.

Congress enacted the proposed Rule 801(d)(2) without change.[61]

The most important change from the common law made by Rule 801(d)(2), apart from denominating admissions as non–hearsay rather than a hearsay exception, was the addition of subsection (D), making admissible against a party "a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." Statements in this category, commonly known as "vicarious admissions," were not admissible under the traditional

---

of substantial admissible evidence, *see* pp. 1219–1220, *supra*, and hearsay on a standard of preponderance of all evidence, including inadmissible evidence.

**59.** Saltzburg at 457; McCormick § 262 at 629 (1972); Morgan, Basic Problems of Evidence 265 (1962); 4 Wigmore, Evidence § 1048, 4.

**60.** Morgan and Wigmore propose that a party cannot object that his own statement was not under oath, or that he lacked opportunity to cross-examine himself. Morgan, 266; Wigmore § 1048, 4. Strahorn asserts that admissions are "relevant conduct of the speaker," Strahorn, The Hearsay Rule and Admissions, 85 U.Pa.L.Rev. 484 at 576 (1937), and Lev claims they are admitted under the doctrine of "estoppel." Lev, The Law of Vicarious Admissions–An Estoppel, 26 U.Cinn.L.Rev. 17, 29, 30 (1957). Saltzburg and McCormick, however, feel that the most satisfactory explanation is that they are admitted as "the product of the adversary system." McCormick also notes the similarity to stipulations or admissions in pleadings. McCormick § 262, 629.

**61.** Congressional action on another proposed rule suggests, however, that the distinction which the Rules make by defining admissions as non-hearsay instead of as hearsay exceptions should be given little weight. Rule 806 as

submitted to Congress provided that the credibility of a hearsay declarant might be attacked or supported as if the declarant had testified as a witness. The Senate Judiciary Committee amended the rule to apply to "a hearsay statement, *or a statement defined in rule 801(d)(2)(C), (D), or (E)."* (Emphasis added.). The Committee explained:

> While statements by a person authorized by a party-opponent to make a statement concerning the subject, by the party-opponent's agent or by a coconspirator of a party-see Rule 801(d)(2)(C), (D) and (E)-are traditionally defined as exceptions to the hearsay rule, Rule 801 defines such admission by a party–opponent as statements which are not hearsay.... The committee is of the view that such statements should open the declarant to attacks on his credibility. Indeed, the reason such statements are excluded from the operation of Rule 806 is likely attributable to the *drafting technique used to codify the hearsay rule,* viz. some statements, instead of being referred to as exceptions to the hearsay rule, are defined as statements which are not hearsay.

(Emphasis added.) The House concurred in the amendment and the Senate proposal is now an integral part of the Rules, the consequence of which, we believe, should be widely noted.

common law rule, which required "speaking authority" as codified in subsection (C). *See infra.* The Advisory Committee explained this change as follows:

> The tradition has been to test the admissibility of statements by agents, as admissions, by applying the usual test of agency. Was the admission made by the agent acting in the scope of his employment? Since few principals employ agents for the purpose of making damaging statements, the usual result was exclusive of the statement. Dissatisfaction with this loss of valuable and helpful evidence has been increasing. A substantial trend favors admitting statements related to a matter within the scope of the agency or employment. *Grayson v. Williams,* 256 F.2d 61 (10th Cir. 1958); *Koninklijke Luchtvaart Maatschappij N. V. KLM Royal Dutch Airlines v. Tuller,* 110 U.S.App.D.C. 282, 292 F.2d 775, 784 (1961); *Martin v. Savage Truck Lines, Inc.,* 121 F.Supp. 417 (D.D.C.1954).

The broad rule requiring receipt into evidence of the statements of a party's employee seems to rest on a slightly different foundation from the rule favoring receipt of a party's *own* statements. As Judge Weinstein has observed, "[v]icarious admissions do not lend themselves readily to any of the analyses proposed" to explain the receipt of admissions generally. He feels that vicarious admissions are received under the Rules because of the "practical need for pertinent evidence" and represent a judgment by the draftsmen that such statements would "on balance, be more helpful than harmful in determining truth." 4 Weinstein ¶ 801(d)(2)[01] at 801–137 & 138. This view is supported by the Advisory Committee Note, which explains the inclusion of vicarious admissions as the result of "[d]issatisfaction with [the] loss of *valuable and helpful evidence.*" (emphasis added).[62]

### 2. An Admission Must be an Assertion

Under Rule 801(d)(2), an admission is defined as a "statement" which possesses certain attributes. The term "statement" is defined in Rule 801(a) to include oral and written assertions as well as nonverbal conduct, if intended as an assertion. Since all of the hearsay evidence before us is in written form, for our present purposes the term "statement" is equivalent to the term "written assertion."

▮▮▮▮ The fact that admissions are defined as types of "statements" probably would not be of much import in the ordinary case. The term assumes prominence in this case, however, because the diaries of a number of Japanese executives offered by the plaintiffs are compilations of written notations. Some of the diary entries are comprehensible to the reader, but most are not, and are, in any event, recordation not of utterances or "statements" of the diarist, but "statements" or thoughts of a third party. Plaintiffs also offer a number of memoranda which are equally unclear. We are thus presented with two questions: (1) can a document which is, at best, a compilation of "statements" be admissible as a whole under 801(d)(2), without separate analysis of each statement therein; and (2) can a written notation which does not clearly assert the truth of some proposition be admissible under 801(d)(2)? We answer both questions in the negative.

First, as to whether or not a compilation can be admissible as a whole without separate analysis of each statement within it, we think that Rule 801(d)(2) requires that each statement be separately admissible. Unlike Rule 803(6), for example, which expressly authorizes the admission of a "data compilation" as a whole, Rule 801(d)(2) speaks in terms of individual "statements." Obviously, in some situations a compilation might be admissible because each of the statements within it is separately admissible. *E. g., United States v. Evans,* 572 F.2d 455, 488 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978) (defendant's appointment calendar admitted under 801(d)(2)(A)). The diaries before us are not of this character, however. Quite apart from the problem of entries

---

**62.** Quoted at p. 1240, *supra.*

which are incomprehensible, the diaries include at least two types of statements which may fail to qualify as admissions. First, there are entries which have been shown to be outside the scope of the diarist's employment by evidence extrinsic to the diaries themselves. For instance, some of the Japanese executives testified before the JFTC that their responsibilities related solely to the domestic Japanese market, but their diaries included scattered references to matters interpreted by plaintiffs as relating to exports. Secondly, there are a great many internal hearsay statements within the diaries. *See infra.* Under these circumstances, we cannot determine the admissibility of the diaries without a separate analysis of the individual statements in them.

Of equal importance is the question whether a written notation which cannot reasonably be characterized as an assertion can be admissible under 801(d)(2). The diary entries and memoranda which the plaintiffs seek to qualify under that rule differ greatly in their form from the usual type of statements which the courts have allowed into evidence as admissions. It is instructive, for example, to examine the three cases cited favorably by the Advisory Committee in its notes explaining the admissibility of vicarious admissions under 801(d)(2)(D). In *Grayson v. Williams,* 256 F.2d 61 (10th Cir. 1958), the court of appeals upheld the admissibility of hearsay statements made by a truck driver concerning the collision which had given rise to the action:

> The judgment is challenged on the further ground that the court erred in allowing admissions of appellant Grayson [the driver] to be admitted in evidence against Southern Freightways, Inc. Three persons visited Grayson in the hospital several hours after the accident. They asked him if appellee's truck was in its proper lane. Lockhead testified in substance that Grayson replied that it was and stated further that he didn't see the Union Pacific truck until the last minute and couldn't avoid striking it. Minardi testified that he said both trucks were in their

proper lane and "I just didn't see the truck in time enough to avoid striking it." Sgt. Schwarting testified that Grayson said he didn't see the other truck until it was right on him; that he cramped his wheels to the left but was too late and they hit.

*Id.* at 66. In *Martin v. Savage Truck Line, Inc.,* 121 F.Supp. 417 (D.D.C.1954), the court admitted "a statement made by the driver of the truck to an investigating police officer at the scene of the collision . . . to the effect that he was driving at the rate of thirty miles an hour, but that the green light was with him." *Id.* at 418. In *Koninklijke Luchtvaart Maatschappij N.V. KLM Royal Dutch Airlines v. Tuller,* 292 F.2d 775 (D.C.Cir.), *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961), the court of appeals upheld the admissibility of a statement made by an aircraft radio operator to an investigator concerning the operator's own conduct during the airplane crash which was the subject of the lawsuit. In each of these cases, which the Advisory Committee cited as archetypal admissions, it was clear that the declarant was asserting certain facts, and it was equally clear what the facts were which he was asserting.

The statements which have come into evidence as admissions since the enactment of the Federal Rules of Evidence are for the most part equally clear. To take only one graphic example, in *Mahlandt v. Wild Canid Survival & Research Center, Inc.,* 588 F.2d 626 (8th Cir. 1978), the plaintiffs claimed that their 3–year–old child had been bitten by a wolf named Sophie, who was kept by a naturalist in his back yard. The court of appeals reversed the trial court's exclusion of hearsay statements, including the wolf's custodian's written assertion that "Sophie bit a child that came in our back yard." *Id.* at 629. A clearer assertion of fact could hardly be imagined.

There are two reported decisions in which diary entries which may have been similar to those offered here have been allowed into evidence as admissions. *United States v. McPartlin,* 595 F.2d 1321, 1347–51 (7th

Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *United States v. Evans, supra.* The opinions in those cases do not provide sufficient information about the contents of the diaries offered there for us to determine whether they were as inscrutable as those offered here. In any event, both cases are plainly distinguished from the situation now before us by one crucial circumstance: in both cases the diarist himself was present at the trial and could clarify the meaning of any unclear diary entries. In *McPartlin*, the diarist testified at length as "the principal government witness." 595 F.2d at 1345. In *Evans*, the diarist was one of the defendants and could have challenged the government's interpretation of any entries which were unclear by testifying or by his counsel's objections. We are aware of *no* decisions holding that written notations which are not clearly assertions can come into evidence in the absence of testimony to explain their meaning.

The plaintiffs argue that a diary entry which is not an assertion is *ipso facto* not hearsay, since "hearsay" is defined in Rule 801(c) as "a statement . . . offered in evidence to prove the truth of the matter asserted." Although this argument has a superficial plausibility, it is fatally flawed as it applies to the documents involved here. Apart from a few entries which plaintiffs purport to offer for a non–hearsay purpose, *i. e.* not to prove the truth of the matter asserted,[63] the plaintiffs' theory of the relevance of the diary entries is that the entries are susceptible to a certain interpretation which supports the plaintiffs' case. In other words, whatever the plaintiffs from time to time say, the fact is that plaintiffs' offer of the diary entries is for the truth of the matter which they claim to be asserted therein. Thus if the entries are not assertions, they are not probative evidence of any fact which is material to the determination of the action. Therefore any entries which are not assertions will be excluded as irrelevant under Rules 401 and 402, except insofar as they can be demonstrated to have been truly offered for a non–hearsay purpose.

We think that the plaintiffs, as proponents of the diary entries, bear the burden of establishing that they are assertions and of ascertaining, with reasonable clarity, what the facts are which are asserted therein. The mere claim, in the form of counsel's argument, that entries which are on their face unclear and inscrutable are susceptible of a certain interpretation which supports plaintiffs' case, and that a jury should be permitted to decide what they mean, is not a sufficient foundation. Instead, the plaintiffs should have established the meaning of unclear diary entries through foundational evidence, in the form of testimony or otherwise. In the absence of such a foundation, the entries cannot qualify as admissions under Rule 801(d)(2).

The defendants have argued that an admission must be "clear and concise," citing *Pulver v. Union Inv. Co.*, 279 F. 699, 705 (8th Cir. 1922); *Evis Manufacturing Co. v. FTC*, 287 F.2d 831, 839–40 (9th Cir.), *cert. denied*, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 28 (1961). Although we find their authorities inapposite, we are in substantial agreement with their teaching that an unclear notation cannot be an admission, at least in the absence of foundation evidence, for the reasons stated. The defendants also argue that an admission must be communicated to someone. This is apparently an extension of their argument that an agent's statement cannot be an admission unless it was communicated to someone other than the agent's principal. While the latter contention has ample support in pre–F.R.E. law, we have determined that the decisions upon which defendants rely were overruled by the enactment of the Rules. *See* pp. 1246–1247, *infra.* We recognize the force of defendants' argument that a statement or notation which is never communicated by the declarant to *anyone* is less likely to be trustworthy than a statement which *is* so communicated. However, we see no reason to read into Rule 801(d)(2) a requirement which would preclude all uncommunicated

---

**63.** We will address that proffer *infra* in ruling on specific documents.

statements, including, for example, all entries made in a private diary, from ever coming into evidence as admissions.[64]

In accordance with the overall plan of this opinion, we defer our consideration of specific diaries and entries until after our discussion of all the legal issues raised by the parties.

### 3. *Adoptive Admissions*

Although the particular legal issues which now confront us under 801(d)(2)(B) were never sharply drawn in argument or briefs, a major difference in the positions of the parties surfaced in the outlining of those factual patterns which, in plaintiffs'

submission satisfied the criteria for adoption but which defendants claimed were insufficient. This disagreement involves the circumstances in which a party's reference to a document, in a protocol, testimony, or interrogatory, constitutes an adoption of all or part of the writing referred to.

Rule 801(d)(2)(B) provides for the admissibility of a statement of which a party has "manifested his adoption or belief in its truth." We agree with Judge Weinstein that the language of the rule requires evidence that the party's conduct was "intended" as an adoption. Weinstein ¶ 801(d)(2)(B)[01] at 801–144.[65]

---

**64.** The defendants also argue that a vicarious admission under Rule 801(d)(2)(C) & (D) must be based upon the agent's personal knowledge. We find this issue very troubling, particularly since Judge Weinstein argues persuasively in support of such a personal knowledge requirement. 4 Weinstein ' 801(d)(2)(C)[01] at 801–156–58 and ' 801(D)(2)(D)[01] at 801–164. Judge Weinstein criticizes *Mahlandt v. Wild Canid Survival & Research Center, Inc.,* 588 F.2d 626 (8th Cir. 1978), in which the Eighth Circuit refused to infer such a requirement. 4 Weinstein at 801-164–65. In view of our rulings that an admission must be an assertion, that an admission does not include internal hearsay statements unless adopted by the declarant, *see* pp. 1266–1267, *infra,* and that an admission under 801(d)(2)(D) must meet the clear requirement of the rule that it concern matters within the scope of the agent's employment, *see,* pp. 1245–1246, *infra,* we do not reach the question of a personal knowledge requirement for authorized or vicarious admissions. Any diary entries to which an objection might be interposed on the basis of an inadequate showing of the declarant's personal knowledge are here also subject to objection on the other grounds mentioned.

**65.** It seems clear that many such references are to writings which the "adopting" declarant has not read, either in whole or in part. The Advisory Committee Notes to 801(d)(2)(B) state that while knowledge of contents is not "inevitably" essential, it is ordinarily so. The example given, where a party states that "X is a reliable person and knows what he is talking about," suggests that the adoptive declaration must quite explicitly manifest the party's adoption or belief in statements beyond those which he has heard or read. In cases of this type of "advance" adoption, McCormick suggests that the statements may be classified as "representative or vicarious admissions, rather than adoptive."

McCormick § 246, at 525. We believe that it is the scope of the adoptive statement which renders knowledge of contents unimportant rather than its timing, and where such "carte blanche" approval is expressed, it is unimportant whether it is given in "advance" of the statements adopted or after they have been made, or whether the other criteria of representative admissions have been satisfied.

The only case which we have found that is close to the situation we have here, where long, complex writings are involved and where the adopting party has not been shown to have knowledge of the contents of the material "adopted," is *United States v. Article of Drug,* 362 F.2d 923 (3d Cir. 1966). The evidence there consisted of transcripts of a series of radio broadcasts, admitted to establish the intended use of vitamin and mineral products offered for sale by the defendant manufacturer. While the Court found that the defendant had "adopted as its own representations" the declarant lecturer's broadcasts, it is clear from the factual circumstances that the statements were not only adopted but also "authorized" and "within the scope of" the lecturer's "agency or employment." The declarant radio lecturer's picture appeared in defendant's catalogue along with the facts that he was defendant's "Chief Consultant" and had "scientifically formulated the exclusive formulas" in the catalogue. He received a weekly salary from defendant under a written consulting agreement, under which he contracted, among other things, to "aid the sale and promotion of the products" and not to perform any of the services specified for any other company. 362 F.2d at 926. Thus, *Article of Drug* follows the "advance adoption" pattern suggested by McCormick, *supra,* and is quite distinct from the situation in which an employee of one company supposedly adopts a diary of an employee of another company after being shown only a short segment of it.

In *United States v. Coppola*, 526 F.2d 764 (10th Cir. 1975), for example, the Court of Appeals distinguished the improper admission of evidence in defendant's first trial from the proper admission of the same statements in defendant's second trial:

> It is not enough that Herman recounted Molina's statements in Coppola's presence and Coppola was silent or did not otherwise respond. Testimony that an accused adopted statements of another person may be let in as an adoptive admission only if it appears the accused understood and unamibiguously assented to those statements.

*Id.* at 769 n. 2 (citation omitted).

■ One of the most interesting questions posed in regard to 801(d)(2) admissions is the extent to which production of documents in response to interrogatories, as permitted under F.R.Civ.P. 33(c), constitutes an "admission of" or "adoption of" the contents of the documents so produced. Written answers to interrogatories may be utilized as admissions,[66] although they are not conclusive on the issues addressed.[67] We agree with the Court in *National Research Development Corp. v. Great Lakes Carbon Corp.*, 410 F.Supp. 1108 (D.C.Del.1975) that "the language of each interrogatory and the wording of the corresponding reply becomes significant" when it is not the written answers themselves, but documents referenced in the answers or produced in lieu of such answers, which the opposing party seeks to use.

In the *National Research* case the plaintiff sought to introduce an inventor's notebook to support its contentions concerning the meaning of a technical term used in a patent. Although the information plaintiff wished to use was apparently on a page of the notebook which had been referenced by defendants in their answers to interrogatories, the Court concluded that the broad and alternative wording of the questions created an "ambiguity in the interpretation of the corresponding response" which rendered it impossible to determine whether any "adoptive connotation" existed. As a second ground for exclusion, the court noted that the question asked did not concern the use of the term involved, and stated that the scope of any "admission," if one existed, "would be narrowly limited by the wording" of the question, and would neither constitute a concession of any other points nor "embrace the truth of the designated documents' total contents."[68]

■ We conclude that for a document produced under F.R.Civ.P. 33(c) to qualify as an admission, the question and answer when taken together must manifest an "adoptive" rather than merely a "referential" connotation. Further, the only issues conceded by such an "admission" are issues specifically addressed in the question, and responded to by the document.

---

**66.** *Lumbermens Mut. Ins. Co. v. Cantex Mfg. Co.*, 262 F.2d 63, 67 (5th Cir. 1958) (defendant insurance company's interrogatory answer admitted the amount of plaintiff's losses and thus constituted a liquidation of the claim as of the date the answer was filed); *Brayton v. Crowell Collier Pub. Co.*, 205 F.2d 644, 646 (2d Cir. 1953); *Ohio Valley Electric Corp. v. General Electric Co.*, 244 F.Supp. 914, 954 (S.D.N.Y. 1965) (defendant's answers to interrogatories from an Eastern District of Pennsylvania case admitted). *See also Gadaleta v. Nederlandsch-Amerekaansche Stoomvart*, 291 F.2d 212, 213 (2d Cir. 1961).

**67.** *Giaraffa v. Moore–McCormack Lines, Inc.*, 270 F.Supp. 342 (S.D.N.Y.1967) (interrogatory answer which referred to a contract purportedly covering injured worker was admitted as evidence, but was rendered nugatory by countervailing evidence).

**68.** 410 F.Supp. at 1114 n. 20. The Court also mentions the availability of other procedures for obtaining the desired evidence:

> Finally, assuming no financial constraints on defendants they could have utilized the procedures available under Fed.R.Civ.P. 28(b) to take the depositions in England of the non-resident non-party inventors and subsequently introduced the inventors' deposition under Fed.R.Civ.P. 32(a)(3). Alternatively during such depositions, the defendants could have developed a record sufficient to indicate that the inventor's notebook satisfied the requirements of the business records exception to the hearsay rule of 28 U.S.C. § 1732(a). However, the record presently before the Court indicates that such efforts were apparently not undertaken.

The plaintiffs contend that certain documents are adoptive admissions because of a party's or a person's failure to disavow the documents. The Advisory Committee Notes to 801(d)(2)(B) recognize the possibility of an adoption by silence and state that "the theory is that the person would, under the circumstances, protest the statement made in his presence if untrue." The Notes caution, however, that the inference is a fairly weak one. In *United States v. Flecha*, 539 F.2d 874 (2d Cir. 1976), the Second Circuit held that the facts that a party has heard a statement and that he has failed to deny it are not in themselves sufficient to establish adoption by silence, but that the circumstances involved must be considered. The court of appeals quoted Lord Justice Bowen in *Wiedemann v. Walpole*, 2 Q.B. 534, 539 (1891):

Silence is not evidence of an admission, unless there are circumstances which render it more reasonably probable that a man would answer the charge made against him than that he would not.

539 F.2d at 877. We agree.[69]

Another disputed point is whether a statement which is written by someone else but signed by a party opponent or his agent constitutes an admission of the party under 801(d)(2)(B). In a criminal case, *United States v. Johnson*, 529 F.2d 581, 584 (8th Cir.), *cert. denied*, 426 U.S. 909, 96 S.Ct. 2233, 48 L.Ed.2d 835 (1976), the Court of

Appeals upheld the trial judge's admission of a statement made by the defendant, taken down in longhand by a Secret Service Agent, and read and signed by the defendant at the conclusion of his interview with the agent. With respect to the hearsay aspects involved, the court stated:

The objections must fail. A statement which is reduced to writing by one other than the accused is generally admissible where the accused reads it over and signs it. *See United States v. Evans*, 320 F.2d 482, 484 (6th Cir. 1963); *United States v. Del Porte*, 357 F.Supp. 969, 976 (S.D.N.Y.), *aff'd* 483 F.2d 1399 (2nd Cir. 1973). Moreover, under the *Federal Rules of Evidence*, which became effective on the date of Johnson's trial, the statement is not hearsay. Fed.R.E. 801(d)(2)(A), (B).

We find no cases or commentary to the contrary.[70]

### 4. Authorized Statements

Subsection (C) of 801(d)(2) is mainly a codification of prior common law, under which an authorized statement by a party's agent was receivable to the same extent as the authorizing party's own statement. Wigmore explains that the basis for this rule is the principle that:

[h]e who sets another person to do an act in his stead as *agent* is chargeable in substantive law by such acts as are done under that authority; so too, properly enough, admissions made by the agent in

---

**69.** Some of the circumstances which might render it *im*probable that the party would deny a statement if untrue are, for example: the party is in official custody; the declarant's statement is ambiguous, *United States v. Flecha, supra*; the party would not have the requisite knowledge to deny the statement; the statement is made by a person to whom the party would be unlikely to respond (*e. g.*, a drunk, an unknown bystander); the party was in a mentally impaired state (*e. g.*, asleep, excited, confused, in pain), 4 Weinstein ¶ 801(d)(2)(B)[01] at 801–145; the party has no motive to respond, or has not heard or understood the statement, 4 Wigmore § 1062 at 117; the statement is made in the course of a judicial proceeding, where decorum prevents immediate response, 4 Wigmore § 1072 at 125. Since plaintiffs rely upon defendants' failure to deny statements made at the JFTC proceedings, this last circumstance is particularly significant.

**70.** *See also United States v. Williams*, 571 F.2d 344 (6th Cir. 1977), *cert. denied*, 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978). In that case, a Secret Service agent questioned a witness and prepared a statement which the witness subsequently signed. In holding that the statement was "adopted" by the witness and thus admissible under 803(5), the court cites the Senate Report explaining the House amendment to the Rule, which added the phrase "or adopted by the witness":

When the verifying witness has not prepared the report, but merely examined it and found it to be accurate, he has adopted the report, and it is therefore admissible.

Senate Report, 4 U.S.Code Cong. & Admin. News at p. 7074 (1974). There is no reason to believe that Congress intended any different approach to adoptions under 801(d)(2)(B).

the course of exercising that authority have the same testimonial value to discredit the party's present claim as if stated by the party himself.

IV Wigmore § 1078 at 162 (Chadbourn rev. 1972). The "speaking authority" required by subsection (C) may represent either express or implied authority, and the authority questions involved are to be determined under the law of agency. *Baughman v. Cooper–Jarrett*, 530 F.2d 529, 532 (3d Cir.), *cert. denied*, 429 U.S. 825, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976).

The Advisory Committee Notes state that the wording of Rule 801(d)(2)(C) was intended to resolve a division among the circuits as to whether an agent's statements were only admissible if made to a third person, or whether statements to the principal himself or itself could also be authorized admissions. *See United States v. Lykes Bros. Steamship Co.*, 432 F.2d 1076, 1078 (5th Cir. 1970) (citing cases from several circuits on both sides of the dispute). Prior to the adoption of the Rules, the Third Circuit had held that an employee's statement made to his employer rather than to a third party could not constitute an admission by the employer. *Nuttall v. Reading Co.*, 235 F.2d 546, 550 (3d Cir. 1956). The Advisory Committee Notes to Rule 801(d)(2)(C) make it clear that under that Rule a statement may be an authorized admission even though it was never communicated to a third party. Thus we view *Nuttall* as legislatively overruled on this point by the enactment of the Federal Rules of Evidence.

### 5. *Vicarious Admissions*

■ As we have mentioned, subsection (D) represents a departure from the common law. As the Advisory Committee Notes state, the traditional test was whether the statement was made by the agent within the scope of his employment. They pointedly note that few agents were employed to make damaging statements, and thus most such remarks were excluded. The Rules, however, follow a trend which allows statements to be admitted so long as they are related to a matter which is within the scope of the agent's employment. Advisory Committee Notes to 801(d)(2)(D). The phrase "during the existence of the relationship" makes it quite clear that the statement must relate to a matter which was within the agent's scope of employment at the time he made the statement. Thus, we must exclude statements made after the termination of employment, or about matters with which an employee was not, or was no longer, involved.

The defendants have argued that two additional criteria must be met to satisfy 801(d)(2)(D): first, the statement must have been communicated to someone outside of the company which employed the declarant, and second, the declarant must be an employee with managerial responsibility. Since neither of these requirements are found in the language of the Rule, or in the Advisory Committee Notes, the defendants base their contention on two pre–Rules cases, *Nuttall v. Reading Company*, 235 F.2d 546 (3d Cir. 1956), and *Gilmour v. Strescon Industries, Inc.*, 66 F.R.D. 146 (E.D.Pa.), *aff'd mem.* 521 F.2d 1398 (3d Cir. 1975).

The *Nuttall* case was decided on the basis of the "authorized" admission exception, discussed *supra*. As we stated there, the Advisory Committee Notes to Subsection (C) make it clear that under that Rule there is no requirement that a statement must be communicated outside of the company against which it is offered. In *Gilmour*, Judge Broderick quoted *Nuttall*, but recognized that the then proposed Rule 801 might alter the common law rule, and decided the issue on other grounds.

■ The defendants acknowledge that the *Nuttal* rule is no longer valid with respect to authorized admissions under subsection (C), but contend that it retains force with respect to vicarious admissions under subsection (D), since the only discussion of the issue is in the Advisory Committee Notes to subsection (C). We reject that contention. It is plain that the committee viewed subsection (D) as an extension of common–law authorized admissions, which

were codified in subsection (C). Thus the discussion in the note to subsection (C) of whether a statement must be communicated to a third party is equally applicable to subsection (D), as the Eighth Circuit expressly held in *Mahlandt, supra,* 588 F.2d at 630. We conclude that *Nuttall* retains no vitality with respect to either type of admission.

■ The defendants also contend that a vicarious admission can be made only by an employee who has managerial responsibilities. This requirement is found only in decisions concerning who is authorized to make an admission for a corporate employer. *See Moran v. Pittsburgh–Des Moines Steel Co.,* 183 F.2d 467 (3d Cir. 1950); *Gilmour, supra,* 66 F.R.D. at 150. Thus the requirement of managerial responsibilities, if it remains valid after the enactment of the Rules, is pertinent only to authorized admissions, not to vicarious admissions. In any event, it is clear that every employee whose statements the plaintiffs offer did have managerial responsibilities.

6. *Admissions of a Subsidiary Corporation Offered Against the Parent Corporation*

Since the plaintiffs offer DSS 1029, the so–called Japan Victor document, against MEI on the basis of MEI's ownership of the majority of the stock of Japan Victor Co., a brief word is in order about the attribution to a parent corporation of a statement which would be an admission if offered against its subsidiary.[71] The facts and contentions surrounding the document are adequately stated in Part XIII, *infra,* and will not be restated here.

■ The issue to be considered is whether, assuming that a statement could come into evidence as an admission against the subsidiary, it may likewise be admitted into evidence against the parent corporation. While there is no precedent precisely on

point, we think the answer is clear: the proponent of the evidence must show either that the subsidiary had authority to make a statement concerning the subject, under Rule 801(d)(2)(C), or that the subsidiary acted as the parent's agent and the statement concerned a matter within the scope of its agency, under Rule 801(d)(2)(D). Under either subsection of the rule, the proponent of the evidence must establish the existence of an agency relationship between the parent and the subsidiary under the applicable principles of agency law.

The principles relevant to deciding whether or not a subsidiary is the agent of a parent corporation have recently been reviewed by Judge Caleb Wright in *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil Co.,* 456 F.Supp. 831, 840–41 (D.Del.1978):

> Whether an agency relationship exists between a parent corporation and its subsidiary is normally a question of fact. The central factual issue is control, *i. e.,* whether the parent corporation dominates the activities of the subsidiary.

> In order to determine whether or not a sufficient degree of control exists to establish an agency relationship, the Court must look to a wide variety of factors, such as stock ownership, officers and directors, financing, responsibility for day–to–day operations, arrangements for payment of salaries and expenses, and origin of subsidiary's business and assets.

(citations and footnote omitted). *See also Walker v. Newgent,* 583 F.2d 163, 167 (5th Cir. 1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979); *Pacific Can Co. v. Hewes,* 95 F.2d 42 (9th Cir. 1938); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.,* 467 F.Supp. 841 (N.D.Cal.1979).

■ As Judge Wright noted, the existence of an agency relationship is a conceptually distinct question from the notion of "piercing the corporate veil." 456

---

71. Similar issues are presented by plaintiffs' proffer of other documents: (1) the protocol of Mr. Maekawa, who at the time of giving his protocol was an employee of Nagoya Sharp Sales Corp., a non–defendant which plaintiffs apparently characterize, without foundation, as a subsidiary of Sharp Corporation; and (2) the EIAJ "Minutes," which plaintiffs offer as admissions against the defendants on the basis of their unsupported allegations that the defendants control the EIAJ, a Japanese trade organization.

F.Supp. at 839. However, the mere fact that one corporation owns a controlling interest in another does not render the subsidiary the agent of the parent:

"A corporation does not become an agent of another corporation merely because a majority of its voting shares is held by the other". *Restatement (Second) of Agency, supra* § 14M. *See also, Pacific Can Co., supra,* 95 F.2d at 46; *Eastern Industries [Inc. v. Traffic Controls, Inc.], supra,* 142 F.Supp. [381] at 384 [D.Del.]; *Owl Fumigating Corp. v. California Cyanide Co.,* 24 F.2d 718, 719 (D.Del. 1928), *aff'd.,* 30 F.2d 812 (3d Cir. 1929); *Scott–Douglas Corp. v. Greyhound Corp.,* 304 A.2d 309, 314 (Del.Super.1973). Nor does the fact that a parent and a subsidiary have common officers and directors necessarily indicate an agency relationship. *See, Pacific Can Co., supra; Eastern Industries, supra; Owl Fumigating, supra; Scott–Douglas, supra.*

456 F.Supp. at 841.

 We agree with Judge Wright's analysis, and adopt it. In the absence of any showing of express authority, we think that the plaintiffs, as proponents of the evidence, should be required to make the same kind of showing as would be required to impose vicarious liability upon the parent corporation: that the parent corporation "directly intervenes in the management" of the subsidiary so as to treat it as a "mere department of its own enterprise." *Consolidated Rock Products Co. v. DuBois,* 312 U.S. 510, 524, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1940). In conformity with the overall organization of this opinion, we defer our discussion of the facts pertaining to the relationship between MEI and the Japan Victor Company until Part XIII, *infra.*

### D. *804(b)(1) Former Testimony*

Plaintiffs seek to introduce into evidence under Rule 804(b)(1) the prior testimony of approximately 16 witnesses, employees of the Japanese manufacturer defendants, who testified before the JFTC in the 1966

"Six Company Case." Rule 804(b)(1) provides:

(b) Hearsay exceptions.–The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony.–Testimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

If admitted, the testimony would be offered against the six defendants who were present at the JFTC Six Company Case hearings to prove a conspiracy to fix prices in Japan, the home market aspect of the alleged "unitary conspiracy." It would also be offered against all other defendants on the ground that the "six companies" are their predecessor in interest. Moreover, plaintiffs propose to offer the testimony against all defendants insofar as it authenticates the diaries. Defendants object to the admission of the former testimony on the grounds that plaintiffs have failed to show: (1) that the declarants are "unavailable" as witnesses in the present trial, within the meaning of Rule 804(a); (2) that the six defendants who were respondents in the Six Company Case had a "similar motive to develop the testimony" in the JFTC hearings; and (3) that those six defendants qualify as "predecessors in interest" of the other eighteen defendants who were not represented at the JFTC hearings. We discuss the legal aspects of these issues in the order mentioned.

#### 1. *Unavailability*

##### a. *Introduction*

 The first requirement for application of all the Rule 804 hearsay exceptions, including 804(b)(1), is that the declarant be unavailable.[72] Unavailability is defined in Rule 804(a) as follows.

(a) Definition of unavailability.–

---

**72.** As will be seen *infra,* the requisites for proving unavailability for purposes of 804(b)(1) differ somewhat from those under 804(b)(2)(3) & (4).

"Unavailability as a witness" includes situations in which the declarant—

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement; or

(2) persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so; or

(3) testifies to a lack of memory of the subject matter of his statement; or

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5) is absent from the hearing and the proponent of his statement has been unable to procure his attendance (or in the case of a hearsay exception under subdivision (b) (2), (3), or (4), his attendance or testimony) by process or other reasonable means.

A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.

Rule 804(a) codifies the historically diverse bases for finding a witness "unavailable" for the purpose of admitting (under subsection (b) of the rule) evidence otherwise excluded by the hearsay rule. The burden of demonstrating unavailability falls, of course, on the proponent. 11 Moore's Federal Practice § 804.02 at 239.

Plaintiffs contend that the witnesses whose testimony they seek to introduce are unavailable within the meaning of subsections (3), (4), and (5) of 804(a). Plaintiffs' only claim under 804(a)(4) is that one of the declarants, Mr. Yajima, is unavailable because of his death in 1968, prior to commencement of this litigation. The defendants concede that Yajima is dead, hence unavailable, so that a discussion of 804(a)(4) is unnecessary. We can defer our discussion of 804(a)(3) until we reach the discussion of other hearsay exceptions because we find that the 804(a)(5) requirement is satisfied with respect to former testimony, and that is sufficient to establish unavailability.

b. *Inability to Procure Attendance Under Rule 804(a)(5)*

Rule 804(a)(5) provides that a declarant of former testimony is unavailable if the proponent "has been unable to procure his attendance ... by process or other reasonable means." In civil cases, it has long been the rule that inability to procure attendance by "process or other reasonable means" is satisfied by demonstration of inability to serve a subpoena. 4 Weinstein ¶ 804(a)[01] at 804–41; Saltzburg at 600; McCormick § 253 at 609; *Trade Development Bank v. Continental Insurance Co.,* 469 F.2d 35, 42 (2d Cir. 1972); *McIntyre v. Reynolds Metals Co.,* 468 F.2d 1092, 1093 n. 2 (5th Cir. 1972); *United States v. Squella-Avendano,* 478 F.2d 433, 439 (5th Cir. 1973). We have found nothing to indicate that the adoption of the Federal Rules of Evidence altered this longstanding rule.

The declarants in this case, Japanese citizens living in Japan, are beyond the subpoena power of this court as governed by Fed.R.Civ.P. 45(e). The statute governing federal courts' subpoena power over persons in a foreign country, 28 U.S.C. § 1783, extends that power only to "a national or resident of the United States" in a foreign country, and therefore plainly does not reach Japanese citizens residing in Japan. Nor do we find in Rule 804(a)(5) any requirement that plaintiffs seek the voluntary attendance of witnesses residing abroad whose attendance cannot be compelled by process. It would be anomalous to apply in a civil case a requirement which the Supreme Court has found inapposite under the stricter standards applied in criminal cases. *See Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972).

Rule 804(a)(5) is written in the disjunctive. The rule, as promulgated by the Supreme Court, required only a showing of inability to procure *attendance* of the declarant with respect to all the 804(b) exceptions. However, the House Judiciary Com-

mittee added language to the Rule which provides that "in the case of a hearsay exception under subdivision (b)(2), (b)(3), or (b)(4)," a proponent must also be unable to procure the *testimony* of the declarant. The House Committee noted:

> the amendment is designed primarily to require that an attempt be made to depose a *witness* (as well as to seek his attendance) as a precondition to the witness being deemed unavailable. The Committee, however, recognizes the propriety of an exception to this additional requirement when it is the declarant's former testimony that is sought to be admitted under subdivision (b)(1).

House Report at 15, U.S.Code Cong. & Admin.News 1974, p. 7088. While the Senate deleted the language added by the House, the Conference Committee adopted the House version. Thus, in the Rule as enacted, there is no additional requirement that a proponent of former testimony attempt to depose the declarant.

Although the Senate Judiciary Committee rejected the House amendment, the Committee expressed its view that if the proponent of hearsay evidence had in fact *taken* the declarant's deposition, the proponent's failure to ask certain questions at the deposition might estop him from claiming subsequently that the declarant was unavailable at trial. The Committee stated:

> The committee understands that the rule as to unavailability, as explained by the Advisory Committee "contains no requirement that an attempt be made to take the deposition of a declarant." In reflecting the committee's judgment, the statement is accurate insofar as it goes. Where, however, the proponent of the [hearsay] statement, with knowledge of the existence of the statement, fails to confront the declarant with the statement at the taking of the deposition, then the proponent should not, in fairness, be permitted to treat the declarant as "unavailable" simply because the declarant was not amenable to process compelling his attendance at trial. The committee does not consider it necessary to amend the rule to this effect because such a situation abuses, not conforms to, the rule. Fairness would preclude a person from introducing a hearsay statement on a particular issue if the person taking the deposition was aware of the issue at the time of the deposition but failed to depose the unavailable witness on that issue.

Senate Report, U.S.Code Cong. & Admin. News 1974, p. 7067. Although the House amendment imposed an attempt–to–depose requirement upon subsections (b)(2), (b)(3), and (b)(4), it did not alter the proposed rule with respect to former testimony. Defendants contend that the Senate Committee's "estoppel" position therefore remains applicable to the proponent of former testimony under subsection (b)(1).

The plaintiffs did not in fact depose the declarants of the diaries and memos written in Japan. However, they *did* depose other officials of the companies which employ or employed the declarants in Japan. Those depositions (in two waves) related first to personal jurisdiction, venue, and service of process, and second, to identification of documents produced in discovery. The defendants contend that application of the Senate "estoppel" guideline bars the plaintiffs from claiming that the declarants are now unavailable. They argue that the plaintiffs had ample opportunity to depose the declarants when they deposed the Japanese defendants. Moreover, they say, in such depositions as were taken plaintiffs did not confront the deponents with issues addressed in the testimony of their employees in the JFTC proceedings and did not attempt to elicit foundation for the admissibility of any of the documents produced. Plaintiffs, in response, do not address the application of Senate guidelines, but maintain that a literal construction of the rule renders a proponent of 804(b)(1) testimony exempt from any requirement of attempting to take depositions.

We cannot accept the defendants' reading of the Senate Committee's comment. First, it must be noted that the Senate Committee guidelines address fairness questions which

would arise under the rule *as promulgated by the Advisory Committee.* Unlike that proposed rule, the rule as enacted makes a distinction between former testimony and the other 804(b) exceptions. We cannot speculate as to what the Senate Committee would have said in direct response to the rule thus drawn.

■ Even if the Senate Committee's view retains some vitality in the construction of the rule as enacted, the extension of the Senate guideline which defendants propose is contrary to the plain language of the rule itself. The defendants in effect contend that the Senate report should be read to impose on plaintiffs a requirement of taking depositions which they might not otherwise take, while the Senate report itself speaks only of a party's willful failure to ask certain questions at a deposition which he has taken voluntarily. To read the Senate report as broadly as the defendants propose would be in effect to impose a requirement that the proponent of former testimony must take the deposition of the declarant, even though the rule as enacted clearly distinguishes in this regard between former testimony and the categories of hearsay treated in subsections (b)(2), (b)(3), and (b)(4). Thus we conclude that the declarants of former testimony are unavailable under Rule 804(a)(5) if they are outside the subpoena power of the court, even if the proponent of the former testimony has made no effort to take their depositions or to request their voluntary attendance at trial.

## 2. Similarity of Motive

In addition to meeting the requirement of unavailability, former testimony under 804(b)(1) must have been given under circumstances such that "the party against whom the testimony is now offered, or in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." It is uncontroverted that the respondents in the JFTC proceedings had an opportunity to develop the witnesses' testimony, as they were represented by counsel who engaged in extensive examination of the witnesses.[73] In this section, we discuss the requirement of similarity of motive to develop the testimony, and in the following section we turn to a discussion of what renders one party a "predecessor in interest" of another.

At common law, the hearsay exception for former testimony originally required identity of parties *and* identity of issues. Both were intended to insure the adequacy of the present opponents' opportunity to cross–examine the witness in the prior proceeding. Gradually the courts reduced these requirements to "predecessor in interest" and "substantial" identity of issues.[74]

■ Abandoning the old requirement of identity of issues, the Supreme Court promulgated, and the Congress adopted, the term "similar motive" in Rule 804(b)(1). The Advisory Committee explained its preference as follows:

> The common law did not limit the admissibility of former testimony to that given in an earlier trial of the same case, although it did require identity of issues as a means of insuring that the former handling of the witness was the equivalent of what would now be done if the opportunity were presented. Modern decisions reduce the requirement to "substantial" identity. McCormick § 233. Since identity of issues is significant only in that it bears on motive and interest in developing fully the testimony of the witness, expressing the matter in the latter terms is preferable.

Advisory Committee Note to Rule 804. The rule thus embodies McCormick's view that

---

**73.** Defendants do argue that there was no *realistic* opportunity to develop the testimony because prior opportunity to examine on particular facts is insufficient if those facts are not probative of substantially the same issue in the present case. However, as this argument goes to similarity of issues, it in effect is dealt with in the following discussion of similarity of motive which is a function thereof. We will confine our discussion to "similar motive" rather than "opportunity," since the semantic distinction may be artificial and in any event is of no great moment.

**74.** *See* McCormick § 256; Weinstein ¶ 804(b)(1)[04].

the requirement of identity of issues "should be restated, not as a mechanical one of identity or even of substantial identity of issues, but rather as a requirement that the issues in the first proceeding and hence the purpose for which the testimony was there offered, must have been such that the present opponent (or some person in like interest) had an adequate motive for testing on cross–examination the credibility of the testimony now offered." McCormick § 257 at 622.

 That similar motive is predicated, at least in part, upon the substantial similarity of issues and purpose for which testimony is offered is clear. But motive may also be influenced by other factors. As Saltzburg observes:

> While common law jurisdictions require substantial identity of issues, the Federal Rule does not depart from the common law in its requirement of a similar motive to develop the testimony. *The way to determine whether or not motives are similar is to look at the similarity of the issues and the context in which the opportunity for examination previously arose.*

Saltzburg at 602.

Such circumstances or factors which might influence motive to develop testimony in-

clude (1) the type of proceeding in which the testimony is given,[75] (2) trial strategy,[76] (3) the potential penalties or financial stakes,[77] and (4) the number of issues and parties.[78] Thus in determining whether a party or his predecessor in interest had the opportunity and similar motive to develop the testimony, the court must evaluate, in terms of both the prior and the present proceedings (1) the similarity of issues, (2) the purpose for which the testimony is offered, and (3) the context or circumstances in which the testimony is given.

### 3. The Meaning of "Predecessor in Interest"

 Rule 804(b)(1) permits the introduction into evidence of prior testimony against a party which was not represented in the earlier action, so long as there was in the earlier action a "predecessor in interest" of the present party, whose motive to develop the testimony in the earlier action was sufficiently similar to that of the present party to satisfy that requirement of the rule. The plaintiffs offer the JFTC testimony against all defendants in this action, arguing that the six respondents were "predecessors in interest" of the other defendants.

**75.** In many of the cases the former testimony was given at a preliminary hearing, and an argument can be made that strategy often dictates little or no cross–examination at that stage, since ample opportunity will be afforded at trial. However, the argument has not been received favorably by the courts. McCormick § 255 at 616 (footnotes omitted).

**76.** *See United States v. Franklin*, 235 F.Supp. 338 (D.D.C.1964), where it was held that as a tactical matter, effective cross–examination in a prior proceedings was not possible.

**77.** A discrepancy in the financial stakes involved in the two cases may also affect motive. An action in small claims court may not be defended with the same vigor as an action where considerably more is involved. Weinstein ⸢ 804(b)(1)[04] at 804–66.

**78.** Although all the issues need not be the same in the two proceedings and the existence of additional issues in one of the cases is immaterial so long as the motive with which the testimony was developed is similar, the presence of additional issues may affect motive,

particularly when additional parties are also involved.
Weinstein *id.* at 804–66. In *Wolf v. United Air Lines, Inc.*, 12 F.R.D. 1 (M.D.Pa.1951), the court excluded depositions taken in prior actions against two co–defendants. Because the instant action involved only one of those defendants, the court concluded "under the prevailing circumstances the interest and motive of United Air Lines in its direct and cross–examination may very well not have been the same at that time as it is now in an action in which Douglas is not a party." *Id.* at 3–4. In *First National Bank v. National Airlines, Inc.*, 22 F.R.D. 46, 48 (S.D.N.Y.1958), depositions taken in an action formerly brought against National Airlines only were excluded as against National and Douglas, the co-defendants in the case at bar. The court held that the depositions could not be offered against Douglas, applying the standard of identity of parties and identity of issues, and ruled that it would be impractical to expect the jury to consider the evidence only against National.

The meaning of the phrase "predecessor in interest" in Rule 804(b)(1) is somewhat confused because the relevant legislative history is ambiguous. As we have noted, the original common law rule concerning the admissibility of former testimony required identity of parties in the two proceedings. Prior to the enactment of the Federal Rules of Evidence, however, many courts and commentators had taken the position that the requirement of identity of parties should be relaxed. For example, Wigmore proposed that the inquiry should be only "whether the former testimony was given upon such an issue that the party–opponent in that case had the same interest and motive in his cross–examination that the present opponent has." 5 Wigmore on Evidence § 1388 at 111 (Chadbourn ed. 1974).

The Supreme Court followed the Wigmore position in its original submission of Rule 804(b)(1), making prior testimony admissible if a person with "motive and interest similar" to the party against whom it is offered had an opportunity to examine the witness. The House Judiciary Committee reinstated the traditional "predecessor in interest" language with the following rationale:

> Rule 804(b)(1) as submitted by the Court allowed prior testimony of an unavailable witness to be admissible if the party against whom it is offered or a person "with motive and interest similar" to his had an opportunity to examine the witness. The Committee considered that it is generally unfair to impose upon the party against whom the hearsay evidence is being offered responsibility for the manner in which the witness was previously handled by another party. The sole

exception to this, in the Committee's view, is when a party's predecessor in interest in a civil action or proceeding had an opportunity and similar motive to examine the witness. The Committee amended the Rule to reflect these policy determinations.

House Report at 15, U.S.Code Cong. & Admin.News 1974, p. 7088. Thus it appears that the House Committee intended that the phrase "predecessor in interest" be construed narrowly, a position that is consistent with the common law meaning of the term.[79]

The Senate Judiciary Committee accepted the House amendment to the Supreme Court's proposed rule. It put its own gloss on the phrase "predecessor in interest," however, by means of the following comment:

> The House amended the rule to apply only to a party's predecessor in interest. Although the Committee recognizes considerable merit to the rule submitted by the Supreme Court, a position which has been advocated by many scholars and judges, we have concluded that the difference between the two versions is not great and we accept the House amendment.

Senate Report at 28, U.S.Code Cong. & Admin.News 1974, p. 7074. Thus it seems that the Senate Committee intended that the statutory phrase "predecessor in interest" be broadly construed as essentially similar to the Supreme Court's proposed rule. In contrast, as we have noted, the House Committee apparently intended that the phrase be construed narrowly in accordance with its common law meaning. While both houses of Congress enacted the same language, they differed in their views of the meaning of that language.

---

**79.** Black's Law Dictionary (5th ed. 1979) defines "predecessor" as "the correlative of 'successor,' " *id.* at 1060, and defines "successor in interest" as follows:

One who follows another in ownership or control of property. In order to be a "successor in interest", a party must continue to retain the same rights as original owner without change in ownership and there must be change in form only and not in substance, and transferee is not a "successor in inter-

est." In case of corporations, the term "successor in interest" ordinarily indicates statutory succession as, for instance, when corporation changes its name but retains same property.

*Id.* at 1283-84 (citations omitted). *See also Lloyd v. American Export Lines, Inc.*, 580 F.2d 1179, 1191 (3d Cir.) (Stern, D.J., concurring), *cert. denied* 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978) ("predecessor in interest" traditionally defined in terms of privity).

In *Lloyd v. American Export Lines, Inc.*, 580 F.2d 1179 (3d Cir.), *cert. denied*, 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978), a majority of a Third Circuit panel adopted the Senate view of the phrase "predecessor in interest." Referring to the Senate Report quoted above, the court of appeals stated, "we, too, fail to see a compelling difference between the two approaches." *Id.* at 1185. The *Lloyd* majority added:

> We do not accept the view that this change in wording signalled a return to the common law approach to former testimony, requiring privity or a common property interest between the parties.

*Id.* at n. 5. *Lloyd* was an action by a crewman (Alvarez) against the shipowner (Export) for injuries sustained in a fight with a fellow crewman (third party defendant Lloyd). Alvarez alleged that Export failed to protect him from Lloyd after Export had knowledge of Lloyd's dangerous propensities. The trial court excluded former testimony given by Lloyd in a Coast Guard hearing which sought to determine culpability in the altercation between Lloyd and Alvarez. The testimony was offered by Export against Alvarez and the question on appeal was whether the Coast Guard examiner was a "predecessor in interest" of Alvarez in terms of 804(b)(1).

Reasoning that there was the same "nucleus of operative facts" and the same "basic interest advanced" by both the Coast Guard examiner and Alvarez, the court concluded that the examiner was a predecessor in interest, stating:

> While we do not endorse an extravagant interpretation of who or what con-

stitutes a "predecessor in interest," we prefer one that is realistically generous over one that is formalistically grudging. We believe that what has been described as "the practical and expedient view" expresses the congressional intention: "if it appears that in the former suit a party having a like motive to cross–examine about the same matters as the present party would have, was accorded an adequate opportunity for such examination, the testimony may be received against the present party." *Under these circumstances, the previous party having like motive to develop the testimony about the same material facts is, in the final analysis, a predecessor in interest to the present party.*

*Id.* at 1187 (emphasis added) (footnote omitted).[80]

In our view, it is highly significant that the "previous party" in *Lloyd* was a government investigator, presumably impartial, who had no role in the subsequent legal action. The *Lloyd* court itself commented on the community of interest that the government, as representative of the public, and an individual might share:

> [O]ur analysis of the concept of interests satisfies us that there was a sufficient community of interest shared by the Coast Guard in its hearing and Alvarez in the subsequent civil trial to satisfy Rule 804(b)(1).... The interest implicated here was a claim or desire or demand which Alvarez as an individual, and the Coast Guard as a representative of a larger group, sought to satisfy . . .

---

**80.** There is some authority for a narrower construction of the phrase "predecessor in interest," which would follow the view of the House Committee. Another court, considering the same issue shortly before *Lloyd*, adopted a much narrower definition of "predecessor in interest." *In Re IBM Peripheral EDP Devices Antitrust Litigation*, 444 F.Supp. 110, 113 (N.D. Cal.1978). And in *Government of Canal Zone v. Pinto*, 590 F.2d 1344 (5th Cir. 1979), a criminal case discussed in the text *infra*, Judge Wisdom commented that, "[e]ven for civil cases, the draftsmen of the Federal Rules *rejected* the theory that subjecting testimony to the questioning of a person who is not a party at the trial, *although he has like motive and interest*, will furnish a guarantee of trustworthiness equal to that of cross–examination by the one against whom the evidence is introduced." *Id.* at 1354 (emphasis added). Moreover, the panel in *Lloyd* was divided and District Judge Herbert J. Stern, sitting by designation, disagreed with the majority's construction of the phrase "predecessor in interest," although he concurred in the result. One commentator has called Judge Stern's opinion "persuasive." Saltzburg at 231 (1980 Supp.). We are bound, however, by the opinion of the panel majority in *Lloyd*.

Individual interests, like those of Alvarez, are involved immediately in the individual life .... Public interests, like those of the Coast Guard, are involved in the life of a politically organized society, here the United States, and asserted in title of that entity. Thus, Alvarez sought to vindicate his individual interest in recovering for his injuries; the Coast Guard sought to vindicate the public interest in safe and unimpeded merchant marine service.

*Id.* at 1185–86 (footnotes omitted).[81]

Entirely different considerations come into play when prior testimony is offered against one co–defendant on the basis of prior examination of the witness on behalf of a different co–defendant, when the two have potentially conflicting interests and litigation strategies. In *Government of the Canal Zone v. Pinto*, 590 F.2d 1344 (5th Cir. 1979), for example, testimony from a preliminary hearing was not admitted under 804(b)(1) against a defendant who was not represented at the hearing, even though the lawyer who later represented him at trial attended the prior hearing on behalf of his co–defendant and engaged in cross–examination on behalf of the co–defendant. Judge Wisdom commented that, "the reliability of preliminary hearing testimony is not assured by the mere fact of cross–examination but only by cross–examination designed to illuminate the accuracy of the statement as it concerns the *particular* defendant." *Id.* at 1353–54 (emphasis added).

The facts and circumstances of this case will require us to determine whether a sufficient "community of interest" between alleged co–conspirators exists to satisfy the

*Lloyd* requirements for finding the six respondents in the JFTC proceedings to be "predecessors" of the other defendants in the present case. Under *Lloyd*, our inquiry is whether the six respondents had a "like motive to develop the testimony about the same material facts" as the other defendants would have had if they had been represented at the JFTC hearing. In applying the principles of *Lloyd* to the vastly different circumstances of this case, we must also bear in mind the House Judiciary Committee's admonition that it is "generally unfair" to impose upon the present party the "responsibility for the manner in which the witness was previously handled by another party." House Report, *supra*, U.S.Code Cong. & Admin.News 1974, p. 7088.

E. *Statements Against Interest Under Rule 804(b)(3)*

Plaintiffs seek admission of numerous documents as statements against the interests of both the declarants and their corporate employers. As we have noted, the 804(b) hearsay exceptions require a showing of unavailability of the declarants. Plaintiffs argue that the declarants are unavailable under Rule 804(a)(3) and (5) and, in the case of Mr. Yajima, under (a)(4) because of his death. Defendants reply that, except for Yajima, declarants do not meet any of the tests of unavailability under 804(a). They also contend that the substantive requirements of 804(b)(3) are not met here because: (1) the statements were not contrary to the declarants' pecuniary or proprietary interests, nor did they tend to subject the declarants to civil or criminal liability, within the meaning of the rule; and (2) plaintiffs have failed to show awareness by

---

**81.** A similar emphasis upon the special relationship between the government and an individual is apparent in *In Re Master Key Antitrust Litigation*, 72 F.R.D. 108 (D.Conn.1976). In that case Judge Blumenfeld admitted testimony developed by the government in a prior antitrust case into evidence in a subsequent action brought by a treble damage plaintiff. He reasoned that: "Congress seems to have intended to relax the common law requirement of actual privity between the parties" and:

In this case there are special considerations which weigh in favor of holding that the

United States was a predecessor in interest of the present plaintiffs. The unique relationship between the Government's antitrust enforcement suits and the private actions which follow has Congressional recognition and ratification, which has in turn provided special benefits to the private plaintiffs.... Under these circumstances it is clearly not unfair to allow the defendants to submit the prior testimony of witnesses at that proceeding who are now unavailable.

*Id.* at 109·110.

each declarant of the implications of his statement such that a reasonable man would not have made them unless he believed them to be true. We consider first the issues relating to unavailability for purposes of Rule 804(b)(3).

### 1. Unavailability

#### a. Inability to Procure Testimony Under Rule 804(a)(5)

The standard of unavailability which is imposed by Rule 804(a)(5) on the proponent of declarations against interest is more rigorous than that imposed on the proponent of former testimony. As applied to 804(b)(3), the parenthetical clause of 804(a)(5) dictates that a witness is unavailable if he is absent from the hearing and the proponent of his statement is unable to procure his "attendance *or testimony*" (emphasis added). While we have ruled that the plaintiffs are unable to procure the attendance of Japanese citizens residing in Japan, pp. 1248–1252, *supra*, the proponent of declarations against interest is required to meet a higher standard by seeking the witness' *testimony* before hearsay evidence may be admitted. The legislative history of Rule 804(a)(5) has been reviewed in detail, *supra*. It is perfectly clear that the House Judiciary Committee, which added to the rule the parenthetical language applicable to subsection (b)(3), intended thereby to require that the proponent of such evidence attempt to depose the absent witness. There is an express statement of that intention in the House Report, quoted at p. 1250, *supra*. Since the plaintiffs made no effort to depose any of the declarants, none of the declarants (except Yajima) are unavailable under 804(a)(5) for purposes of the hearsay exception for declarations against interest.

#### b. Lack of Memory Under Rule 804(a)(3)

Plaintiffs submit that the witnesses before the JFTC are unavailable under Rule 804(a)(3) because of lack of memory of the subject matter of their testimony and protocols and diaries. Notwithstanding the wording of the rule, which requires that lack of memory be established by the testimony of the declarant, plaintiffs seek to establish lack of memory by certain answers to interrogatories addressed to the declarants' *employers*. When plaintiffs asked for details of meetings among competitors in nos. 42, 43 and 44 of plaintiff NUE's Second Set of Interrogatories, the defendants are said to have answered to the effect that they had no knowledge or information aside from the documents which they produced. Those documents, produced under F.R.Civ.P. 33(c), included the JFTC testimony and protocols and diaries. Plaintiffs argue that under Federal Rule of Civil Procedure 33(a), corporations are bound to inquire of their employees before making a corporate response, and that a corporation's answers are deemed to represent the findings of those inquiries. They claim that the answers should therefore be treated as representations of the declarants themselves, who are defendants' employees, that they are unable to remember the subject matter of the statements, hence are unavailable with 804(a)(3).

Defendants contend, correctly, that there is no evidence that the declarants themselves are unable to recall the subject matter of the testimony and protocols. Except for Yajima, all the declarants are alive, well and still in the employ of the respective manufacturing defendants. Yet they have never been asked whether or what they remember, because they have never been deposed. Rule 804(a)(3) provides that a declarant is deemed unavailable when he "testifies to a lack of memory of the subject matter of his statement." Defendants argue that Rule 804(a)(3) means what it says, *i. e.*, that the declarant is unavailable only when he "testifies to a lack of memory." Their position is supported by the Advisory Committee Note, which observes that "the practical effect" of a claimed lack of memory is to put present testimony "beyond reach," and notes that "the lack of memory must be established by the testimony of the

witness himself, which clearly contemplates his production and subjection to cross–examination."

■ Despite the clear requirement of the rule that lack of memory must ordinarily be proved by testimony of the declarant, we might still find that the defendants were estopped to deny their employees' lack of memory, if their interrogatory answers clearly asserted that the declarants lacked memory, or even if the answers clearly asserted that the defendant corporations as institutions lacked memory of the pertinent subject matter.[82] However, we do not think that the relevant interrogatory answers are susceptible of the interpretation which the plaintiffs seek to place upon them.

The pertinent interrogatories refer to the subject matter of the meetings in question as well as to dates and names of partici-pants.[83] Interrogatory No. 42 asks defendant to:

> state the date or dates and identify the persons present at each meeting . . . during which there was any discussion, comment or reference to the prices, price levels or price formulae, rebates, discounts, allowances, or other terms or conditions of sale for television receivers.

No. 43 asks for identification of all documents and reports relating to or reporting these meetings. No. 44 asks for identification (if a document) and description (if oral) of *each communication* between "you and other defendant or defendants, or any other manufacturer, seller, distributor, exporter or importer of television receivers" regarding pricing policies.[84] The defendants responded to these interrogatories both by making massive document productions, and by written answers. Although the written answers of the defendants are not identical, the general tenor of most of the answers is

---

**82.** Rule 33(a) of the Federal Rules of Civil Procedure, in its provisions for serving and answering interrogatories to corporations, states that whatever officer or agent of the corporation is chosen to answer on behalf of the corporate party, he must "furnish such information as is available to the party." Since this language was added in 1946, the rule has been construed to place on the responding corporation a duty to inquire of appropriate employees before submitting its answers. *General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1210 (8th Cir. 1973), *cert. denied*, 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974). *See also Hornung v. Eastern Auto. Forwarding Co.*, 11 F.R.D. 300 (N.D.Ohio 1951); *Drum v. Town of Tonawanda*, 13 F.R.D. 317 (W.D.N.Y.1952). A corporation's answers must speak as of the composite knowledge of the party and include facts and knowledge of its agents and any person under its control. 4A Moore's Federal Practice ⸗ 33.07 at 44 and ⸗ 33.26 at 143. The rationale underlying "corporate responsibility" to respond to interrogatories is obvious: in a large corporation, no single official is likely to have knowledge of the affairs of the entire corporate body. Responses to discovery which revealed only the knowledge of one individual would be useless in corporate litigation, where knowledge held by the corporate entity is sought.

In *General Dynamics*, for example, interrogatories were served on the defendant corporation, Selb. Selb's corporate Secretary Frey, designated by Selb to answer on behalf of the corporation, responded that he had "insufficient personal knowledge upon which he [could] base an answer and there are no other present employees or officers available to answer." The 8th Circuit held that under Rule 33(a) Frey, in acting for the corporation, was "duty bound to secure all information available to Selb, including information within the personal knowledge of past and present employees." *Id.* at 1210. Moreover, "knowledge of officers and employees of Selb Manufacturing, relative to the subject matter of the instant case, is imputed to the corporation itself." *Id.* at 1210. Generally, a duty to inquire carries the burden of being deemed to possess knowledge such as an appropriate inquiry would have yielded. *Cage v. New York Central Railroad Co.*, 276 F.Supp. 778, 787 (W.D.Pa.), *aff'd*, 386 F.2d 998 (3d Cir. 1967).

**83.** We thus reject defendants' contention that the interrogatories on which plaintiffs rely to show lack of memory refer only to dates and names, rather than to the subject matter of the meetings.

**84.** NUE included in its first set of interrogatories a list of definitions of terms, including:

> (3) "Describe" means to state and date and identify the persons involved in the transaction, communication, event, or occurrence in question, and of the transactions, communications, events or occurrence in question, and state the *nature and subject matter* of the transactions, communications, events or occurrence in question.

(emphasis added).

that, apart from the documents produced to NUE, the defendant corporations were not aware of the matters discussed at meetings among competitors.[85]

Plaintiffs would have us read the written answers to NUE's interrogatories as representations that defendants' employees have no knowledge of the subject matters contained in the former testimony, "protocols," diaries, and memoranda. We find this to be an inappropriate and excessive interpretation of these responses. First, the written answers cannot be considered in isolation from the defendants' production of a large body of documents from which the names, dates and subject matters requested in the interrogatories could be gleaned. The production of documents itself contained much information—thousands of pages—but nowhere has there been a representation by defendants or their officials that they do not recall the subject matter of *those* materials.

Secondly, plaintiffs fail to show the necessity or prudence of accepting this second–hand evidence over depositions or in–court testimony. It would torture logic and the Federal Rules to conclude that, because corporations made limited responses as to knowledge of names, dates and facts, their officials should now be presumed forgetful of the myriad information contained in the several types of documents—without the plaintiffs ever questioning (deposing) those individuals at all. The unavailability requirement places a large burden on the proponent of the evidence to establish the necessity of foregoing individual testimony, with its circumstantial guarantees of reliability, in favor of inherently suspect and unclarified hearsay evidence. Since all but one of the relevant corporate officials (declarants) are alive and employed by defendants, the necessity of such forebearance is not readily apparent.[86] Accordingly, we hold that the plaintiffs may not avail themselves of 804(a)(3).

85. For instance, responding to no. 42, Hitachi claimed that, except for references to certain meetings in documents produced for discovery, it had "no information as to the specific dates, persons present at or subjects discussed at meetings of trade associations or other groups." In answer to no. 44, Hitachi said that it was "aware of no such communication," and referred to its answer to no. 42. Toshiba responded to nos. 42, 43 and 44 by noting that the meetings were held irregularly and that it did not have information or documents identifying dates, persons or "the specific matters discussed at each meeting," other than in the documents produced. Matsushita gave similar *negative responses; in its memorandum* opposing NUE's motion for an order compelling answers to plaintiff's interrogatories, it further explained its answers by noting that it "could not recall the specific information requested for each such meeting and so stated that fact." In answering no. 44, MELCO said that except for routine correspondence, there were no other communications.

Several of the defendants responded to no. 44 by referring to their answers to no. 42. They now contend that in doing so, they did not opine as to the subject matter of the meetings, but only to names and dates as questioned by no. 42. Though no. 42 was so limited, interrogatory nos. 43 and 44 referred more broadly to documents and communications, and the defendants answered the latter interrogatory by incorporating by reference their answers to no.

42. Thus the fact that no. 42 was more limited in its scope than nos. 43 and 44 is of no consequence.

86. Implicit in the unavailability of the 804 exceptions is the mandate that the proponent of the evidence show the necessity of admitting the hearsay evidence. *See Dallas County v. Commercial Union Assurance Co.,* 286 F.2d 388, 396-97 (5th Cir. 1961); Note, *The Theoretical Foundation of the Hearsay Rules,* 93 Harv. L.Rev. 1786, 1799 (1980). The 804 exceptions, "save that of former testimony, have fewer circumstantial guarantees of reliability than the exceptions in Rule 803." 11 Moore's Federal Practice § 804.02, p. VIII 239. Their trustworthiness must be rigorously guarded, and the hearsay evidence supplanted by the declarant's testimony whenever possible. Even where former testimony is introduced, "tradition, founded in experience, uniformly favors production of the witness if he is available." Advisory Committee Note to Rule 804(b)(1). Admissibility under the 804 exceptions rests on the theory that:

It is better to have the hearsay evidence than no evidence at all. The 804 exceptions bear sufficient reliability to justify their admission when the only other alternative is to lose the declarant's information.

*Id.,* 11 Moore's Federal Practice § 804.02, p. VIII 239. The mandate that necessity be shown is thus critical.

2. *Statement Against Interest—The Requirements of Rule 804(b)(3)*

Rule 804(b)(3) embodies the long–recognized hearsay exception for declarations against interest, and is "based on the guaranty of trustworthiness which accompanies a statement against interest." *United States v. Lilley*, 581 F.2d 182, 188 (8th Cir. 1978). In pertinent part, the Rule creates an exception to the hearsay rule, if the declarant is unavailable, for

> a statement which was at the time of its making so far contrary to the declarant's pecuniary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.

The rule proposed by the Supreme Court would have broadened the common–law exception by including in its scope statements which tended to make the declarant "an object of hatred, ridicule, or disgrace." Congress deleted this clause of the proposed rule, retaining "the traditional hearsay exception for statements against pecuniary or proprietary interest." House Report, U.S. Code Cong. & Admin.News 1974, p. 7089. However, Congress also retained the provision of the proposed rule relating to civil or criminal liability, which it viewed as a clarification rather than an alteration of the common law rule. *Id.*; Senate Report. On the precise legal issues before us–whether a statement which is against the interest of the declarant's employer falls within the exception, and whether the declarant must be subjectively aware that the statement is against his interest–the legislative history indicates no intention to alter pre–existing law.

■ Preliminarily, we note that the exception uses the term "statement." Thus it refers back to the definition of "statement" as "assertion," which we discussed at length in Part II–C–2, *supra*. For the same reasons stated there with respect to admissions, we think that a written notation which is not an assertion cannot be a "statement" against the declarant's interest. Accordingly, any of the diary entries or memoranda which fail to qualify as admissions because they are not assertions will also fail to qualify as statements against interest for the same reason.

■ To qualify as an exception to the hearsay rule under 804(b)(3), a declaration must be against the employee's interest, not just the employer's interest. Since the trustworthiness of the declaration is insured only by the accompanying threat of loss or liability, the statement must be to the declarant's "immediate prejudice." *Nuttall v. Reading Co.*, 235 F.2d 546, 550 (3d Cir. 1956). In *Gilmour v. Strescon Industries, Inc., supra,* Judge Broderick, interpreting Rule 804(b)(3) [then Proposed Rule 804(b)(4)] in light of *Nuttall*, held that "a declaration against the interest of the declarant's employer ... does not fall within this exception to the hearsay rule." 66 F.R.D. at 150. We agree with Judge Broderick's analysis, since the necessary guarantee of trustworthiness is lacking unless the declaration is against the personal interest of the declarant. We note, however, that statements against an employer's interest may be against the employee's own pecuniary or proprietary interests if, for example, they threaten the loss of employment or reduce the chances for future employment. *See Gichner v. Antonio Troiano Tile and Marble Co.*, 410 F.2d 238 (D.C. Cir. 1969).

■ Rule 804(b)(3) also requires that the statement be *so far* contrary to the declarant's interests that a "reasonable man in his position would not have made the statement unless he believed it to be true." Plaintiffs contend that the "reasonable man" language establishes an objective test for awareness of the possibility of loss or liability. While this approach is appealing, it is simplistic, for it denies the very rationale of this hearsay exception: that the credibility of self–implication is assured by the declarant's knowledge of the potential consequences. The standard then is objective only to the extent that it is based upon what a "reasonable man" would have said, given a *subjective* understanding of the

danger to his interests. The Third Circuit in *Nuttall, supra,* held that the fact testified to must be "so palpably against the declarant's interests that he must have *realized it to be so* when he made the statement." 235 F.2d at 550, quoting 2 Morgan, Basic Problems of Evidence 252 (1954) (emphasis added). Though both *Nuttall* and Morgan antedate the Federal Rules of Evidence, Rule 804(b)(3) does not change the traditional approach requiring consciousness of the implications of the statement against interest. Indeed, a post–F.R.E. case, *Workman v. Cleveland–Cliffs Iron Co.,* 68 F.R.D. 562 (N.D.Ohio 1975), has followed the same analysis. A contrary approach would undercut the very rationale of the rule, for as Judge Weinstein has observed:

> It is not the fact that the declaration is against interest but the awareness of the fact by the declarant which gives the statement significance.

Weinstein ¶ 804(b)(3)[02] at 804–98 (quoting Jefferson, "Declarations Against Interest: An Exception to the Hearsay Rule," 58 Harv.L.Rev. 1, 17 (1944).

Since the plaintiffs contend that the declarants' statements were against their interest because they tended to subject the declarants to civil and criminal liability under Japanese law, we must at some point review the pertinent Japanese law and practice. It is convenient to do so here.

Japanese antimonopoly law outlaws price–fixing, furnishes a cause of action against private entrepreneurs for damages, and provides for fines and imprisonment. Section 3 of the Act Concerning Prohibition of Private Monopoly and Maintenance of Fair Trade (Act No. 54 of April 14, 1947), as amended, provides:

> Sec. 3 [Prohibition of Private Monopolization and Unreasonable Restraint of Trade]
>
> No entrepreneur shall effect private monopolization or any unreasonable restraint of trade.

Under the Act, an "entrepreneur" is "a person, who carries on a commercial, industrial, financial or any other business." (Section 2(1)). An unreasonable restraint of trade means (Section 2(5)):

> . . . such business activities, by which entrepreneurs by contract, agreement, or any other concerted activities mutually restrict or conduct their business activities in such a manner as to fix, maintain, or enhance prices.

Both civil and criminal remedies are set out by the Act. Section 25 provides for indemnification of the person injured by private monopolization or unreasonable restraint of trade. Criminal liability for employees who violate the Antimonopoly Act is available pursuant to sections 89 and 95. The Act states:

> Sec. 89 [Private monopolization and unreasonable restraint of trade]
>
> (1) Any person committing one of the following offenses shall be punished by penal servitude for not more than three years or by a fine of not more than five million yen [at pertinent times, less than $14,000]:
>
> (i) Any person who, in violation of the provisions of Section 3, effects private monopolization or unreasonable restraint of trade.

Section 95 provides for "imprisonment or the imposition of a fine for employees who commit violations of the Act."

While private civil and criminal sanctions exist under the Japanese antimonopoly law, they are rare, and actions against employees are virtually unknown. Plaintiffs' own expert witness, Professor John O. Haley, testified that there have been only "three or four" civil actions brought in the thirty–year history of the Antimonopoly Act. PTO 264 at 305 (June 24, 1980). According to the defendants' unchallenged representations, none of these have ever been brought against individuals, and all were initiated *after* the Six Company Case commenced in 1966. Moreover, according to the defendants' unchallenged representations, only four Antimonopoly Act criminal cases were prosecuted in Japan prior to 1974, all of which involved consumer fraud rather than price–fixing, and the first criminal cases under section 89, the price–fixing section, against individuals were the oil company

cases initiated in 1974. Defendants' Supplemental Memorandum Concerning the Inadmissibility of the JFTC Materials Under Fed.R.Evid. 801(d) and 804(b)(3) at 18 (July 14, 1980).

We leave until later our conclusions as to the effect of this law and practice upon plaintiffs' claim that statements made by various declarants fall within the ambit of Rule 804(b)(3).

### F. The Residual Hearsay Exceptions: Rules 803(24) and 804(b)(5)

#### 1. Introduction

In addition to proffering the diaries, protocols, and testimony of witnesses before the JFTC under the traditional hearsay exceptions, plaintiffs proffer those documents under the residual exceptions codified in F.R.E. 803(24) and 804(b)(5), which create an exception from the hearsay rule for:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

All 804 exceptions are subject to a general showing of unavailability of the witness as required by subsection (a) of that Rule. Rule 803 has no such condition. The residual exceptions are otherwise identical in language and purpose.[87]

In *United States v. Bailey*, 581 F.2d 341, 346–47 (3d Cir. 1978), the court of appeals reviewed the legislative history of these exceptions and observed that "[t]he history ... indicates a congressional intention that the rules have a narrow focus." [88] *Accord, deMars v. Equitable Life Assurance Society*, 610 F.2d 55, 61 (1st Cir. 1979); *Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir. 1979); *United States v. Kim*, 595 F.2d 755, 765 (D.C. Cir. 1979); *United States v. Mathis*, 559 F.2d 294, 299 (5th Cir. 1977).

The proposed rules as submitted to Congress included broad residual exceptions. The Advisory Committee explained:

> It would ... be presumptuous to assume that all possible desirable exceptions to the hearsay rule have been catalogued and to pass the hearsay rule to oncoming generations as a closed system. Exceptions (24) and its companion provision in [Rule 804(b)(5)] are accordingly included. They do not contemplate an unfettered exercise of judicial discretion, but they do provide for treating new and presently unanticipated situations which demonstrate a trustworthiness within the spirit of the specifically stated exceptions. Within this framework, room is left for growth and development of the law of evidence in the hearsay area, consistently with the broad purposes expressed in Rule 102. *See Dallas County v. Commercial Union Assur. Co.*, 286 F.2d 388 (5th Cir. 1961).

The proposed residual exceptions were eliminated by the House Judiciary Committee. The Senate reinstated the exceptions in a modified form, and the Senate version was accepted by the House–Senate Conference Committee.[89] The Senate Judiciary Com-

---

**87.** Because the residual exceptions have their own unavailability requirements, the existence of two such identical provisions is rather mysterious. *See* Note, The Theoretical Foundation of the Hearsay Rules, 93 Harv.L.Rev. 1786, 1793, n. 27 (1980).

**88.** The plaintiffs urge that in *Ebasco Services, Inc. v. Pennsylvania Power & Light Co.*, 460 F.Supp. 163, 185 n. 23 (E.D.Pa.1978), we indicated that the residual exceptions should be liberally construed. We find no such view expressed either directly or by implication in the footnote cited. It is clear from *Bailey*, as well as from the legislative history and decisions in other circuits, cited in text *infra*, that the residual exceptions are to be narrowly construed.

**89.** The Conference Committee added a requirement of advance notice to the adverse party when the exceptions are invoked. *See United States v. Oates*, 560 F.2d 45, 72 n. 30 (2d Cir. 1977). The notice requirement is not before us.

mittee explained its reasons for restoring limited residual exceptions to the Rules:

> [W]e feel that, without a separate residual provision, the specifically enumerated exceptions could become tortured beyond any reasonable circumstances which they were intended to include (even if broadly construed). Moreover, these exceptions, while they reflect the most typical and well recognized exceptions to the hearsay rule, may not encompass every situation in which the reliability and appropriateness of a particular piece of hearsay evidence make clear that it should be heard and considered by the trier of fact.
>
> The committee believes that there are certain exceptional circumstances where evidence which is found by a court to have guarantees of trustworthiness equivalent to or exceeding the guarantees reflected by the presently listed exceptions, and to have a high degree of probativeness and necessity could properly be admissible....
>
> The committee, however, also agrees with those supporters of the House version who felt that an overly broad residual hearsay exception could emasculate the hearsay rule and the recognized exceptions or vitiate the rationale behind codification of the rules....
>
> *It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances.* The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b). The residual exceptions are not meant to authorize

major judicial revisions of the hearsay rule, including its present exceptions. Such major revisions are best accomplished by legislative action. It is intended that in any case in which evidence is sought to be admitted under these subsections, the trial judge will exercise no less care, reflection and caution than the courts did under the common law in establishing the now–recognized exceptions to the hearsay rule.

(emphasis added), U.S.Code Cong. & Admin. News 1974, p. 7065.

There are essentially three legal issues before us with respect to the residual exceptions. Initially, we must determine whether the residual exceptions are available to render admissible evidence which appears to fall within a category encompassed in one of the specified hearsay exceptions, *e. g.*, former testimony or business records, but which fails to meet the precise requirements of the specific exception. In our hearings, this issue has been dubbed the "near miss" question. Secondly, we must interpret the provision in the rule requiring the proponent to make reasonable efforts to secure equally probative evidence. Finally, we must analyze the trustworthiness requirement of the rule. We address these issues in the order stated.

### 2. The "Near–Miss" Problem

 The defendants contend that the residual hearsay exceptions cannot be invoked as the basis for the admissibility of evidence which is generically of a type covered by another specific hearsay exception, but which fails to meet the precise requirements of that specific exception.[90] For in-

---

**90.** In a related contention, the defendants have urged that if an item fails to meet the terms of one of the specific hearsay exceptions, it may not be offered under another of the specific exceptions. On this view, for instance, if a document is generically a business record, but fails to qualify for admission as such under Rule 803(6), it may not be offered under any other hearsay exception. We reject that view. There is nothing in the language or the structure of the hearsay rules to suggest that the specific exceptions are exclusive in their application, and the Judiciary Committees of both

Houses of Congress expressly rejected the position advanced by the defendants in their comments on Rule 803(5). The House Committee stated:

> [I]t is the Committee's understanding that a memorandum or report, although barred under this Rule, would nonetheless be admissible if it came within another hearsay exception. This last stated principle is deemed applicable to all the hearsay rules.

House Report, U.S.Code Cong. & Admin.News 1974, p. 7087. The Senate Committee expressed its agreement with this principle, using

stance, they contend that if a document is a "business record" it must qualify for admission under Rule 803(6), and not under the residual exceptions. The plaintiffs counter that there is no such rule of law, and cite a number of cases in which courts have considered the admissibility of evidence under the residual exceptions after finding that the evidence failed to meet the terms of one or more of the specific exceptions. *E. g.*, *United States v. Hitsman*, 604 F.2d 443 (5th Cir. 1979).

We agree in principle with the defendants. The Advisory Committee explained its proposed residual exception, which was broader than the one enacted by Congress, as designated for "new and presently unanticipated situations." The Senate Judiciary Committee, which drafted the present rule, commented that "an overly broad residual hearsay exception could emasculate the hearsay rule and the recognized exceptions or vitiate the rationale behind codification of the rules." The Senate Committee also stated its intent "that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." U.S. Code Cong. & Admin.News 1974, p. 7066. We find it clear from the history of the rules that neither the Advisory Committee nor the Senate Judiciary Committee intended that the residual exceptions be used to qualify for admission evidence which is of a type covered by a specific exception, but

which narrowly fails to meet the standards of the specific rule. Instead, they intended that the residual exceptions be used in exceptional and unanticipated situations which are not specifically covered by the specific exceptions.[91]

The defendants' position is also supported by a basic principle of statutory construction, which we find equally applicable to the Federal Rules of Evidence: that the specific controls the general. As the Supreme Court stated in *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 1992–1993, 48 L.Ed.2d 540 (1976):

> It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550–551, 94 S.Ct. 2474, 2482–2483, 41 L.Ed.2d 290 [(1974)].

In conformity with this rule we conclude that the residual exceptions cannot be invoked when there is a specific exception which sets forth conditions governing the admissibility of a clearly defined category of hearsay evidence.[92]

virtually the same language as the House Committee. Senate Report. This clear statement of legislative intent precludes any assertion that the specific hearsay exceptions are exclusive of one another. In our view it does not, however, defeat defendants' "near miss" contentions with respect to the residual exceptions. The quoted statement of the House Judiciary Committee cannot be applied to the residual exceptions, since the House Committee would have eliminated the residual exceptions entirely. The statement of the Senate Committee must be interpreted in light of that Committee's more specific comments on the residual exceptions, which we consider in the text.

**91.** Mr. Justice Stewart, joined by Mr. Justice Marshall, has commented:

> It seems to me open to serious doubt whether Rule 804(b)(5) was intended to provide case–by–case hearsay exceptions, or

rather only to permit expansion of the hearsay exceptions by categories.
*McKethan v. United States*, 439 U.S. 936, 939 n. 3, 99 S.Ct. 333, 335 n. 3, 58 L.Ed.2d 333, *denying cert.* to *United States v. Garner*, 574 F.2d 1141 (4th Cir. 1978) (dissenting opinion). Although this statement is somewhat cryptic, we view it as a reference to the point at issue before us. *Cf.* Saltzburg at 241 (1980 Supp.) (criticizing Justice Stewart's language and arguing for a case–by–case approach.)

**92.** In *United States v. American Cyanamid Co.*, 427 F.Supp. 859, 865 (S.D.N.Y.1977), Judge Brieant rejected the government's contention that the residual exceptions could not be invoked without a specific showing that the evidence offered thereunder was "exceptional." We agree with that ruling, but do not find it pertinent to the issue raised by the defendants in this case.

For example, the exception for former testimony, Rule 804(b)(1), applies to a clearly defined category of evidence and specifies conditions which must be met in order for evidence in that category to be admissible. *See* Part II–D, *supra.* We will thus not consider a proffer of former testimony under the residual exceptions if the testimony fails to meet the specific requirements of Rule 804(b)(1), such as unavailability of the declarant, and similarity of motive to develop the testimony at the former hearing. Some of the other specific hearsay exceptions similarly apply to a clearly defined category of evidence, and we would follow the "near miss" doctrine with respect to them as well, if the evidence before us were within those categories. *E. g.,* Rule 803(18) (learned treatises); Rule 803(22) (judgment of previous conviction.)

However, most of the hearsay exceptions which plaintiffs invoke are not of this type. They do not apply to a clearly defined category of evidence, as the former testimony exception does. Instead, they apply to a relatively amorphous category of evidence which is delimited solely by the requirements set forth in the rule itself. For instance, the business records exception applies to any "memorandum, report, record, or data compilation, in any form" which satisfies certain additional requirements. *See* Part II–B, *supra.* Rule 804(b)(3) applies to any "statement" which is against the declarant's interest, as specified in that rule. *See* Part II–E, *supra.* We view rules 803(1) (present sense impression) and 803(5) (recorded recollection), under which the plaintiffs also offer the diaries and memoranda, as of the same character. *See* n. 48, *supra.* We do not see how the "near miss" doctrine which defendants urge could practically be applied to those rules, without negating the residual exceptions altogether, a result which is plainly contrary to the intent of Congress.

Accordingly, although as we have stated we agree with the defendants' position in principle, we will not apply it to the evidence before us, except for former testimony, and we will consider plaintiffs' proffer under the residual exceptions. We note,

however, that the considerations which we have reviewed in this section of our discussion are additional reasons to apply the express requirements of the residual exceptions most rigorously, so as not to vitiate the hearsay rule and the specific exceptions. We turn next to those express requirements.

3. *The Requirement of Making Reasonable Efforts to Procure Other Evidence.*

Rules 803(24) and 804(b)(5) expressly require that the statement must be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." The rules thus have their own requirement of unavailability of the witness or of similarly reliable evidence. Where a declarant is available for questioning, this provision requires at least that a proponent depose or produce him as a witness, if that can reasonably be done, since live testimony is inherently more probative than hearsay evidence. *United States v. Mathis, supra,* 559 F.2d at 298–99.

Several courts have held that in order to satisfy the requirement of the residual hearsay exceptions, the proponent of the hearsay evidence must attempt to procure the testimony, not only of the declarant, but also of *other* witnesses who have knowledge of the subject matter of the hearsay evidence. In *In the Matter of Sterling Navigation Co.,* 444 F.Supp. 1043 (S.D. N.Y.1977), the district court affirmed the bankruptcy court's refusal to admit under 804(b)(5) testimony of an unavailable declarant where other witnesses with knowledge of the subject matter were not deposed. Because the president of a bankrupt Bahamian corporation was unavailable, a creditor sought to introduce the president's former testimony at a bankruptcy hearing as evidence of stock ownership and loan–making authority in the corporation. But since others who might possess similar information were not questioned, the proponents did not meet the necessity requirement of the residual exception. The District Court said:

[N]o affirmative steps had been taken to depose the Bahamian shareholders. . . . It appears that Council [proponent] was content to offer its transcript without making the requisite reasonable efforts to obtain other evidence. In view of this attitude it can hardly be said that the interests of justice would be served by admitting the evidence.

*Id.* at 1047. We agree.

In *deMars v. Equitable Life Assurance Society, supra,* the First Circuit reversed the district court's ruling admitting the written report of an unavailable medical expert on the grounds that the proponent could have procured the opinion of another expert witness. 610 F.2d at 61. In *United States v. Kim, supra,* the D.C. Circuit upheld the district court's ruling that a telex was not admissible under the residual exception because, *inter alia,* the proponent of the evidence had failed to procure other documentary evidence or testimony of knowledgeable persons other than the author of the telex. 595 F.2d at 766. In *Workman v. Cleveland–Cliffs Iron Co.,* 68 F.R.D. 562 (N.D.Ohio 1975), the court refused to admit the hearsay statement of an unavailable declarant under 804(b)(5) because the proponent of the evidence had made no effort to secure the testimony of other witnesses to the events dealt with in the hearsay statement.[93] In view of the rigor with which the requirements of the residual exceptions should be construed, we agree with these courts that the proponent of hearsay evidence under the residual exception must attempt to procure the testimony by deposition not only of the declarant, but also of any other witness with knowledge of the subject matter of the statement, unless such testimony plainly cannot be procured by reasonable means.

### 4. *Trustworthiness*

Evidence to be admitted pursuant to the residual exceptions must possess "cir-

cumstantial guarantees of trustworthiness" equivalent to the other enumerated exceptions under Rules 803 and 804. The court of appeals has said that the trustworthiness of a statement, for purposes of the residual exceptions, should be analyzed by evaluating:

the facts corroborating the veracity of the statement, [and] also the circumstances in which the declarant made the statement and the incentive he had to speak truthfully or falsely. Further, consideration should be given to factors bearing on the reliability of the reporting of the hearsay by the witness.

*United States v. Bailey,* 581 F.2d 341, 349 (3d Cir. 1978). Additional factors bearing on the trustworthiness of hearsay evidence are discussed in our analysis of the trustworthiness requirement of the business records exception in Part II–B–3, *supra.* In contrast to the trustworthiness provision of Rule 803(6), however, the trustworthiness requirement of the residual exceptions is part of the plaintiff's affirmative burden of establishing admissibility.

### G. *The Problem of Internal Hearsay*

Many of the documents upon which we must rule are laden with internal hearsay. The diaries in particular are full of statements which internal or external evidence shows to be hearsay statements made by another person and merely recorded by the diarist. Even the testimony and protocols contain hearsay statements; according to the representations of counsel, hearsay evidence is not excluded in Japanese legal proceedings. The pervasiveness of internal hearsay necessitates some comments on the legal standards relating to hearsay within hearsay and hearsay within admissions.

### 1. *Hearsay Within Hearsay*

Rule 805 makes it clear that hearsay within hearsay is not admissible unless

---

**93.** In *Bailey, supra,* the court of appeals noted the existence of the requirement that the statement be more probative than other evidence which the proponent reasonably could procure, 581 F.2d at 346, but had no occasion to discuss

or apply that requirement. In *Copperweld Steel Co. v. Demag–Mannesmann–Bohler,* 578 F.2d 953 (3d Cir. 1978), the court viewed this requirement as waived. *Id.* at 964 n. 17.

each of the hearsay components independently satisfies an exception to the hearsay rule. *See, e. g., United States v. Ruffin,* 575 F.2d 346, 357 (2d Cir. 1978). Thus a statement in a diary, for example, which recounts the hearsay statement of another person is double hearsay if it is offered for the truth of the matter asserted by the person whose statement is recorded. At the first level, it is hearsay because it is the statement of the diarist offered to show that the other declarant made the statement attributed to him. At the second level, it is hearsay because it is the statement of the other declarant offered for the truth of what he said. Unless the plaintiffs, as proponents of the evidence, can show that the statement recounted can overcome hearsay objections at both levels, it is not admissible evidence.

 The plaintiffs argue that internal hearsay should be admitted across the board under the residual exceptions, rules 803(24) and 804(b)(5).[94] They rely heavily on *Sherrell Perfumers, Inc. v. Revlon, Inc.,* 1980–2 Trade Cas. ¶ 63,293 (S.D.N.Y.1980), *further consideration,* 76 Civ. 4572 (S.D. N.Y. July 15, 1980), in which Judge Sweet found particular double–hearsay statements admissible under 803(24). We have no doubt that the residual exceptions may be applied to internal hearsay as well as first–level hearsay, if the requisites of those exceptions are met. However, as we have explained in Part II–F, *supra,* the residual exceptions should be narrowly construed. We can perceive no justification for misapplying the exceptions in the manner for which plaintiffs contend so as to negate the rule against internal hearsay. Moreover, the specific requirements of the residual exceptions must be met in order for a statement to be admissible under them. The requirements include a showing by the proponent of the evidence that it is more probative on the point offered than any other evidence which the proponent could procure by reasonable means, including depositions of other witnesses. *See* pp. 1264–1265, *supra.* In *Sherrell Perfumers,* Judge Sweet found the latter requirement met. 1980–2 Trade Cas. at p. 75,554. Thus, in considering plaintiffs' proffer of hearsay evidence under the residual exceptions, we must consider, *inter alia,* whether this special requirement of the exceptions is met. We must also consider, of course, whether the internal hearsay meets the specific terms of any other hearsay exception so as to render it admissible.

### 2. *Hearsay Within Admissions*

 Under the Federal Rules of Evidence, admissions under Rule 801(d)(2) are non–hearsay, rather than hearsay admitted under an exception. As a result, hearsay within an admission is not strictly within the terms of Rule 805, governing "hearsay included within hearsay." We think, nevertheless, that internal hearsay in a statement which comes into evidence as an admission must be subjected to an independent analysis to determine whether or not it would survive a hearsay objection in its own right.[95] In *Cedeck v. Hamiltonian Federal*

---

**94.** At one point plaintiffs argued that if a document is admitted under the business records exception to the hearsay rule, any statement contained therein, hearsay or not, may be received and considered by the trier of fact. They did not press the point strongly. At all events, it is plainly incorrect. It is plain from Rule 805, as well as the structure of Article VIII of the Federal Rules of Evidence that what a declarant could not testify to on the witness stand (because of hearsay rules) cannot come in via a document itself admitted under one of the hearsay exceptions. While Rule 803(6) does operate to a very limited extent as a second–level hearsay exception, it does not create an across–the–board admissibility for internal hearsay statements. The limited second–

level exception mentioned arises from the fact that Rule 803(6) permits the admission of hearsay evidence which was transmitted to the declarant by another person with knowledge, acting in the course of a business duty. *See* part II‑B‑5, *supra.* To that limited extent Rule 803(6) operates both as a first–level and a second–level hearsay exception, *i. e.,* it permits the receipt into evidence of internal hearsay which meets its specific requirements despite the more general strictures of Rule 805.

**95.** Our view is supported by the Congressional amendment to Rule 806, which provided that in matters affecting the credibility of the declarant, admissions under Rule 801(d)(2)(C), (D) and (E) are to be treated the same as hearsay

*Savings and Loan Association*, 551 F.2d 1136 (8th Cir. 1977), the Eighth Circuit held that a statement made by the employee of the defendant could not come into evidence as an admission because it was merely "a reiteration of what someone told him," and was not independently admissible as an admission or under a hearsay exception. We agree that the mere reiteration by a party's agent of the statement of another person does not render the statement an admission against the party, unless the party or his agent adopted the statement within the meaning of Rule 801(d)(2)(B). *See* Part II–C, *supra*.

We have now concluded our survey of the law applicable to the evidence whose admissibility we will consider in this opinion. The survey has been long, but we will now be able to resolve the specific evidentiary questions before us with dispatch, by incorporating referenced portions of the foregoing discussion. We turn first to the admissibility of the Yajima diaries.

### III. *The Yajima Diaries–DSS 48–50*

#### A. *Introduction*

The Yajima diaries, DSS 48–50,[96] are three notebooks which the Japanese Fair Trade Commission ("JFTC") seized during the course of its investigation in the "Six Company Case." Plaintiffs contend that the notebooks were authored by a Toshiba official named Seiichi Yajima, who during 1965 and 1966, the period covered by the diaries, attended on Toshiba's behalf meetings of the so-called "Tenth Day Group," one of a number of groups allegedly engaged in price fixing activities within Japan. The diaries were marked as exhibits during the course of the "Six Company Case." Toshiba Corporation produced these notebooks to plaintiffs during the summer of 1972 in response to a Request for the Production of Documents which had been served by plaintiff NUE at the outset of the litigation and which called for all documents relating to the Six Company Case. The notebooks were designated with document identification numbers TJ4514–4593; TJ4598–4631; and TJ4646–4660, respectively.[97]

Plaintiffs offer the diaries in evidence against all the defendants in this action. More specifically, plaintiffs offer these diaries as business records under F.R.E. 803(6), as admissions of Toshiba Corporation under F.R.E. 801(d)(2), as a declaration against the interest of Mr. Yajima under F.R.E. 804(b)(3) and as admissible under F.R.E. 804(b)(5), one of the residual hearsay exceptions. Plaintiffs' overriding proffer is that the diaries are an authentic account of what took place at the meetings of the Tenth Day Group and other groups mentioned therein.

Our modus procedendi in dealing with these diaries shall be first to set forth the plaintiffs' and then the defendants' contentions as to matters of foundation or qualification, *i. e.*, we shall set forth the factual and to some extent the legal basis for the parties' contentions that the proffered documents are (or are not) authenticated under F.R.E. 901 and that they are (or are not) admissible under one of the exceptions to the hearsay rules. This initial summary is essentially complete vis á vis the parties' contentions on authentication and business record status; as to the status of the diaries as admissions of a party–opponent, as statements against interest, and under the residual hearsay exceptions, we shall supplement

---

statements. *See* n. 61, *supra*. This suggests that admissions under those subsections should be subjected to the same internal hearsay analysis as statements admitted into evidence under the hearsay exceptions.

**96.** Each document considered at the evidentiary hearings was accompanied by a "Document Submission Sheet" or "DSS," the function of which is explained in the Public Records Opinion at 17.

**97.** The documents produced in discovery ran into the millions, hence counsel established an elaborate document identification system. At the core of the system is a series of lettered prefixes, such as "TJ," which identify the company making the production. The numbers following the prefix are a function of the parties' labors in numbering each produced page.

the statement of contentions in the course of our later discussion. While this recitation of contentions will sometimes be lengthy, its fullness will facilitate our application of legal principles to the challenged documents. We shall also follow this modus procedendi in connection with the other documents which are taken up in subsequent segments of this opinion.

B. *Plaintiffs' Foundation For Authentication and Admissibility Under One of the Exceptions to the Hearsay Rules*

(1) The diaries are specifically cited, indeed incorporated by reference, in Toshiba's answers to interrogatory numbers · 8 and 42–44 to NUE's second set of interrogatories to defendants. In plaintiffs' submission, by this reference, Toshiba has, in effect, conceded authentication, business records status, and other necessary foundation for the diaries.

(2) The three diaries were lawfully seized by the JFTC from Toshiba's offices and turned over to the JFTC by Mr. Kono, then the manager of the TV division. Upon their return, Toshiba made copies of the diaries and produced them to the plaintiffs.

(3) One of the diaries, DSS–48, contains the Toshiba logo in Japanese and English at the top of the page.

(4) During the Six Company Case Mr. Yajima gave to the JFTC investigators four protocols (DSS–75, DSS–76, DSS–77, and DSS–78) during which Mr. Yajima identified the diaries. The protocols, which bear a seal, have a recognized legal status in Japan.

(5) During the course of his formal testimony before the JFTC, Mr. Yajima identified the diaries, testified to certain entries, and said that they were accurate and reflected meetings of the six defendants.

(6) Yajima's protocols and testimony also include statements that show that he was present at the meetings he recorded in his diary.

(7) The notebooks appear in the JFTC "investigator's list of evidence" (DSS–93) which plaintiffs claim is an official record of the JFTC.

(8) Testimony of defendants' other employees at the JFTC hearing and statements by defendants' other employees in their protocols referred to one of Yajima's notebooks to confirm what occurred at a meeting.

(9) Mr. Kamakura's protocol makes reference to Yajima's presence at the meetings.

(10) Mr. Yajima allegedly reported to his superiors at Toshiba after returning from certain meetings, passing on information on which they relied.

(11) The diary is on its face a business record; *i. e.* it pertains purely to business matters which are of importance to Toshiba, and it looks and reads like a business record (the "res ipsa loquitur" contention).

(12) Yajima's obligation to attend meetings and to make reports to Narita suggests that the information that he entered in the diaries was maintained by him as his regular practice; moreover, the entries (about the Tenth Day meetings) occur at fairly regular intervals.

(13) The secretary company of the Tenth Day Group meeting would take down information for production, shipment and inventory, and since Yajima testified that Toshiba was the secretary company from March 1966 to June 1966, when Yajima was recording Tenth Day Group information, he was acting on behalf of the Group and his own company.

(14) Entries were made periodically relating to regular subject matters. They covered basically the same type of information month after month. These topics were continually discussed, and it was part of the practice at these meetings and part of Yajima's practice to record this type of information.

(15) When Yajima was shown the diary during the taking of the JFTC protocol, Yajima said "This notebook is mine and what was written in it deals with the events of this year and was written on the spot."

C. *Defendants' Response*

(1) There is no testimony on the record of this case by a "custodian or other qualified

witness," F.R.E. 803(6), or in fact by anyone authenticating or establishing the foundation required by the admission of any of these diaries into evidence. Indeed, plaintiffs took no deposition of any person who (i) had knowledge of the manner in which the notebooks were kept and (ii) could confirm the contents of the notebooks. Rather, plaintiffs rely for foundation completely upon their counsel's presentation to the court.

(2) The Toshiba logo appears on only one of the diaries (DSS 48), and in any event, the fact that Toshiba stationery was used is of no significance.

(3) There are time gaps in the notebooks: DSS 48 refers to November 1965 to December 1965; DSS 49 refers to the period January 1965 to June 1965; DSS 50 refers to the period January 1966 to November 1966. There is no notebook for the period July through October 1965.[98]

(4) The "Yajima Protocols" cited by plaintiffs as places where Mr. Yajima identified the diaries are simply brief passing references to only two of the diaries which, in fact, do not establish that the diaries are admissible under any of the exceptions to the hearsay rules.

(5) The Yajima testimony also does not establish the foundation for the admission of the diaries into evidence. Only one of the diaries is referred to during Mr. Yajima's testimony and only in passing references which do not establish the foundation for the admissibility of the documents.

(6) Toshiba's interrogatory answers do not establish the necessary foundation for the admissibility of the diaries, since the diaries were produced in response to a Request for the Production of Documents, not as answers to Interrogatories. At all events, the interrogatories did not request information relating to the substance of the meetings or the necessary foundation for the admissibility of the diaries. Moreover, Toshiba, in its interrogatory answers, specifically disclaimed any knowledge concerning the accuracy of the Yajima diaries or concerning what took place at any of the meetings of the groups about which the interrogatories inquired. See Toshiba's Answers to Interrogatories 8, 42, 43, and 44 of Plaintiff's [NUE] Interrogatories Set No. 2.

(7) The testimony and protocols of Messrs. Adachi, Narita, Tsurata, and Kamakura also do not establish the foundation for the admissibility of the diaries since these references to the diaries do not establish any of the requirements of any of the exceptions to the hearsay rules, and are merely passing references to diaries which were being used merely to refresh the recollection of the witness.

(8) While the protocols and testimony contain some statements to the effect that Mr. Yajima reported to his superiors after attending meetings, there is nothing in the record establishing that he utilized his diary for this purpose. Further, there is nothing in the record of this case establishing that Mr. Yajima was under a business duty to keep his diary; nor is there anything in the record of this case to show that Mr. Yajima systematically checked his diary or that it was his continuous habit to keep the diary.

(9) The diaries themselves are a "hodge podge" of notes which are pointless without the testimony of some person who was present at the meetings. One cannot even tell with any certainty where accounts of meetings begin and end; whether the accounts are what the author thought or surmised, or what someone else said, and if so, who said it. Further, there are at least 28 separate entries which the translators noted as "illegible."

(10) The diaries contain double and triple hearsay, and because of the manner in which the entries were kept, it is impossible to sort out what is based upon Yajima's personal knowledge and what is based upon hearsay. Further, Mr. Yajima stated in his protocol that the information he obtained from other companies at meetings was in large part based upon "guesses" and "hunches." Therefore, it is impossible to

---

**98.** Defendants also note correctly that there were numerous Tenth Day Group meetings allegedly attended by Yajima which are not mentioned in the diaries.

sort out what part of his diary is guesswork and what part was actually heard by Mr. Yajima.

Against this background of contentions, we now apply our discussion of law (Part II) to the Yajima diaries on the basis of the developed record.

### D. Authentication (F.R.E. 901)

■ Although the question is a close one, especially as against defendants other than Mr. Yajima's employer, Toshiba Corp., we find, pursuant to the applicable Rule (F.R.E. 104(b)), that the diaries have been authenticated under the prima facie standard of *United States v. Goichman, supra,* as the genuine diaries of Mr. Yajima. Put differently, there is sufficient admissible evidence from which the trier of fact could conclude that the diaries are what their proponents claim (i. e., Mr. Yajima's diaries). In this regard, we rely upon the items of evidence hereinafter enumerated, making shorthand reference to the evidence that has been more fully described, *supra,* in one or the other of the parties' contentions.

(1) The Toshiba logo. See Part II–A–3(b), *supra.*

(2) The protocols, which we find admissible against Toshiba only, *see infra,* but which identify the diaries.

(3) Yajima's testimony, which we find admissible against all defendants in its authentication aspect only, *see* Part VIII–C–4, *infra,* and which identifies the diaries.

(4) Toshiba's production of the diaries and reference to them in its Rule 33(c) interrogatory answers.[99] See discussion at Part II–A–3(a), *supra.*

(5) The cross–reference to Mr. Yajima in the other defendants' interrogatory answers and JFTC testimony.

(6) The similarity to other authenticated documents. See discussion at Part II–A–

3(d), *supra.* While there has been no testimony by any custodian or "subscribing witness," such is unnecessary under Rule 903.

### E. Business Record Status (F.R.E. 803(6))

For the reasons which follow, we conclude that the plaintiffs have not qualified the Yajima diary as a record of regularly conducted activity under Rule 803(6). Furthermore, we conclude that defendants have shown a lack of trustworthiness under the 803(6) trustworthiness proviso. We make this determination pursuant to F.R.E. 104(a), hence, we give the plaintiffs the benefit of inadmissible as well as admissible evidence. Our conclusion flows from a host of individual reasons, but there are several overriding considerations which we state at the outset in terms of the legal requisites of Rule 803(6). To the extent necessary, we incorporate by reference what we said of the diaries in general at pages 1211–1213 of the Preliminary Statement, for everything we wrote there applies to Yajima's diary. As is already clear, we basically accept defendants' contentions in this area.

### 1. The Regular Practice Requirement

■ As we have seen, one aspect of qualification of a business record is the necessity of demonstrating that the record was "kept in the course of a regularly conducted business activity," and that "it was the regular practice of that business activity to make the record." We refer to that aspect of the business records rule herein as the regular practice requirement. As such, it has two parts and the plaintiffs have made much of the first part, ignoring the second. Defendants do not dispute that Yajima's activities and the matters related in the diaries were business–related and that any information garnered from the Tenth Day Group meetings was used in Toshiba's business.[100] But as defendants

---

**99.** The Answers to Interrogatories are admissible only against Toshiba. They are hearsay as to others than the answering party, *see* n. 40 *supra.*

**100.** During the relevant period, Yajima was either manager of the second television section of Toshiba (color TV) or manager of the first television section of Toshiba (black and white TV) or both, with responsibilities for production and sales planning. While not near the

correctly argue, the plaintiffs have totally failed to show that the diaries meet the requirement of regularity described at length in Part II–B–2. For, as we therein explained, F.R.E. 803(6) contemplates the admission of materials which are created by routine practices where careful checking and habits of precision and regularity assure their accuracy. There is no evidence before us from any source of any routine practice or careful checking by Yajima or any habit of precision or regularity. None of the proffers of plaintiffs supply these requisites, nor do the diaries themselves, and neither the testimony nor protocols of Mr. Yajima nor anyone else supply the missing but necessary requisite for 803(6) status.

The testimony and the protocols contain only passing references to the diaries, hence plaintiffs' argument based thereupon must fail.[101] Toshiba's Answer to Interrogatories and Rule 33(c) productions have been discussed at length in Part II supra, and we have explained there why these factors do not qualify the diaries as business records. The reference in one diary to contemporaneous recordation is just that, a random reference. There is, on the other hand, extensive evidence of gaps in these diaries, failure to record numerous meetings,[102] and delay in recordation.

In contrast to notions of regularity, the diaries are erratic. They are, like most notes that one keeps for oneself, written in an irregular and shorthand manner which Yajima himself doubtless understood, but which no one else can. One cannot tell with any certainty where accounts begin and end. The diaries are laden with all kinds of arrows and symbols and code–like notations and references which are unintelligible. Indeed, the diaries are dominated by cryptic entries. In no sense are the diaries what one could fairly describe as minutes of meetings. With a few exceptions upon which we shall comment, one can never tell whether a given word or phrase or statistic or thought set forth in the diaries represents the statement of some individual, and if so, who he was or what he said. More specifically, the reader cannot tell what Yajima meant by a given entry or what its source is–whether someone said something, whether someone told him that someone said something, whether he thought something, or someone told him that someone thought something, et cetera.

Where there are numbers arranged in juxtaposition to the names of various Japanese manufacturers of consumer electronic products, or where Yajima places a number which could be interpreted as a bottom price next to the name of a company, it would be possible to conclude that we have been supplied with evidence that production figures or "bottom prices" have been exchanged by company representatives present at this meeting. But that would only be speculation, for we do not really know what Yajima meant by his entry. Equally important, we do not know when and where he got the information, including figures, which he recorded or when he recorded the entries. And even where there are supposed statements of position ar-

top of the Toshiba hierarchy, Yajima had broad managerial responsibility, and his attendance at and observations of the Tenth Day Group meetings were apparently within the scope of the authority with which he had been entrusted by Toshiba. Ostensibly, Yajima reported to his superiors the results of the meetings. Plaintiffs contend that Yajima used his diaries to report to other Toshiba officials, but they have not produced any evidence to support their contention, though they might have done so by the simple expedient of deposing any of the many Toshiba officials, peers or superiors, who were familiar with Yajima's practices and who have been available for depositions for many years. Mr. Tadashi Kamakura is but one such person.

101. Mr. Yajima refers to his diaries only three times in his protocols. None of these statements gives meaning to the diary entries, let alone establishes the foundation requirement of F.R.E. 803(6). These three passing references are contained in DSS 75 (MJ3278-1); DSS 76 (MJ3260-1); and DSS 77 (MJ3261-1).

102. In Appendix B to their FPS, plaintiffs claim that 21 meetings of the Tenth Day Group occurred within the period subsumed in Yajima's diaries, yet there are only 11 entries in the diaries for this period.

ranged beside the name of a manufacturer of consumer electronic products, we know nothing of the source of information or the time or manner of recordation. While some of the things we have been saying bear upon the firsthand knowledge requirement which we shall discuss *infra*, they also bear upon the regularity of practice requirement insofar as they relate to the author's method of preparing the diaries.

We have considered all of plaintiffs' alleged foundation bases and found them wanting. The res ipsa loquitur approach is totally unavailing for the reasons we have stated. Neither the protocols in the testimony nor any cross–authentication is sufficient. Passing references or even affirmations of accuracy of an occasional entry will not suffice. The mere fact that Yajima attended meetings of the Tenth Day Group or reported to his superiors thereupon (and there is no evidence he used his diaries to do so) does not satisfy the regular practice requirement. No more availing is plaintiffs' reliance upon "a pattern of reporting the conduct of the meetings" to both superiors and subordinates. That fact has not been established in this record, but even if it had and even though entries are "business related," the regular practice requirement is not thereby met.

Not only have plaintiffs failed to qualify the diaries, but the indications which appear are contra–indications negating a finding of regular practice. The short of it is that the foundational contentions set forth by defendants are correct. The diaries are hodge–podges of notes in which Mr. Yajima has not explained with any degree of clarity what he meant. Plaintiffs have failed to meet the regular practice requirement explained in Part II.

The plaintiffs assert that code–like entries do not deprive a document of business record status, citing *United States v. Baxter*, 492 F.2d 150, 164 (9th Cir. 1973), *cert. dism.*, 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974), where the court admitted the customer book left by a member of a heroin importation conspiracy which contained ambiguous nicknames and code–names. But what plaintiffs neglect to mention is that the author of the notebook testified at trial (he was the government's informant and "star" witness), hence, was subject to cross–examination on the notebook. Rather, the situation we face here is similar to what the court faced in *United States v. Lykes Bros. S.S. Co.*, 432 F.2d 1076, 1079 (5th Cir. 1970), where, affirming the district court's refusal to admit internal "notes" produced by the defendants, the Fifth Circuit stated:

> "An examination of the notes does not reveal either when they were prepared, by whom they were prepared, for whom they were prepared, or from what source of information they drew. The notes, therefore, of themselves, do not overcome the lack of a proper foundation which the government otherwise failed to provide."

Plaintiffs rely heavily upon *McPartlin, supra*, but there the diarist took the witness stand, was subject to in–court examination, and the diary was used only to refresh recollection and corroborate dates. That is not what is attempted here. Rather, plaintiffs seek to introduce the diaries and then to argue from bits and pieces, from selected words and sentences that there was (export) conspiratorial activity afoot. This is a clever litigation strategy, but one which they cannot successfully pursue because of the lack of foundation for admissibility of their evidence.

It is of course true that Yajima died before this action was instituted. However, as we have noted, others might have been called in an attempt to qualify his diary, but they were not. Yajima's superior, Mr. Kamakura, attended many meetings of the Tenth Day Group with Yajima. Presumably, he could have clarified Yajima's diary or described Yajima's reporting practices. Perhaps he could have explained (or perhaps he would have "explained away") the bits and pieces of the diary that plaintiffs rely upon. In any event, although he is alive and well and employed by Toshiba and has been available for depositions for years, he has not been called. Others familiar

with Yajima's work and habits might have been called too, but they were not. We must again underscore in this regard that our remarks are not just retrospective. Plaintiffs' litigation strategy, as clearly explained by Mr. Rome, contemplated that the plaintiffs would not call any such witnesses at trial, a strategy confirmed by his failure to list any such witnesses in his FPS.

### 2. Requirement of Firsthand Knowledge and Contemporaneity

Plaintiffs have also failed to demonstrate that the diaries were made by a "person with knowledge or from information transmitted by a person with knowledge." Yajima's diaries contain double and triple hearsay, and because of the manner in which the entries were kept, it is impossible to sort out what is based upon Yajima's personal knowledge and what is based upon hearsay. Yajima stated in his protocol that information he obtained from other companies at meetings was in large part based upon "guesses" and "hunches."[103]

As we have noted, the firsthand knowledge requirement of 803(6) is subject to the provision that information may properly be transmitted to the recorder by someone with knowledge and with a duty to report. However, neither has that requirement been met as to any matters which may have been reported to Yajima by others. Again, plaintiffs' reliance upon circumstantial evidence and colloquy instead of upon conventional methods of laying foundation has failed them, for we have no evidence that such others themselves have firsthand knowledge or a duty to report. The diaries do not explain themselves, and no one, via deposition, has explained them. Nor, as we have noted above, will they do so in trial testimony, because of the failure of plaintiffs to list any such person in the FPS.

### 3. The Trustworthiness Proviso

Rule 803(6) provides for the exclusion of business records which otherwise

meet its requisites when the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The burden is upon defendants to show lack of trustworthiness.

We shall not burden the record by rescribing our description of the diaries. However, given that description, we do not believe that diaries possess the circumstantial guarantees of trustworthiness that the hearsay rules implicitly and 803(6) explicitly require. The word "trustworthiness" hardly needs an exegesis in this context. Suffice it to say that the inadequacies of the diaries which we have described in such detail make it clear that where diaries such as these are sought to be admitted for the truth of their contents, they cannot be accorded faith or credit or trust within the framework of a judicial system which does not countenance guesswork or speculation. In short, a document which is unintelligible is not trustworthy. Plaintiffs might have supplied the necessary foundation, but they have not. The defendants have met their burden of showing that the diaries are untrustworthy, and that is another ground of 803(6) exclusion.

### F. Admissions of a Party Opponent

Having held that the diaries as a whole cannot come in (against all defendants) as business records, we must consider whether individual passages from Yajima's diaries may nonetheless come in as admissions of a party opponent, i. e. Yajima's employer Toshiba Corp., under F.R.E. 801(d)(2). Conceivably, such an approach might require us to analyze every passage in the diaries to see if it can pass 801(d)(2) muster, as well as to determine with respect to each passage whether Yajima was authorized to make the statement (the diary entry) under Rule 801(d)(2)(C) or whether it was made within the scope of his employment so as to qualify under Rule 801(d)(2)(D).[104] Because they

---

**103.** For example, he stated in his protocol that his entry concerning a March 23, 1965, Palace Group meeting was founded on hearsay:

"But I don't know where it [the entry] was determined, it is just a note of what I heard from the director."

**104.** Notwithstanding plaintiffs' contentions, there is no evidence of adoption of the diaries

are simpler of resolution we turn to the latter considerations first.

█ There is no foundation in the record which bears on, much less establishes, whether Mr. Yajima was authorized by Toshiba to make a statement (*i. e.* make a diary) concerning the subject (presumably the subject matter of the Tenth Day Group meetings). Accordingly, there is no basis for their admissibility under F.R.E. 801(d)(2)(C). However, with the exception hereinafter noted, it seems plain that attendance at the Tenth Day Group meetings was within the scope of Yajima's agency or employment, that the diaries concern matters within the scope of his agency or employment, and that they were also made during the existence of the employment relationship. Yajima was at various times manager of marketing planning for color as well as black and white TV in Japan and it would seem that *making* a diary would be impliedly within the scope of his employment. There is no evidence that he was forbidden to make a diary and it would be hypertechnical to hold that the act of making a diary was beyond the scope of his employment. F.R.E. 801(d)(2)(D) is thus satisfied. The exception which we note is that Yajima had absolutely no authority over export matters. Any reference to export matters in his diaries was beyond the scope of his employment, hence excludable.

The other problems to which we have adverted are far more troublesome. As we have seen in our discussion of the law, Part II–C–2 *supra*, an admission is, by definition, a statement which meets the fundamental requirement of F.R.E. 801(a)(2) that the "statement" be "an oral or written assertion, or "non–verbal conduct of a person if it is intended as an assertion." [105] The putative "statements" at issue are the diary entries. We are not dealing in any respect with oral utterances or non–verbal conduct, so that the question is whether the diary entries are intended as written assertions.

█ We have explained above that the party proffering the evidence has the burden of establishing that what it is proffering is in fact an assertion. In general terms (see discussion *infra*), we find that plaintiffs have not met that burden here. This conclusion stems from the nature of the diaries which we have described. One cannot tell from reading the diaries what Mr. Yajima intended, whether he was making an assertion or relating the assertion of someone else, or relating what he thought someone else said or what he thought someone else thought or what someone told him someone else said or thought, et cetera. While plaintiffs might have illuminated this area of the case had they taken the deposition of Mr. Kamakura or any of the scores of people who attended Tenth Day Group meetings, because of their calculated trial strategy, they did not.

We have couched our statement that the plaintiffs have not met their burden of establishing the diary entries as assertions in "general terms". Although we have read the diaries several times and are reasonably confident that this conclusion applies across

---

either by Yajima (in his protocols or testimony) or, more to the point, by Toshiba, to whom they were never communicated, hence 801(d)(2)(B) is unavailing. Our discussion in the text will be limited to 801(d)(2)(C) & (D).

**105.** As we have also noted at p. 1242, *supra*, defendants have argued most persuasively that the kinds of entries which Yajima made in his diaries are not what are generally considered admissions within the meaning of F.R.E. 801(d)(2). We refer here to the fact that we are dealing with recordation of amorphous statements or thoughts attributable to no one and not communicated or apparently intended to be communicated to anyone. The conventional notion of an admission, *i. e.* a declarative utterance of the person making the statement, hardly seems sufficiently elastic to include under its umbrella someone's diary entry about what someone else *may* have said or thought without any explanation of the diarist's source. How can such an "animal" be used as a "statement of a party opponent"? Notwithstanding our rhetorical question, and for the reasons set forth in Part II, *supra*, we have come to the conclusion that under the structure of the Federal Rules of Evidence such diary entries could conceivably be admissions against Yajima's employer, Toshiba Corporation, if they meet the definition in F.R.E. 801(a) of a "statement."

the board, by this locution we refrain from making a categorical declaration (or holding) which applies to every passage or entry in the diaries. For reasons to be explained in our opinion addressing the conspiracy summary judgment motions, such a passage by passage analysis is unnecessary. We are satisfied, however, with respect to any supposed "export references," all of which we have examined, that plaintiffs have not met their burden of establishing the existence of an assertion, hence none of those so–called references are admissible as admissions of Toshiba.

As we pointed out in summarizing plaintiffs' foundational approach with respect to the diaries, all of the diaries and the material contained therein are proffered as accurate accounts of what transpired at meetings of the Tenth Day Group and other allegedly conspiratorial groups mentioned therein. Plaintiffs from time to time have argued their various diary passages are not offered to establish their truth or to establish Yajima's belief in their truth, in either of which cases they would, if the necessary foundation were established, qualify as assertions, but rather that they are introduced merely to demonstrate that they were made, i. e. that Yajima wrote the entry.[106] In such event however the diary entries would be inadmissible under F.R.E. 401 because they would be irrelevant to the litigation. Alternatively, their probative value would be so slight that it would be far outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury or by considerations of undue delay and waste of time. F.R.E. 403.[107]

### G. Statements Against Interest

Although plaintiffs have met the unavailability requirement of Rule 804(b)(3)–Mr. Yajima is dead–the diaries nonetheless fail to meet the other facets of the statement against interest exception. Preliminarily, we note that, for the reasons set forth in the preceding sections, the Yajima diary entries are not statements, i. e., assertions within the Rule 801(a) definition of statements which on its face applies to Rule 804(b)(3)'s "statements" against interest. At least, the export references are not.

Beyond this analysis, however, it is even harder for the diary entries to qualify as statements against interest than as mere statements. As has been made clear in the discussion in Part II, *supra*, in order to qualify as a statement against interest the statement must be against the interest of the declarant, i. e., Mr. Yajima, rather than that of his employer, Toshiba Corporation.[108] As we have seen, at times relevant here criminal prosecution and civil actions against alleged corporate offenders in Japan were extremely rare, and such actions against individuals were unheard of. Nonetheless, given the *text* of the Japanese anti–monopoly law, we are not prepared to conclude that Yajima stood no risk of prosecution as an individual, if in fact the diaries were inculpatory as to him personally. However, we find little or nothing in the diaries to render Yajima personally liable under Japanese law.

One cannot extract diary entries from context and attribute *to Mr. Yajima* any positions ascribed in the diaries to Toshiba, his employer. Because of the cryptic nature of the diaries, and their failure to

---

**106.** Plaintiffs are not consistent in their advocacy, and seem to assert whatever position they think will allow any of the diary passages in.

**107.** We refer here to specific prejudice to Toshiba, confusion, delay, et cetera. Additionally, there is the pervasive problem of treating admissions against one party in a multi–party trial, when all of the defendants are charged with similar acts. Limiting instructions may be useless in such a case, and the F.R.E. 403 problems assume a heightened dimension.

**108.** The defendants contend that the diaries are not even statements against the interest of Yajima's corporate employer, but rather are consistent with the defendants' defense in the Six Company Case. We find much to be said for this contention and will discourse upon it at length in our opinion addressing the motions for summary judgment with respect to plaintiffs' conspiracy claims.

attribute positions or actions to individuals, there are no utterances of Mr. Yajima as such to consider. The Yajima diaries, for the most part, record the actions of others, not the actions of Mr. Yajima, and some of the reported discussions took place at meetings that Yajima did not attend. Any passages in the diaries reflecting such discussions could not be statements against the interest of Mr. Yajima, except insofar as mere recordation of entries could be deemed to be "against interest."

Moreover, under Rule 804(b)(3), the question is not simply whether the statements are against interest but whether any statements attributable to Mr. Yajima were "*so far*" contrary to his interest that a reasonable man would not have made them unless they were true. That test is not met here.

There is an additional and still stronger ground for excluding the diaries under Rule 804(b)(3). For, even if one assumes that Yajima's diaries were objectively against his interest, it is plain that the plaintiffs have not met the important requirements of Rule 804(b)(3) of showing that the declarant *believe* at the time he makes the statements that it is against his interest. There is just nothing in the record to suggest that Yajima, represented by Toshiba counsel when he gave the testimony and protocols, was aware that anything he was saying was contrary to his own interest, nor can such be inferred on this record.

### H. *The Residual Hearsay Exceptions*

In view of the foregoing discussion about Mr. Yajima's diaries, and of our extensive discussion in Part II–F, we need not labor long on the admissibility of the Yajima diaries under the residual exceptions, Rule 804(b)(5), notwithstanding Mr. Yajima's "unavailability."

First, the diaries fail to satisfy the requirements of F.R.E. 804(b)(5)(B), that the statement be more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts. While the testimony of Mr. Yajima obviously could not be procured at this time by reasonable ef-

forts since he is deceased, the plaintiffs could have done much to procure evidence about the alleged conspiratorial meetings from other sources, i. e. by taking the depositions of Yajima's business associates and those who were present at the meetings. There are dozens of such people who are available. Plaintiffs' oft–repeated complaint that the witnesses would not remember is but an ipse dixit. There are voluminous materials upon which to base examination. Indeed, it would be a travesty if the plaintiffs were permitted to invoke the residual exceptions when by a calculated litigation strategy they refused to even seek the necessary foundation required by the traditional hearsay exceptions.

There is another and equally compelling reason why the diaries are not admissible: failure to meet the overriding requirements of exceptional guarantees of trustworthiness as required by the Third Circuit in *United States v. Bailey, supra.* We need not repeat what we have said at such lengths about the diaries. It is enough to say that it has been more than amply demonstrated on the record that the diaries are not trustworthy and, as we pointed out above, the burden of showing trustworthiness for purposes of the residual exceptions is upon the proponent of the evidence. Thus, neither of the requirements, i. e. exceptional guarantees of trustworthiness or high degrees of probativeness and necessity, are present here. For all of the foregoing reasons, and in light of the narrow construction we are obliged to give the residual exceptions under *Bailey*, we hold that Yajima's diaries are inadmissible under 804(b)(5) and 803(24).

### I. *Internal Hearsay (Rule 805)*

It is also necessary to subject the content of the diaries to internal hearsay examination. Subject to such scrutiny, vast portions of the diaries would have to be excluded as containing multiple hearsay not subject to any exception to the hearsay rule. In view of our decision to exclude the diaries for other reasons, it is not necessary for us to make a page by page analysis so as to redact them leaving only what is not

multiple hearsay. We can however say with confidence that were we to do so such significant portions would be excised that the diaries as a whole would themselves have to be excluded as having been so fragmented as not to give a fair representation of anything, even if they did theretofore.

## IV. *The Yamada Diary, DSS 51*

### A. *Introduction*

The Yamada Diary is a notebook into which Noboru Yamada, Department Manager of the Electric Appliance Department, Consumer Products Division of Hitachi, Limited, made certain entries during the period from (approximately) August 1965 to November 1965. It was seized during the JFTC raid upon the offices of Hitachi Ltd. on November 8, 1966. Hitachi produced this notebook to plaintiffs in the course of discovery in these proceedings. At that time, the document was identified by document identification numbers HJ 50016 through HJ 50054.

Plaintiffs offer the Yamada diary in evidence against all defendants. Plaintiffs claim that it is authenticated under F.R.E. 901(a), 901(b)(4), 901(b)(9), and 902. They offer it as a business record under F.R.E. 803(6), as an admission of Hitachi, Limited, under F.R.E. 801(d)(2), as a present sense impression under F.R.E. 803(1), as a declaration against interest under F.R.E. 804(b)(3) and as admissible under the residual hearsay exceptions F.R.E. 803(24) and 804(b)(5). In general terms plaintiffs offer the Yamada notebook as an authentic account of what took place at the group meetings which Mr. Yamada purportedly attended.

### B. *Plaintiffs' Foundation For Authentication and Admissibility Under One of the Exceptions to the Hearsay Rules*

Plaintiffs' proffer of Yamada's notebook, as well as those of Yamamoto, Okuma, and Tokizane, considered *infra*, is based upon the same types of matters that they offered to lay foundation for the Yajima notebooks. Plaintiffs describe the common bases as follows:

(1) Identification of the diaries in the (respective) interrogatory answers of the diarist's employer as its response to those interrogatories.[109]

(2) The "pattern of cross–authentication" which exist among the DSS 48–98, in which various persons identify entries in documents.[110]

(3) The "confirming testimony" which establishes the trustworthiness of the JFTC material.[111]

Plaintiffs also rely across the board upon "a pattern of reporting the conduct of the meetings to both superiors and subordinates," the fact that the notebooks are "business–related" and upon the lawful JFTC seizure of the diary from the Hitachi premises.

In addition to these factors, plaintiffs also rely upon the following:

(1) Counsel for the Hitachi defendants have indicated that there was "no reason to believe that it was not Mr. Yamada's diary."

(2) The "chop" or seal of Mr. Yamada has been affixed to one of the pages of the diary (HJ50034).

(3) The Yamada diary appears in the JFTC investigator's list of evidence (DDS–93), which plaintiffs claim is an official record of the JFTC.

(4) One or more individuals named Yamada are identified in Hitachi, Toshiba, and Sanyo Answers to Interrogatories (Plaintiffs' FPS, App. A at 423, 480, 485) as having attended meetings of the MD Group and the Market Stabilization Council.

---

**109.** The Yamada diary was identified in answers to interrogatories filed by Hitachi, Ltd. and Hitachi Kaden.

**110.** For example, selected passages in the Yamada notebook (DSS 51 at 50017) are said to parallel selected passages in the Yamamoto notebooks (DSS 52 at 50066). DSS 48–98 includes the diaries, protocols, and testimony.

**111.** Testimony by Mr. Adachi of Hitachi before the JFTC (DSS 64 at MJ 1925–1) is said to confirm entries in Yamada's notebooks (DSS 51 at 50017).

(5) Entries in the Yamada diary are of the sort which might be expected by one in Mr. Yamada's high position, (*i. e.*, general manager of the Yokohoma works and later Department Manager, Electronic Appliance Department Consumer Products Division), thus indicating the authenticity of the diary.

(6) There is a pattern of reporting in the notebook congruent with that of other diaries.

## C. *Defendants' Response*

(1) The document was produced to plaintiffs in response to a Rule 34 request, not a Rule 33(c) proffer.

(2) Hitachi's interrogatory answers do not establish in any way either its authenticity or business record status.

(3) Other than a reference in the JFTC list of evidentiary materials (DSS–93), which is of dubious admissibility, there is no information in the record regarding the document.

(4) No evidence has been presented as to when or for what purpose Mr. Yamada's seal was attached to *one* page of the Yamada document.

(5) Entries are essentially illegible and unintelligible.

(6) Mr. Adachi's testimony before the JFTC merely elucidates a few figures in the Yamada diary and does nothing to authenticate the diary.

(7) Validation of the Yamada diary by comparison of certain entries therein to certain entries in the Yamamoto diaries is impermissible unless the Yamamoto diaries have first been authenticated, and even if the Yamamoto diaries were authenticated, similarity in entries could have resulted from information which was derived from a common third–party source.

(8) Yamada is a common Japanese surname and the persons named "Yamada" who are identified in various defendants' answers to interrogatories as having attended various group meetings are not necessarily the same as Noboru Yamada of Hitachi, Ltd., since at least four other persons named "Yamada" are mentioned in the record.

(9) No evidence is in the record to indicate that Noboru Yamada attended any of the meetings noted in the Yamada diary.

(10) Plaintiffs have presented no evidence to demonstrate that Mr. Yamada acted under a duty to record any of the information in the diary.

(11) Plaintiffs have presented no evidence as to what periods of time may have elapsed between when Mr. Yamada learned certain information and when he recorded it in his diary.

(12) There is no evidence of systematic checking or of a regular or continuous habit on Mr. Yamamoto's part in marking entries in his notebooks relating to group meetings.

(13) Mr. Yamada is alive and well and still employed by Hitachi and available for depositions, but has not been deposed by plaintiffs.

## D. *Authentication*

 Although the point is very close, we find Mr. Yamada's diary to be authenticated for much the same reason as we found Yajima's diaries authenticated. We rely in this regard on the identification of the documents in answers to interrogatories and its production by Hitachi [112]; the presence of Mr. Yamada's "chop" on one of the pages of the diaries; the apparent acknowledgement of the authenticity of the diary in Mr. Adachi's testimony before the JFTC,[113] and the circumstances of seizure of the

---

**112.** Defendants have asserted that the document was produced in response to a Rule 34 request, not a Rule 33(c) proffer. This would make some difference on the question of authentication but not enough to affect the outcome here.

**113.** Mr. Yamada did not testify before the JFTC and gave no protocol. We do not ignore the defendants' contention that Mr. Adachi's testimony before the JFTC merely elucidates one minor facet in the Yamada diary; that alone would not be enough but it does not stand alone.

diary. We believe that these factors taken together satisfy the *Goichman* standard.

## E. *The Business Records Exception*

■ Yamada's diary does not qualify as a business record under F.R.E. 803(6) for the reasons set forth at length in our discussion of Yajima's diaries. We shall not burden the record by rescribing virtually all of the reasons for nonadmissibility advanced there, and we simply incorporate by reference our rulings. In capsule form, we note the following. First, the plaintiffs have failed to adduce any evidence of routine practice or systematic checking or of any habit of precision or regularity on Mr. Yamada's part in connection with his diary entries. Second, this diary is worse than a "hodge podge." We have read it in its entirety (in English translation of course) and can certify that there is hardly a line much less a page which is intelligible–that is to anyone other than Mr. Yamada, assuming *he* could understand it. To call this document cryptic would be extremely charitable. Third, there are the same problems of lack of evidence of first hand knowledge and a duty to report. Fourth, there is no evidence in the record as to what periods of time may have elapsed between when Mr. Yamada learned certain information and when he recorded it in his diary. Moreover, for the foregoing reasons and because of the character of the diary there are trustworthiness problems of such dimension as to render the diary inadmissible under the 803(6) proviso. To repeat what we said in discussing Yajima's diaries, a document which is unintelligible cannot be trustworthy. We have thus essentially accepted defendants' contentions about the Yamada diary and its admissibility under Rule 803(6).[114]

In addition to the reasons akin to those which required exclusion of Yajima's diaries, there are other reasons preventing the Yamada diary from coming in as business records. There is no evidence in the record as to Yamada's presence at any of the Tenth Day Group meetings. Plaintiffs seem to believe that the congruence between entries in Yamada's diary and entries in the other diaries is sufficient to establish such a presence and also to establish the admissibility of the diary as a business record under 803(6). For the reasons explained above that is incorrect. Moreover, unlike Yajima, Yamada is alive and well and available for depositions but they have never been taken. Plaintiffs have had an opportunity to lay foundation for admissibility–that is what lawyers usually do in cases before us–but have passed it by.

## F. *Admissions, The Other Hearsay Exceptions, and Internal Hearsay*

■ The Yamada diary and the entries within it do not qualify as admissions for the same reason as the Yajima diaries: lack of foundation. Rather than repeat what we said above we incorporate it by reference and add the overall comment that, as in Yajima's case, there is insufficient information in the record for us to conclude that the entries in Yamada's diary constitute assertions, or what they assert. And if they are not proffered as assertions they are irrelevant.

■ The diaries do not qualify as statements against interest for the same reasons as the Yajima diaries: the absence of assertions, the absence of identifiable statements of Yamada which would be personally inculpatory against him, and plaintiffs' failure to produce evidence from which we could infer that Yamada was conscious that any statements were against his interest. In addition, plaintiffs have failed to meet the unavailability requirement, for Mr. Yamada, unlike Mr. Yajima, is alive and well and has been available for a deposition.

114. As we have explained above, production of the document, even pursuant to Rule 33(c), does not establish it as a business record. Equally unavailing is the supposed pattern of reporting which though not established would not qualify a document as a business record in any event. The fact that entries are business related or that Mr. Yamada had a high position in the company or that an occasional entry was verified during JFTC testimony does not help the plaintiffs either.

█ The residual exceptions are unavailing because of the utter lack of trustworthiness of the diary on its face. Additionally, Mr. Yamada is available for depositions; hence the diaries themselves are not more probative on the point for which they are offered than other evidence which the proponent could procure through reasonable efforts. We understand of course that the events at issue occurred many many years ago, and that plaintiffs therefore argue that the diary is the best available evidence of what occurred. The plaintiffs have failed to establish that this is so, however, since they have not made the slightest attempt to take depositions. Rather than being meaningless, we think that a deposition might have been very fruitful inasmuch as the deponent/declarant could have been examined on all of the diaries, testimony, protocols and the other hearsay materials. As with the Yajima diary, this is not the stuff of which residual exceptions are made.

█ It is also necessary to subject the content of the diaries to internal hearsay examination. As with the Yajima diaries, vast portions of the Yamada diary would have to be excluded as containing multiple hearsay not subject to any exception to the hearsay rule. As with the Yajima diaries, the deletion of internal hearsay would result in the excision of such significant portions that the diaries as a whole would themselves have to be excluded as having been so fragmented as not to gave a fair representation of anything, even if they did theretofore.

## V. *The Yamamoto Diaries, DSS 52–54*

### A. *Introduction*

The Yamamoto diaries, into which Mr. Mamoru Yamamoto of Hitachi, Limited, purportedly made certain entries during the period of approximately October of 1964 to July of 1966, were seized by JFTC during the course of the Six Company Case. Hitachi Ltd. produced these notebooks to plaintiffs during discovery in these proceedings. At that time, these documents were identified by document identification numbers HJ 50055 through HJ 50160 and HJS 60002 through HJS 60010.

Plaintiffs offer these diaries in evidence against all defendants. More specifically, plaintiffs claim these diaries are authentic under F.R.E. 901(a), 901(b)(4), and 901(b)(9). They are offered as admissions of Hitachi, Limited, under F.R.E. 801(d)(2), as present sense impressions under F.R.E. 803(1), as business records under F.R.E. 803(6), as declarations against Mr. Yamamoto's interest under F.R.E. 804(b)(3) and under the residual exceptions, F.R.E. 803(24) and 804(b)(5). Plaintiffs offer the diaries as authentic accounts of what took place at the group meetings which Mr. Yamamoto purportedly attended.

### B. *Plaintiffs' Foundation for Authentication and Admissibility Under One of the Exceptions to the Hearsay Rules*

(1) The Yamamoto notebooks were identified in answers to the interrogatories filed by Hitachi Ltd.

(2) In his protocol before the JFTC (DSS–86), Mr. Yamamoto identified the notebooks, which are in turn identified in the JFTC investigator's list of evidence (DSS–93) as his own.

(3) In his testimony before the JFTC (DSS–64), Mr. Adachi testified concerning two entries in the Yamamoto notebooks, and raised no challenge to the authenticity of the notebooks at that time.

(4) Mr. Yamamoto put his business address into his notebooks, and kept his notebooks at his desk, for that is where the JFTC investigators found (and lawfully seized) them.

(5) In his protocol before the JFTC, (DSS–64), Mr. Yamamoto stated that he went to some meetings of the Tenth Day Group.

(6) As to group meetings which he did not attend, Mr. Yamamoto states in his protocol before the JFTC (DSS–64) that Mr. Adachi would communicate information concerning these meetings to Mr. Yamamoto within a week of occurrence of the meetings, and that Mr. Yamamoto would

promptly record all information relevant to his business responsibilities.

(7) It can be assumed from the corporate structure of Hitachi, Ltd. that Mr. Yamamoto was receiving regular timely reports concerning group meetings which he did not personally attend.

(8) Dates of group meetings noted by Mr. Yamamoto correspond with dates of which plaintiffs are aware from other evidence in this litigation, thus corroborating the accuracy of Mr. Yamamoto's notes.

(9) Mr. Adachi did not "embellish" any of the reports he made to Mr. Yamamoto concerning meetings which Mr. Yamamoto did not attend because he knew the information had to be reliable enough for Mr. Yamamoto to act upon it.

(10) All entries in the Yamamoto notebooks are business–related.

(11) The contents of the Yamamoto notebooks must have been communicated at least at Mr. Ueno, for he signed the receipt when the JFTC investigators seized the notebooks.

(12) Mr. Adachi ratified the contents of the Yamamoto notebooks because, if Mr. Yamamoto's practice in writing this information down were against company policy, Mr. Adachi would have stopped him from acting as he did.

(13) One diary (DSS 53) bears the Hitachi logo, with the legend "1964 Diary" and under that "Hitachi Kaden, Inc." and under that "Hitachi Installment Sales, Inc." Yamamoto gives his name and for his address he gives "TV Dept., TV. SEC," which identifies the diary as a business notebook, not a personal notebook.

C. *Defendants' Response*

(1) The Yamamoto notebooks were produced to plaintiffs in response to a Rule 34 request, not a Rule 33(c) proffer;

(2) The authenticity of the Yamamoto notebooks was not challenged before the JFTC because the notebooks were not introduced as substantive evidence.

(3) Mr. Adachi's testimony before the JFTC relating to entries in the Yamamoto notebooks relates not to the authenticity of the notebooks, but to the inaccuracy of figures recorded in the notebooks.

(4) Correlation of dates recorded for group meetings recorded in the Yamamoto notebooks with dates noted in other items of proffered evidence does nothing to satisfy the requirements of the Federal Rules of Evidence.

(5) Many dates of group meetings which took place in the period covered by the Yamamoto notebooks are not noted therein, which fact indicates a lack of regularity in creation of these entries.

(6) Plaintiffs have presented no evidence that Mr. Yamamoto regularly put into his notebook information concerning group meetings that Mr. Adachi had personally attended, as opposed to meetings which Mr. Yamamoto or Mr. Adachi may have learned of from unidentified third persons.

(7) There is no evidence of systematic checking or of a regular or continuous habit on Mr. Yamamoto's part in making entries in his notebooks relating to group meetings.

(8) Mr. Yamamoto states in his protocol before the JFTC (DSS–86) that Mr. Adachi added his own ideas and accounts of Tenth Day Group Meetings to Mr. Yamamoto's.

(9) There is no evidence indicating what Mr. Yamamoto's source was for information regarding meetings of any group other than the Tenth Day Group, and neither Mr. Yamamoto nor Mr. Adachi ever attended a single meeting of some of the groups referenced in the Yamamoto notebooks.

(10) The supposition that a document is found in a business office does not establish it as a business record, nor does the fact that portions of the document are business–related.

(11) There is no evidence that the contents of these notebooks were ever communicated to anyone, and the fact that Mr. Ueno signed the JFTC receipt does not establish that he read the notebooks.

(12) Entries in the Yamamoto notebooks are essentially unintelligible, and it is impossible to determine where opinion stops and the information, if any, begins.

1282

## D. Discussion

We need not dwell long on the Yamamoto diaries because we agree essentially with defendants' contentions. Accordingly, the diaries must be excluded for the reasons set forth in our discussion of the Yajima and Yamada diaries. They are authenticated by virtue of their mode of seizure and production, by Mr. Adachi's brief testimony, by Mr. Yamamoto's act of putting his business address in the notebooks, and by his reference to the diaries in his protocol. However, they must be excluded as hearsay because they have not satisfied any of the exceptions.

 First, they cannot qualify as business records because they suffer from the same vices as the Yajima and Yamada diaries. They are more similar in character to Yajima's diary then to Yamada's; hence we incorporate by reference our discussion of the admissibility of Yajima's diary under Rule 803(6) including our comments upon plaintiffs' proffered foundation. However, Yamamoto's diaries also have problems of their own. The principal additional problem with the Yamamoto diaries is that it is plain (and plaintiffs concede) that Mr. Yamamoto never attended many of the meetings whose events are allegedly recorded in the diaries. Indeed, Yamamoto stated in his protocol that his diaries were founded *entirely* on hearsay:

> These two notebooks are mine and the content of the discussions at the meetings of the Tenth–Day Group and TS Group was written by me from what I heard from Vice–Director of the TV Department Adachi. It was when I went to Vice–Director Adachi's desk or when he came to my desk that he talked to me about the discussions at the meetings. This was either the next day or within a week following the date of the meeting. He talked to me looking at his memo from the meeting, and he added his own ideas. I have written only the parts of the meeting which related to me in my notebooks.

The hearsay source of this diary would never have been apparent but for this statement. That is another reason why the absence of testimony concerning the diary entries relied upon by plaintiffs renders the entries extremely suspect.

It is thus known with respect to at least some of these meetings that they were attended by Mr. Adachi, who would communicate information concerning these meetings to Mr. Yamamoto. Plaintiffs submit that Mr. Adachi would communicate the information to Mr. Yamamoto within a week of the occurrence of the meetings and that Mr. Yamamoto would thereupon promptly record all information relevant to his business responsibilities. They assert that the correspondence of dates of group meetings noted by Mr. Yamamoto with dates of which the plaintiffs are aware from other evidence of the litigation corroborates the accuracy of Mr. Yamamoto's notes. They submit that Mr. Adachi did not embellish any of the reports he made to Mr. Yamamoto concerning meetings which Mr. Yamamoto did not attend because he knew the information had to be reliable enough for Mr. Yamamoto to act upon it in his official duties. And they conclude that Adachi ratified the contents of the notebooks because if Yamamoto's practice in recording this information were against company policy, Mr. Adachi would have stopped him from doing so.

These contentions are all very interesting and might be convincing had plaintiffs established them by taking the deposition of either Yamamoto or Adachi, both of whom have always been available. In the absence of such evidence, plaintiffs' contentions must fail. There is no evidence that Mr. Adachi or anyone else ever saw the diary. Plaintiffs have presented no evidence that Yamamoto regularly put into his notebook information concerning group meetings that Adachi had attended as opposed to meetings which Yamamoto or Adachi may have learned of from unidentified third persons. In addition to the fact that Adachi added his own ideas to his accounts of the Tenth Day Group meetings to Yamamoto, the diary contains entries regarding the meetings of groups (the TS Group and the Palace Group) which neither Yamamoto nor Adachi ever attended.

There was, alas, no evidence of systematic checking or of habits of precision or of a regular continuous practice on Yamamoto's part in making entries in his notebooks relating to group meetings. The regularity problems are further demonstrated by the fact that within the time frame of 21 meetings of the Tenth Day Group referenced in Appendix B of plaintiffs' FPS, both Yamamoto diaries contain a total of only four references to the meetings. That fact hardly supports a claim of regularity of either attendance or of reporting.

The diaries contain the same methodological problems that the Yajima diary contains in terms of being similarly cryptic and erratic. There are likewise numerous unintelligible entries and it is impossible to sort out opinion from fact. Notwithstanding plaintiffs' suggestion, correlation of dates recorded for group meetings recorded in the Yamamoto notebooks with dates noted in other items of proffered evidence does not qualify the diaries as business records within the meaning of the F.R.E. Neither does it matter that the diaries relate to business matters. For the same reasons we mentioned in the case of the other diaries, there are overwhelming indicia of the unreliability of the diaries.[115]

We need not dwell further on the Yamamoto diaries. For the very same reasons set forth in our discussion of the Yajima and Yamada diaries and the preceding discussion with respect to the Yamamoto diaries, neither the diaries nor the individual entries within them can qualify as an admission against Hitachi, or as statements against interest, nor can they qualify under the residual exception. Moreover, they are afflicted by the same internal hearsay problems as we have noted with respect to the diaries of Yajima and Yamada.

## VI. *The Okuma Diary, DSS 55*

### A. *Introduction*

The Okuma diary is a notebook into which Mr. Mshizo Okuma, formerly assistant manager of the radio and television section and later assistant director of the sales department of Melco, made certain entries. While the diary is lengthy, we have before us only the three pages thereof which have been translated. The diary was seized by the JFTC during the course of the Six Company Case. Melco produced the diary to plaintiffs during discovery. At that time, the translated pages of the diary were marked by document identification numbers 2198 to 2200, although as will be seen, Melco claims that the plaintiffs have misrepresented the diary by marking the pages out of their correct order. Plaintiffs offer the notebooks in evidence against all defendants on essentially the same basis as we have noted in connection with the previous diaries. They offer the diary pages as containing authentic accounts of what took place at the group meetings which Mr. Okuma purportedly attended.

### B. *Plaintiffs' Foundation*

(1) The Okuma diary was identified via Melco's supplemental answers to interrogatories of NUE, dated May 15, 1975, in which Okuma was identified as assistant to the manager of the Consumer Product Sales Department of Melco. The diary was also identified in Melco's response to plaintiffs' interrogatories to defendants relating to the existence, location, and destruction of documents.

(2) Okuma identified his diary in his protocol given to the JFTC, stating that it was his diary and specifically referring to a February 16th meeting of the Tenth Day Group which he attended. Moreover, he identifies the February 16th entry as being *written at* the Tenth Day Group. In the protocol, Okuma also confirms a certain diary entry.

(3) In his testimony given under oath before the JFTC, Okuma confirms attendance at Tenth Day Group meetings, and makes (only) one correction in the protocol. Okuma was not confronted with his diary during his JFTC testimony, but plaintiffs assert that in light of the fact that he was

---

115. Mr. Adachi's testimony before the JFTC relating to entries in the Yamamoto notebooks itself points out the inaccuracy of certain figures recorded therein.

testifying and made a correction to the protocol, he could have corrected the diary had he wished.

(4) The diary was lawfully seized by the JFTC from Melco's premises and is so identified in DSS 93.

(5) The statement on the top of the diary, namely, "Confirmation of the proceedings of the previous minutes" confirms the fact that minutes were kept.

(6) Okuma made one correction in the diary, "thus confirming the others are accurate."

(7) Okuma identified one of the entries as an entry he wrote down while talking to the factory, thereby establishing it as a business entry.

## C. Defendants' Response

Melco asserts generally the same objections to the authenticity and admissibility of the diary under exceptions to the hearsay rules as do Toshiba and Hitachi in the discussion above. We add only the points especially stressed by Melco. First, Melco asserts that this was a personal diary intended for Okuma's eyes only. Melco contends that the diary is not authenticated by Okuma's testimony or protocol because the testimony does not mention the diary and because all of the materials taken together are "confusing, internally inconsistent, and meaningless without explanatory testimony by Okuma himself, which the plaintiffs consciously elected not to seek as a matter of trial strategy." Melco highlights its claim that the unexplicated diary is untrustworthy by demonstrating that the documents submitted by plaintiff are out of chronological order and would be confusing and incomprehensible to the trier of fact. More specifically, Melco asserts that the documents which were originally legended as Melco documents number 20583 and 20584 were reversed by plaintiff in their numbering, creating the impression that certain events took place when they in fact did not.

116. *We do not deem pages which plaintiffs have not bothered to translate to be candidates for admission.*

## D. Discussion

▮▮▮ We shall not dwell on the Okuma diary because our analysis of its admissibility *vel non* essentially tracks our previous analysis. The Okuma diary is authenticated against Melco by virtue of its mode of seizure and production and reference in answers to interrogatories and in Okuma's protocol. However, Melco's interrogatory answers and Okuma's protocol are both admissible only against Melco. As against all other defendants, there is insufficient authenticating evidence even to meet the prima facie standard of *Goichman, supra.* As a result, the Okuma diary is authenticated only against Melco, and is inadmissible against all other defendants because it is not authenticated by evidence which is admissible against them.

The diary cannot qualify as a business record because it suffers from the same vice as the other diaries, the lack of evidence of systematic checking or of a regular continuous habit on Okuma's part in making entries in his notebooks relating to group meetings. There is a trustworthiness problem caused by plaintiffs' submission of misordered pages. Moreover, the few pages of the diary that have been translated are punctuated with illegible entries (in English), the correctness of whose translation is challenged.[116] Other problems include attribution of statements to various companies without explaining who the speaker was or explaining whether this was merely what the diarist's impression was of the companies' position; a nine–page gap between the first and second pages proffered by the plaintiffs; and the presence of cryptic narrative and chart–like entries which it would take the testimony of the diarist or someone present at the meeting to explain. The diary entries plainly are not admissible as business records. Neither are the diaries nor portions thereof admissible under 801(d)(2) nor 804(b)(3) nor 803(6) nor 803(24)

or 804(b)(5)—all for the same reasons as heretofore expressed.

## VII. *The Tokizane Diary, DSS 56–57*

### A. *Introduction*

The Tokizane diary is a notebook of approximately 80 pages, comprising entries purportedly made by Hayata Tokizane, an employee of Matsushita Electric Industrial Co., Ltd. ("MEI"). At the time that the diary entries were allegedly made (between March and April, 1965) Mr. Tokizane was the Director of the Television Division of MEI. He was also a director of MEI from 1967 to 1971 and Managing Director from 1971 to 1974. Only two pages of the diary were submitted to the Court, document numbers MJ3972 and MIH20080.

Plaintiffs offer the Tokizane diary in evidence against all defendants. More specifically, plaintiffs offer this diary as a business record under F.R.E. 803(6), as an admission of MEI under F.R.E. 801(d)(2), as a declaration against the interest of Mr. Tokizane under F.R.E. 804(b)(3), and under the residual hearsay exceptions, F.R.E. 803(24) and F.R.E. 804(b)(5). Substantively, plaintiffs offer the diary as evidence that Matsushita and Sony conspired to fix the price of 9″ color transistor TV sets at 39,800 yen, and that there was a meeting of the Palace Group on March 23, 1965, where a decision was made concerning the price of color TV's.

### B. *Plaintiffs' Foundation for Authentication and Admissibility Under One of the Hearsay Rules*

(1) MEI answers to interrogatories identify Mr. Tokizane as the director of the television division of MEI from 1964 to 1968; as such, he was the direct superior of the general manager of the television department of MEI, the immediate superior of the general manager of the transistor department of MEI, and the immediate superior of the general manager of the color television department of MEI.

(2) The first part of the diary was produced by the Matsushita defendants, and is referred to by them in their correspondence and in their Answers to Interrogatories Set No. 2, Interrogatories 8, 42, and 44.

(3) The diary contains entries about employees' wages, new employees, and a meeting concerning a press release for new products, *i. e.* business related matters.

(4) The diary was an exhibit in the "Six Company Case," and part of the record in that proceeding (DSS 93).

(5) The diary contains a March 31 entry about a meeting at the "Head Office" involving the President, Vice President and Managing Director who discussed color TV prices, transistor TV's, that the price of a 9″ television receiver would be 39,800 yen, and that the president would inform Sony to that effect. The diary also contains an April 1 entry indicating "telephone from President about the Sony matter." Plaintiffs claim that this entry, in conjunction with the March 31 entries, indicates that Matsushita and Sony set the price of 9″ transistor color TV's at 39,800 yen.

(6) The April 5 entry refers to a phone call from the "Chairman" (but does not specify which chairman) concerning the decision of the Palace Group on color prices. This decision was purportedly made at a Palace Group meeting on March 23, 1965, since Appendix B to Plaintiffs' FPS and document MJ2823 (the JFTC investigator's statement of the case, DSS–94) lists a Palace Group Meeting on March 23, 1965.

(7) Despite the fact that the diary entries do not mention the year, they do indicate that April 5 was on a Monday, and an examination of a perpetual calendar reveals that the year must be 1965.

### C. *Defendants' Response*

(1) There was no testimony or protocol by Mr. Tokizane in the Six Company Case record. No one else in the Six Company case referred to Mr. Tokizane's diary. The present case has no deposition dealing with Mr. Tokizane. There was no foundation laid for admissibility of the diary in the JFTC proceeding. Consequently, other than the bare diary itself, there is no expla-

nation of what the diary means, how it was prepared, and for what it was used.

(2) Since no other source sheds light on the meaning of the diary, it is impossible to relate any individual entry in the diary to any other entry. For example, nothing in the diary indicates that the 9″ T.R. price of 39,800 yen in the March 31 entry relates to the "telephone from president" entry of April 1, or the "Chairman phone call entry" of April 5, or any other entry. The attempted connection between the 9″ television receiver price of 39,800 yen, in the March 31 entry, with the April 5 entry concerning the Palace Group decision on color prices is impossible, since 39,800 yen is too low a price for a color TV.[117]

(3) The entries do not purport to have anything to do with an export conspiracy, nor do they say that there was any agreement reached in the sense of parallel pricing conduct. Consequently, the jury cannot be permitted to speculate as to what these meaningless entries refer to.

(4) Plaintiffs' contention that the March 31 and the April 1 entries indicate that Sony and Matsushita together set the price of 9″ color transistor TV sets at 39,800 yen is clearly erroneous, since at the alleged time of the diary entries (April 1965) Sony was not exporting color TV sets. Also, the price of 39,800 yen was not comparable to Sony's prices for those models. Furthermore, the diary entries nowhere state that Sony and Matsushita fixed prices, merely that the president will inform Sony about *something*, and it is impossible to infer a price–fixing agreement involving Sony from these cryptic comments in the diary.

(5) It is uncontested that Mr. Tokizane never attended any of the various group meetings. Thus, any references to discussions at the Palace Group meetings are, at best, multiple hearsay.

(6) There is no showing in the diary as to what year the entries were made. References in other documents that meetings took place in 1965 does not shed light on the year that *this* diary was made.

(7) If the diary was necessary to Mr. Tokizane's business, it would have been written in a comprehensible manner.

D. *Discussion*

We have spent much time in dealing with the diaries. This has been necessary because of the great scaffolding which plaintiffs have erected on the basis of random entries therein, a scaffolding which collapses because of the non–existence of foundation. It is time to move on to other matters and so we shall simply note that we agree with defendants' contentions and conclude that the Tokizane diary is not admissible under any of the exceptions to the hearsay rules for essentially the same reasons as the other diaries.[118] Plaintiffs make much of Mr. Tokizane's high position within Matsushita. That does not affect admissibility. This document is as cryptic as can be and we are not about to let the trier of the fact (aided of course by some helpful suggestions of their friendly plaintiffs' counsel) speculate as to what it means on the basis of selected bits and pieces.

[108] At the hearing plaintiffs' counsel argued that even if the document was inadmissible, it would still be relied upon for "corroboration." We know of no authority for such a proposition, and suggest that it reflects the bankruptcy of plaintiffs' evidentiary case.

VIII. *JFTC Testimony, DSS 58–74*

A. *Introduction*

During the Six Company proceedings, a total of 17 different witnesses testified before the JFTC Hearing Examiners.[119] The names of the witnesses are as follows:

---

117. Plaintiffs have now conceded the mistake and stated that the reference should be to a monochrome set.

118. We do find it authenticated against MEI, but not against any other defendant because of the absence of authenticating evidence which is admissible against the other defendants.

119. All of the testimony that was presented during the Six Company Case was discussed together at the evidentiary hearings, hence we shall discuss all of the testimony together herein.

| DSS Number | Witness | Company | Document Number |
|---|---|---|---|
| DSS 58 | Tsuruta | MEI | TJ 2144–2218 |
| DSS 59 | Oshima | MEI | TJ 2509–2551 |
| DSS 60 | Ta Fujio | MEI | TJ 1468–1523 |
| DSS 61 | Tsu Fujio | MEI | TJ 4416–4464 |
| DSS 62 | Hirano | Sanyo | TJ 2014–2143 |
| DSS 63 | Yoshioka | Sanyo | MJ 2232–2264 |
| DSS 64 | Adachi | Hitachi | MJ 1893–1986 |
| DSS 65 | Yamamoto | Hitachi | TJ 1408–1467 |
| DSS 66 | Nishi | Hitachi | MJ 2652–2661 |
| DSS 67 | Okuma | Melco | MJ 1987–2044 |
| DSS 68 | Kihara | Melco | MJ 2527–2547 |
| DSS 69 | Kamakura | Toshiba | MJ 2044–2087 |
| DSS 70 | Yajima | Toshiba | MJ 2098–2160 |
| DSS 71 | Kawahara | Toshiba | MJ 2662–2670 |
| DSS 72 | Ogawa | Sharp | MJ 2161–2187 |
| DSS 73 | Ogawa | Sharp | MJ 2617–2632 |
| DSS 74 | Iue | Sanyo | MJ 2671–2678 |

The six defendants were jointly represented by three counsel, identified in the translations as "surrogates." The vast bulk of the interrogation of the witnesses was conducted by these counsel. Some questions were also put to the witnesses by the JFTC Hearing Examiners and occasionally questions were put by the investigators. The subject matter of the testimony related to business practices of the six companies, with emphasis upon their pricing policies, and to activities at meetings of the Tenth Day Group at which there were discussions of "bottom prices," predicted consumer demand, and of the wholesale, retail, and rebate margins operative in the manufacturers' distribution chains. Virtually all of the testimony concerned the Japanese domestic market, although there is an occasional random reference to exports.

Not all of the testimony is inculpatory of a domestic price–fixing conspiracy. Indeed, the testimony is pervaded by denials that any agreements were reached, by testimony that the companies did not tell each other the truth at the meetings, and by contentions that the principal function of the meetings was not the fixing of prices, but the projection of demand. There were occasional references to the diaries, but they did not play a significant role in the testimony. There was no effort to formally authenticate the diaries. We shall not dwell here upon the substantive import of the JFTC testimony, reserving that for the conspiracy summary judgment opinion.

Suffice it to say for now that the tenor of the testimony nowhere contains the slightest suggestion that the activities of the defendants were in the nature of fixing an artifically high price in Japan for the purpose of financing a predatory export raid on the American market. Indeed, there is no suggestion of that even in the JFTC complaint. *See* DSS 94.

Plaintiffs offer the testimony of the above–listed witnesses against all defendants in this action. Plaintiffs offer this testimony as prior testimony under F.R.E. 804(b)(1); as statements against interest under F.R.E. 804(b)(3); as party admissions under F.R.E. 801(d)(2); as business records of the JFTC under F.R.E. 803(6); and as admissible under the residual hearsay rules, F.R.E. 803(24) and F.R.E. 804(b)(5). Defendants object on grounds of lack of authentication and hearsay. We turn to a discussion of these issues against the background of our legal discussion in Part II, *supra*.

### B. Authentication

The proffered documents are copies of the notes of the testimony taken before the JFTC, but without any kind of seal, or certification from the JFTC or its court reporter of its correctness, and without testimony by a witness who has compared the copies with the original. While most of the defendants have not asserted the point, and although plaintiffs express understandable chagrin at the apparent hypertechnicality of the contention, Melco, correctly noting that it is the plaintiffs' burden to authenticate its evidence regardless of what the defendants come forward with, objects to the admission of the JFTC testimony on the grounds of lack of authentication. The Melco objections are based on the lack of:

1) certification by the JFTC that the proffered copy is a genuine copy of the original;

2) testimony or certification that the typed copy is an accurate transcript of the original handwritten copy;

3) testimony or certification that the examiner accurately reported his notes of the witness' statements;

4) signature or oath by the witness; and

5) certification of a "public document" as required under F.R.E. 902(3) relating to "foreign public documents."

For reasons stated in Part II A–5, *supra*, we view Rule 1005 objections as waived and Rule 80(c) as inapposite. We will consider Melco's objections, however, under the general standards of Rule 901.

■■ The plaintiffs have responded to these objections in several ways. First, they point out that defendants identified the notes of testimony in their answer to "Plaintiffs' [NUE] Interrogatories to Defendant Set. No. 2, Interrogatories Nos. 8, 42–44." Secondly, the plaintiffs note that the transcripts were produced by the defendants in response to plaintiffs' Request for the Production of Documents. Thirdly, the plaintiffs observe that all of the witnesses were called to testify by an attorney who represented all respondents to the JFTC case, and that the witnesses were sworn. Fourth, they note that there is a stenographer's seal cn the (copy of the) transcript. Fifth, they point out that the format of all the notes of testimony is the same. Finally, they argue that all the witnesses were employed by the various defendants.

We are satisfied that the plaintiffs have made a sufficient prima facie showing of authentication under Rule 901 by virtue of the factors they have noted, and by virtue of the contents and substance of the transcripts themselves taken in conjunction with circumstances. F.R.E. 901(b)(4).

## C. Admissibility as Former Testimony–Rule 804(b)(1)

Since we are dealing here with the admissibility of former testimony, we must first consider the terms of F.R.E. 804(b)(1), which we have discussed in Part II.D above. In accordance with that discussion, there are three distinct points we must address in considering the admissibility of the JFTC testimony: (1) unavailability; (2) opportunity and similarity of motive; and (3) the predecessor in interest notion. The latter point is important because the plaintiffs seek to offer the JFTC testimony against all defendants, not just those involved in the Six Company Case, on the grounds that the defendants in the Six Company Case are the predecessors in interest of the other defendants.

### 1. Unavailability

We have explained in Part II–D–1 the principles regarding the requirement of unavailability both in general and as applied to Rule 804(b)(1). For the reasons stated there, we find Yajima unavailable because of his death, and we find the other witnesses who testified before the JFTC unavailable within the meaning of Rule 804(a)(5), for purposes of Rule 804(b)(1) only, because they are beyond the subpoena power of the Court.

### 2. Similarity of Motive to Develop The Testimony

#### a. Contentions of the Parties

We commence our discussion of similar motive by summarizing the positions of the parties. It is more convenient to begin with the position of defendants who in one of their briefs have outlined the differences between the JFTC action and the present action as follows:

| | Japan | U.S. |
|---|---|---|
| Nature of Action | Investigation by an administrative agency in Japan under the Japanese civil law system with minimal evidentiary rules, including the admission of hearsay evidence. | Private, treble damage lawsuit in the U.S. under the Sherman Act and common law system with evidentiary rules generally excluding hearsay. |
| Nature of Charge | Whether or not an alleged agreement between Japanese television manufacturers on the suggested retail price resulted in a restraint on the actual prices within Japan. | Whether or not certain Japanese television manufacturers combined and conspired for the purpose and with the intent of predatorily invading the U.S. market by selling at unreasonably low prices in order to drive plaintiffs out of business. |

| Substantive Law | Japan | U.S. |
| --- | --- | --- |
| | Whether the alleged agreement on suggested retail prices constituted an "unreasonable restraint of trade" under the Japanese interpretations of the Japanese Antimonopoly Law (JAL Sections 3, 1(6)). No "per-se" rule under Japanese law. | Whether there was a broad, all-embracing conspiratorial agreement to fix prices and make a predatory invasion of the U.S. market. |

Defendants thus contend that the issues are not substantially similar. They argue that in the JFTC proceeding the only issue was "whether respondents had jointly established a suggested retail price, the retailers and wholesalers margins, and the rebate level." In the case at bar, defendants claim the issues are (1) whether "the alleged two year Japanese conspiracy drove the prices of television receivers up and established inordinate profit margins," (2) whether "this domestic conspiracy was an integral part of an alleged export conspiracy involving almost one hundred companies doing business all over the world to create a 'war chest' to finance the sale of CEP's in the United States at artificially low prices"; and (3) whether the JFTC testimony establishes the authenticity of the diaries as business records.

Defendants claim that neither issues (1) nor (2) were involved in the JFTC proceeding. As to issue (3), defendants maintain that there was no motivation in the JFTC hearing to show that the diaries of the declarants were not business records because no similar rules of evidence exist in Japan.

In addition to claiming that there is no similarity of issues between the two proceedings, defendants urge that there is no similarity of purpose for which the testimony is offered and that the circumstances under which the opportunity to develop the testimony arose are not meaningful in light of the present circumstances. In this regard, defendants emphasize the following factors: (1) the unforeseeability to the parties to the JFTC proceeding that there would ensue a subsequent litigation involving additional defendants, some with no operations in Japan, and involving complex allegations of home market *and* export conspiracies; (2) the difference in the natures of the proceedings, *i.e.* an administrative agency hearing under Japanese civil law with minimal evidentiary rules versus a private treble damage lawsuit in the U.S. with more stringent evidentiary rules; and (3) the difference in the sanctions available, *i.e.* a fine of 500,000 yen in Japan (equivalent at the time to 1,388 U.S. dollars) and treble damages of 1.2 billion dollars in the instant case.

Plaintiffs claim that the requirements of similar motive as measured by substantial similarity of issues and purpose are fully met in this case. They deny that any circumstances in the present proceedings have made the opportunity to develop the testimony in the prior proceeding less meaningful. Plaintiffs assert that the testimony given at the JFTC proceedings concerned the issue of a conspiracy to fix prices in the Japanese domestic television market and that "this is the precise issue and purpose for which such testimony is being offered in this litigation." Furthermore, plaintiffs contend that the testimony was offered at the JFTC proceedings on the issue of the authenticity of the diaries and notebooks, again a precise issue and purpose for its being offered here.

In addition, plaintiffs take issue with defendants' contention that there is a requirement that parties to the action in which the former testimony was taken know or should know there was additional pending litigation in which the testimony might be used. Even if there were such a requirement, plaintiffs submit that the parties had reason to believe that civil or criminal lawsuits might follow the JFTC proceeding because the act under which the proceedings was instituted also contained provisions for a private right of action and for criminal sanctions. *See* Part II.E.3, *supra* (quoting Japanese Antimonopoly Law).

Having stated the parties' contentions as to the similarity of motive requirement, we now turn to their resolution.

### b. *Similarity of Issues and Purpose*

 In order to establish the existence of the alleged unitary conspiracy among defendants, plaintiffs must prove the existence of the conspiracy's component parts and their connection. One element or building block of this theory is an alleged agreement between the six defendants named in the JFTC proceeding to fix prices in Japan. Insofar as that issue was an issue before the JFTC and is an issue in the present case, we find that the six defendants named in both cases had a similar motive to develop the testimony by direct examination to satisfy Rule 804(b)(1).

The record makes plain that one of the precise issues before the JFTC was whether the six companies made and put into practice agreements on the suggested retail price, retail and wholesale profit margins, and rebate levels for color and black and white TV. That alleged agreement is a component of plaintiffs' case here, and to that extent the issues are substantially similar in both cases and thus the first requirement for similarity of motive is met. Indeed, since the vast bulk of the interrogation in the Six Company Case was conducted by counsel (surrogates) for the defendant companies, and it was those counsel who elicited all the facts on these points, it would seem unfair not to permit into evidence here what they brought out there, given the similarity of issues.

The second requirement for similarity of motive which we have described in Part II, *supra*, is also met. The *purpose* for which the testimony was offered by the six defendants in the JFTC proceeding was such that they had an adequate motive for testing there the credibility of the testimony now offered to prove the home market side of the alleged conspiracy.

### c. *Other Differences in Circumstances*

 While the similarity of motive may be negated by other differences between the circumstances of the two proceedings, the simple existence of such differences does not require a finding of lack of similarity of motive. In the circumstances of this case we find that such differences between the proceedings as do exist do not greatly affect the motive to develop the testimony as to the issue of the alleged home market conspiracy. Because the testimony will be limited to its relevance to that one issue in this case, defendants' arguments that circumstances which now prevail render the former opportunity to develop the testimony meaningless must fail.

First, administrative agency and preliminary hearings under American law, both less than full trials, are nevertheless sufficient forums for admissible former testimony. The crucial factors are that the testimony has been given under oath and that the opposing party had a reasonable opportunity to cross-examine. It is not contended by defendants, nor can we find any evidence, that the testimony before the JFTC was either not given under oath or was given without opportunity to develop the testimony regarding the issues raised by the JFTC "recommendation."

Second, there is no requirement that the parties to the JFTC proceeding have reason to know that subsequent litigation would ensue. Nor does the fact that the subsequent litigation which did ensue is far more complex than the original action affect the six defendants' motives to develop the testimony regarding the home market price–fixing issue. Because we shall, *see infra*, narrowly limit the purpose for which the testimony may be introduced and the specific defendants against whom it may be used, the additional issues and parties in the present case have no bearing on the similarity of motive to develop the testimony as it will be offered. As McCormick states, "Additional issues or differences in regard to issues upon which the former testimony is not offered are of no consequence." McCormick § 257 at 620–21. And because the evidence will not be allowed against defendants other than the six defendants in the JFTC proceedings, their presence in this action cannot affect the motives of those six defendants.

Defendants' argument that the different sanctions available in each case affects the

similarity of motive to develop the testimony likewise must fail. Although there may be valid reasons for defending a small claim less vigorously than a large one, the JFTC proceeding was hardly analogous to a matter in small claims court, see n. 77 *supra*, and the respondents in the JFTC proceeding appear to have defended themselves quite thoroughly. Thus, we find no reason to believe that the six defendants would have attempted to elicit any different testimony than that given on the issue of a conspiracy to fix prices in the domestic market.

The defendants submit that the dangers of admitting the JFTC testimony are similar to those involved in admitting the diaries, *i.e.* the testimony is misleading and confusing in the context of this case, without clarification by a live or deposed (and knowledgeable) witness. The defendants are protected in this regard by their right and apparent ability to call the declarants as witnesses in the present case and thereby to seek to rebut any inferences they fear might otherwise be drawn.

We conclude then, with the exception hereinafter noted, that as against Sanyo, Toshiba, Sharp, Hitachi, Matsushita, and Melco, who defended the Six Company Case jointly, the testimony of their employees before the JFTC on the issue of retail prices, retailers and wholesalers margins, and the rebate level, all relating to the Japanese domestic market, is admissible as former testimony under Rule 804(b)(1) in this action.

#### d. *Export References*

The defendants contend that the JFTC proceeding involved only Japanese market matters, and there were no claims of (a) "war chesting" or (b) an "export low price conspiracy," hence, that they did not have an adequate opportunity or motive there to cross examine the witnesses on the issues involved in this litigation. In support of their contention they add that references to export in the JFTC testimony are predominantly characterized by discussions of (a) the witnesses' duties and responsibilities (*i.e.* "export is not my responsibility") [120] and (b) the witnesses' lack of knowledge about export matters.

We agree with defendants' description of the record and with their contentions. While we have ruled that defendants cannot escape whatever cut there may be of the testimony about their activities in the Japanese home market, regardless of its use in an unforeseen lawsuit, we are satisfied that there is no way that any "war chesting" or export references which may appear in the JFTC testimony can be utilized here. While the alleged export conspiracy and its connection to the alleged home market con-

---

**120.** Consider, *e.g.*, the following exchange:

TRIAL EXAMINER: One other point. How do you arrive at the export price? For instance, is the export price calculated by a comparison with the domestic price? Or is there an entirely different method of pricing applied for export purposes?

WITNESS: *Although I am not in a position to answer your question because it is beyond my area of responsibility*, I believe that when a product is sold domestically, expenses on service, shipping, publicity, and so forth are all included in the price. Whereas in the case of export, the price is usually negotiated on the basis of F.O.B., thus excluding all other expenses, covering shipping, advertisement, services, etc. Naturally, there would be a difference in price, as well as in the external design of a T.V. For export purposes, the cabinet is very crude in contrast to the deluxe of domestic models. This is true not only of external design but also true of what goes inside. We can export a set with very simple inside arrangements. Accordingly, from the point of view of manufacturing, those television sets for exportation are treated quite differently from those for domestic use. In view of all these factors, we, of course, see some difference in the production cost and consequent price differences in the products.

TRIAL EXAMINER: The hearing will now proceed in an open session.

SURROGATE YAMADA: Does the so-called Television Division handle only domestic affairs?

WITNESS: Yes, that is correct.

SURROGATE: Then, you are involved with affairs related to export?

WITNESS: No. *Anything to do with export is done through a separate division.* (emphasis added)

MJ 002081–1 to 2083–1

spiracy is here in issue, it was not even remotely involved in the JFTC case. The defendants would have had no reason whatever to develop by way of direct or cross examination anything about exports or "war chesting" before the JFTC. Thus we shall excise from admission into evidence under Rule 804(b)(1) any reference in the JFTC testimony which could be construed to reference "war chesting" or any export connection.

### 3. *Predecessor in Interest*

 Plaintiffs suggested in oral argument that the six defendants involved in the JFTC proceedings qualify as "predecessors in interest" of all those defendants who were not parties to that prior action, thereby rendering the testimony admissible against all defendants. Defendants on the other hand urge that the six JFTC defendants could not be predecessors in interest of all the other present defendants whose alleged involvement in a conspiracy was unknown at the time. Moreover, defendants argue, many of the alleged co-conspirators have such different interests and strategies that effective representation of one might conflict with the interests of another.

We agree with defendants that the six JFTC respondents do not qualify as predecessors in interest of the other defendants in this case. Under *Lloyd, supra,* the standard is whether the six respondents had a like motive to develop testimony about the same material as the other eighteen defendants would have had, if they had been represented at the JFTC hearing. *See* Part II.D.3, *supra.* We think they plainly did not, as the six respondents had no motive to inquire about the participation of their present co-defendants in the conspiracy charged by the JFTC. To permit the testimony into evidence against the eighteen co-defendants would be to risk unfair prejudice to them merely because the plaintiffs have joined them with the six JFTC respondents in the present litigation. Apart from the allegation of conspiracy, there is no evidence of a "community of interest" between the six respondents in the JFTC pro-

ceedings and the other eighteen defendants in this case, some of whom are not even Japanese corporations.

Moreover, we are cognizant of the factual differences between *Lloyd,* a case involving the government as a representative of the public interest, and the present case, which involves co-defendants with potentially conflicting interests. The facts of this case are much closer to those of *Pinto, supra,* which similarly involved co-defendants with potentially conflicting interests, than to those of *Lloyd.* We agree with Judge Wilson's analysis in *Pinto* of the dangers inherent in admitting testimony developed by one co-defendant against another, and find similar considerations relevant here.

### 4. *Authentication References*

Plaintiffs offer certain references in the testimony to authenticate some of the diaries. While none of the diaries were formally authenticated during the testimony, and no witnesses were asked directly whether or not a particular diary was genuine, some witnesses were shown particular portions of particular diaries and asked to comment upon them in some way. Some witnesses were shown diaries which they allegedly maintained themselves (e. g., Yajima), while others were shown diaries maintained by other persons (e. g., Adachi). Plaintiffs offer this testimony as circumstantial evidence authenticating the diaries.

 We find the references to the diaries, offered here to authenticate them under Rule 901, admissible against all defendants. There was no issue expressly raised as to the authenticity of the diaries in the JFTC proceeding. However, the six respondents there plainly had ample opportunity, and would have had sufficient motive, to challenge their genuineness when they were shown to witnesses, if in fact they had any reason to suspect that the diaries were not authentic. Moreover, on this narrow issue only, the interest of all other defendants in showing the diaries to be inauthentic was adequately represented by the six respondents. Given the narrowness of the issue, the motive of the six respondent com-

panies to challenge the authenticity of the diaries was identical to the motive which any other defendant would have had to challenge their authenticity. Thus, the previous and the present parties shared a like motive to develop testimony about the same subject matter sufficient to make the six respondents "predecessors in interest" of the others under *Lloyd, supra*, with respect to the authentication references only.

### D. *Other Hearsay Exceptions, Admissions, and Internal Hearsay*

 We need not tarry long on the admissibility of the testimony under the other exceptions. We consider the residual exceptions 803(24) and 804(b)(5) inapplicable to former testimony, for reasons stated in Part II–F, *supra*. The exception for statements against interest, Rule 804(b)(3), is not met because none of the declarants, except Yajima, is unavailable, since their depositions could have been taken; because plaintiffs have made no showing from which we could infer that any of the declarants were conscious that the statements were against their personal interests; and because the testimony is generally consistent with the defense offered in the Six–Company Case and therefore is not even against the employers' interests.[121]

The plaintiffs also offer the testimony as admissions of the employers of each witness. Since we have ruled that the testimony, except for export references, is admissible under F.R.E. 804(b)(1) against the six companies which collectively employed all of the witnesses, we need not consider that contention except with respect to export references. We find the export references in the testimony of only two witnesses admissible as admissions.

 While the witnesses may have been authorized to testify before the JFTC, thus rendering their statements concerning the domestic market authorized admissions under Rule 801(d)(2)(C), the JFTC proceeding did not concern the export market, and therefore any testimony concerning that market would have been outside their authority under subsection (C). Under Rule 801(d)(2)(D), our inquiry is whether the witnesses whose testimony included so–called export references in fact held positions in their companies which gave them any responsibility for exports. In their list of purported "export references" in the testimony, the plaintiffs have included portions of the testimony of five persons: Yajima and Kamakura of Toshiba; Tsu Fujio of MEI, Yoshioka of Sanyo; and Nishi of Hitachi.[122]

Tsu Fujio was Senior Managing Director of MEI (DSS 61 at TJ004417). Although the record does not indicate what his duties were in the area of export, we are willing to infer from his senior position in the Matsushita parent company that it is more probable than not that his duties had some relation to export. Accordingly, the "ex-

---

**121.** Plaintiffs' claim that the testimony is admissible as a business record of the JFTC is not responsive to the pertinent hearsay objection that the witness who testified before the JFTC is a declarant who will not be present at the trial in this litigation. No party has interposed an objection to the JFTC reports of the witnesses' testimony as hearsay. Instead, such matters have been considered, properly, under the rubric of authenticity. Moreover, to the extent that any transcript of testimony is a "memorandum, report, record, or data compilation" of the JFTC, within the meaning of Rule 803(6), it is a memorandum, report, etc. only of what the witness *said*, and not of the truth concerning the matters which he testified to. As a result, the testimony would still have to be subjected to hearsay analysis even if viewed as a business record of the JFTC.

**122.** These portions of the testimony were designated as export references in a letter of Arnold I. Kalman, Esq., plaintiffs' counsel, dated February 12, 1980. Plaintiffs also designated as export references portions of the testimony of Tsuruta of MEI and Hirano of Sanyo. However, we can find no mention of export in the referenced portions of the testimony of either of those witnesses and accordingly we do not discuss their authority here. Plaintiffs designated part of the testimony of another witness, Yasuo Ito, as an export reference, but Ito's testimony has not been proffered in our hearings and is not considered here. We intimate no view here as to whether the "export references" referred to in the text are in any way probative of the "unitary conspiracy" charged by plaintiffs.

port reference" in his testimony will be admissible against MEI only, under 801(d)(2)(D). The same reasoning applies in the case of Mr. Nishi, who was Senior Managing Director of Hitachi, Ltd., DSS 66 at MJ002652, and the "export reference" in his testimony will accordingly be admissible against Hitachi, Ltd. only.

The "export references" in the Yajima and Kamakura testimony, however, are inadmissible. Kamakura was the Director of the TV Business Department of Toshiba Shoji and Toshiba Corporation, and Yajima was a section manager within that department; according to Kamakura's protocol, the department is "in charge of the *domestic* business." DSS 81 at MJ003294 (emphasis added). During his testimony, Kamakura repeated at least five times that he and his department had no responsibility for export matters. DSS 69 at MJ002091–83 and 90–91.

As for Yoshioka of Sanyo, while he does not discuss in his testimony whether or not he had any export responsibility, we do not think that there is anything in the record to support an inference that his duties related to exports. Yoshioka testified that he was the Assistant Director of the Business Department of the TV Division of Sanyo Electric Co., Ltd. Although we have been provided no information about precisely where this put him in the hierarchy of Sanyo executives, he plainly did not enjoy the stature which Nishi and Fujio had within their companies. More importantly, the plaintiffs have conceded in their FPS, with preclusive effect, that Sanyo Electric Co., Ltd., did not engage in exporting. Instead, all exports were channeled through its subsidiary, Sanyo Electric Trading Co., Ltd. *E. g.*, FPS vol. 2 at 773 and 948. Thus Yoshioka's employer did not itself export consumer electronic products to the United States, and Yoshioka's relatively low position in the parent company's hierarchy does not permit an inference, on the record before us, that he had export responsibilities. As a result, the export reference in his testimony is inadmissible.

Defendants' final contention about the JFTC testimony is that it is replete with hearsay and double hearsay statements. The principles which we enumerated in Part II with respect to internal hearsay are applicable to former testimony as well as to other forms of hearsay. The defendants are correct that there is much internal hearsay contained within the JFTC testimony and that any such hearsay which does not meet the requirements of Rule 805, described above, must be excluded. However, we shall not take the time to review the testimony ourselves at this time for purposes of internal hearsay analysis. Should it become necessary, we shall do so in connection with the summary judgment motions.

## IX. *JFTC "Protocols," DSS 75–92*

### A. *Introduction*

The "records of statements" ("protocols") were prepared during the course of the JFTC investigation, prior to the initiation of the JFTC hearings. These protocols were prepared by the JFTC investigators based on statements voluntarily submitted by employees or representatives of defendant companies. Plaintiffs offer in evidence the protocols of Messrs. Yajima, Narita, Kamakura, Kamuro, Kawahara (Toshiba); Adachi, Yamamoto (Hitachi); Ito, Okuma (Melco); Maekawa, Saeki (Sharp); and Koiski (Fuji). The protocols were produced by defendants during the course of discovery in these proceedings. Plaintiffs offer the protocols as prior statements of the declarants under F.R.E. 801(d)(1); as admissions of the defendant companies under 801(d)(2); as public records under 803(8)(B); as former testimony under 804(b)(1); as statements against interest under 804(b)(3); and as admissible under 803(24) and 804(b)(5), the residual hearsay exceptions. Plaintiffs offer these protocols as evidence of what transpired at the Tenth Day and Palace Group meetings, as evidence of the alleged home market conspiracy, and to authenticate the diaries.

### B. *Plaintiffs' Foundation For Authentication and Admissibility Under One of the Exceptions to the Hearsay Rules*

(1) The protocols are reliable and trustworthy because their making was governed

by JFTC regulations, Articles 6, 8, and 12. Article 12 provides that whenever an investigator has interrogated persons, he shall make a protocol, read it to the deponent, and review it for verification. If the deponent affirms the contents of the protocol, he may be asked to sign and seal the document. The protocol statements are the declarants', not the investigators'.

(2) The protocols are authentic because they were produced in response to interrogatories, were exhibits in the Six Company Case, and were signed by the declarants who acknowledged their truthfulness.

(3) The protocols represent prior testimony because at the JFTC proceeding they were identified as part of the record, and the declarants could have been cross examined concerning their accuracy.

(4) The declarants were authorized by their respective companies to make the statements to the investigators because they gave their statements voluntarily, were identified with defendant companies, and were put forward by defendant companies to testify at the JFTC proceedings.

(5) The protocols are public records of the JFTC within the meaning of Fed.R.Evid. 803(8) since the investigators recorded the statements.

(6) The statements were contrary to the *employers'* pecuniary or proprietary interests. Declarants would have told the truth since there is a perjury provision at Section 92–2 of the JFTC proceedings.

(7) The protocols establish that there was a regular practice by which information concerning the meetings was communicated among defendant employers.

## C. *Defendants' Response*

(1) The procedure for producing the protocols was as follows: The JFTC investigators listened to the witnesses, wrote down their versions of what transpired, and would sometimes let the witnesses see the statement, but would more often simply read the statement to the declarant. All changes which were made in the protocols were made by the investigators. The protocols were not statements of the declarants, but statements of the investigators.

(2) The declarants did not testify to the truth of the statements, just that there were "no mistakes." DSS's 88 and 89 do not contain signatures.

(3) Since plaintiffs in their FPS have not listed the declarants as witnesses, the declarants will not be present at trial to authenticate the protocols when they are offered, and no depositions of the declarants have been taken.

(4) There is nothing on the record of this case indicating that the declarants were authorized by the defendant companies to make the statements. The declarants by appearing before the JFTC did not do so in the course of their employment, and the mere fact that the declarants testified at the JFTC hearing does not indicate that the statements before the investigators were authorized or ratified by the employers.

(5) The investigators recorded the witnesses' accounts of what took place in the past. The records were not prepared for purposes independent of litigation.

(6) There is no indication that the declarants had a personal interest at stake or that they feared personal prosecution as a result of giving the statements. Further, there is no indication that they were aware the statements were against their interest.

(7) Portions of the protocol statements are not based on the witnesses' personal knowledge. There are many inconsistencies between the protocols and the testimony.

(8) The protocols do not contain any export references.

## D. *Authentication*

[118] We conclude pursuant to F.R.E. 104(b) that the protocols have been authenticated as the genuine protocols given by the various deponents to the JFTC. There is sufficient evidence from which the trier of fact could conclude that the protocols are what their proponents claim, *i. e.,* genuine protocols. We rely in this regard upon: (1) the production of the protocols by the various defendants in response to interrogato-

ries; (2) the fact that the protocols were in fact exhibits in the Six Company Case, and some of them were referred to by witnesses during their testimony; (3) the fact that the protocols were signed by the declarants, acknowledging their truthfulness; (4) the similarity of all of the protocols to each other; and (5) our conclusion from examination of the protocols that their appearance and internal patterns are distinctive characteristics which, taken in conjunction with circumstances, support the inference of genuineness. *See* Part II.A.3, *supra.*

### E. *Admissibility Under Exceptions to the Hearsay Rules*

 Before reaching the weightier aspects of plaintiffs' contentions and defendants' response, we dispose of the simpler questions of admissibility. First of all, the protocols cannot come in as former testimony under F.R.E. 804(b)(1) because they are not testimony. The former testimony rule encompasses only testimony given at a hearing, and the ex parte interview by the JFTC investigator, even as explained by plaintiffs' witness Professor Haley, did not constitute a hearing. Secondly, although the statements and the protocols are direct statements of the declarant, the protocols and any component part thereof cannot constitute statements against interest because of the failure of plaintiffs to make a showing that any of the declarants believed at the time he made the statements that it was against his interest. We have elaborated · on this point in connection with our discussion of the diaries and need not repeat it here.

 Neither may the protocols come in under the residual exceptions for the same reasons explained in the case of the diaries—failure to meet the foundational burden of establishing that they are more probative on the point than any other evidence which the proponent can procure through reasonable efforts. Nor are the protocols admissible as public records and reports under F.R.E. 803(8)(B) because the

statements of witnesses are not "matters observed pursuant to a duty imposed by law as to which matters there was a duty to report." Such a reading of 803(8)(B) would be in direct contravention of its fundamental thesis, *i. e.* the notion that there are circumstantial guarantees of trustworthiness which create a presumption of reliability of government reports. *See* Public Records Opinion at p. 29. The plaintiffs do not offer the protocols simply to establish that the JFTC investigator took the statement accurately, but rather for their truth. No action of the public official is implicated by that proffer and 803(8)(B) is not a basis for admission.[123]

 The only basis on which the protocols can come into evidence is under F.R.E. 801(d)(2). Rule 801(d)(2) relates solely to admissions of a party opponent, hence the protocol of Koiski of the Fuji Company cannot be admitted because Fuji is not a defendant in the case. Because the makers of the other "protocols" are employees of either Toshiba, Hitachi, Melco, or Sharp we must turn to the question of their admissibility against those companies. Obviously—by the plain terms of the rule—a protocol is admissible only against the company who employed the person giving it.

 The plaintiffs having invoked Rule 801(d) in its entirety we must consider admissibility under each of the rule's component parts. Only subparagraphs (B), (C), and (D) are potentially applicable. In the technical sense all of the protocols are adoptive admissions under 801(d)(2)(B) in that they were written by the JFTC investigator and signed by the witness, who thereby manifested his adoption or belief in the truth of the statement written by another. However, the witness's "adoption" would not suffice to admit the statement against the employer. Hence we must turn to the terms of 801(d)(2)(C) & (D).

 An immediate problem arises in the case of the protocol given by Mr. Maekawa of Sharp Corporation. Sharp has represented to the Court that Mr. Maekawa was not employed by Sharp Corporation at

---

**123.** The contention that the protocols can come in under 801(d)(1) is baseless because none of the declarants have been proffered as witnesses in the forthcoming trial.

the time he gave the protocol, hence the protocol could not be admissible under 801(d)(2)(C) or (D). We accept Sharp's uncontroverted representation and conclusion.[124] However, with respect to all of the other protocols, we are unpersuaded by defendants' position that when appearing before the JFTC investigator, the givers of the protocol were neither authorized by their employers nor within the scope of their employment. At all times they were represented by company counsel, were apparently on company time, were identified with defendant companies, and were ultimately put forward by defendant companies to testify at the JFTC proceedings. Under the circumstances we cannot see how we can conclude other than that the declarants were authorized by their employers to give protocols and that, at all events, they were within the scope of their agency and employment at the time they gave their protocols to the JFTC investigators.

The receipt of the protocols as admissions against Toshiba, Hitachi, Melco, and Sharp respectively does not mean the statements are free from internal hearsay scrutiny. There is much internal hearsay within the protocols which would, at trial, have to be redacted. *See* Part II.G., *supra*. However, we need not for present purposes analyze the protocols to determine which portions must be the subject of redaction for, the protocols contain no export references which would aid plaintiffs in establishing a low price export conspiracy.[125] We shall thus assume, for purposes of the summary judgment motion and the F.R.E. 104(a) preliminary determination on conspiracy, that the protocols are admissible in their entirety.

### X. The "Shimizu Memorandum"–DSS 95

#### A. Introduction

This memorandum is a hand–written document dated December 29, 1965, bearing the "chop" of "Shimizu." It was seized by the JFTC during the 1966 raid on the offices of Hitachi. Hitachi, Ltd. produced this memorandum to plaintiffs in the course of discovery in these proceedings. At that time the document, which is captioned "the second meeting of the color TV committee," was identified by document identification numbers HJ 50004 through HJ 500010. Although they concede that it is an internal Hitachi memorandum, plaintiffs offer the "Shimizu memorandum" in evidence against all defendants. More specifically, plaintiffs claim this memorandum to be authentic under F.R.E. 901(a), 901(b)(1), 901(b)(4) and 902. They offer it as an admission of Hitachi, Ltd. under F.R.E. 801(d)(2), as a business record under F.R.E. 803(6), as a declaration against interest under F.R.E. 804(b)(3), and under the residual hearsay exceptions F.R.E. 803(24) and 804(b)(5).

#### B. Plaintiffs' Foundation for Authentication and Admissibility Under One of the Exceptions to the Hearsay Rules

(1) The memorandum is on stationery bearing the Hitachi logo.

(2) Mr. Shimizu's "chop" is on the memorandum, thereby identifying him as its author and the memo itself identifies him as a participant in the meeting.

(3) The JFTC exhibit list (DSS 93) identifies the "Shimizu memorandum" as having been seized from a Hitachi, Ltd. file on "the color TV committee."

(4) The contents of the memorandum show it to be a business record.

(5) Information contained within the memorandum concerning group meetings is consistent with information contained within other items of proffered evidence.

---

**124.** The plaintiffs have pointed out that Mr. Maekawa's employer when he gave the protocol was a company which had the word "Sharp" in its name. However, that fact is plainly insufficient to establish an agency relationship between Sharp and Mr. Maekawa's employer.

**125.** Consequently, we need not consider here whether export matters were within the scope of employment of the givers of the protocols.

(6) The memorandum purports to deal with the "second meeting of the color TV committee" within Hitachi, and this is the type of information which the "ambience" of intracompany reporting demonstrates is regularly communicated within the corporate structure.

(7) The memorandum contains export references and figures.

(8) The memorandum is a business record because it was drafted in connection with a business activity.

(9) The memorandum was kept as a part of Hitachi, Ltd.'s files for a year before the JFTC seized it.

(10) The memorandum is dated as having been written on the date of the meeting to which it refers.

(11) The memorandum is relevant in that it shows that information gathered at Okura and Palace group meetings was utilized in Hitachi corporate planning.

(12) The presence of the letters "UE" in a circle on the memorandum indicates that Mr. Satoshi Ueno of Hitachi, Ltd. who turned the document over to the JFTC investigators, was routed a copy of the memorandum.

(13) The memorandum is a "statement of an Hitachi employee concerning a meeting he was authorized to attend."

The plaintiffs, in a post–hearing memorandum, add a host of other "reasons," but these are in essence conclusory statements which are a function of their interpretation of the document (assuming it is authentic and admissible) purporting to explain its relationship to Hitachi's business practices. These other "reasons" do not add to plaintiffs' argument on foundation.

## C. *Defendants' Response*

(1) No evidence other than the mere presence of the chop of a Mr. Shimizu on the memorandum has been presented to indicate who the author of this memorandum is.

(2) Mr. Shimizu of Hitachi, Ltd. is alive and well, but plaintiffs have not deposed him.

(3) The individuals who might be those indicated by name in the memorandum are alive and well, and plaintiffs have not deposed any of them.

(4) Hitachi, Ltd. sells stationery containing the corporate logo to its employees.

(5) This memorandum is not mentioned in either the protocols or the testimony before the JFTC.

(6) The alleged export references within the memorandum are inconsistent and fail to support plaintiffs' allegations.

(7) The text of the memorandum is confused and has possibly been altered.

(8) No testimony of the custodian of this memorandum has been presented.

(9) No evidence of the regularity of creation of this memorandum has been presented.

(10) The memorandum contains multiple hearsay, and no evidence has been presented as to who attended the intercompany group meetings from whence much of the information purportedly contained in the memorandum is derived.

(11) No evidence of communication of the memorandum has been presented.

(12) The memorandum does not contain assertions such as are required for something to constitute an admission.

(13) Without knowing the identity of the author of the memorandum, it is impossible to determine the scope of his agency within Hitachi, Ltd., whether he had authority to speak concerning the matters discussed in the memorandum, or whether his statements are based upon firsthand knowledge.

## D. *Discussion*

 We find the memorandum authenticated on much the same basis as the diaries the seizure, Hitachi's production, and the "chop." Business record status is, however, another matter. This document is no more a "business record" than the diaries. We do not know who wrote it, nor do we know anything of the method of its preparation, whether it was created by a

process involving habits of precision or regularity and systematic checking, or otherwise. There is no showing of who received the document or that it was relied upon. Neither do we know anything of the sources of information of the writer of the memo. The plaintiffs assert that the document speaks for itself, but of course it does not and cannot. The plaintiffs have the burden of establishing that the document is a business record. They cannot shift that burden no matter how hard or often they try. Although Shimizu and others with knowledge have been available, the plaintiffs have not deposed them. Moreover, the memorandum is laden with internal hearsay, including "news from the OKURA group." The document is far from clear; rather, like the diaries, it needs interpretation by someone familiar with it. We shall not prolong the opinion unnecessarily by recapitulating our legal discussion. It is plain from the recitations of the positions of the parties that the applicable legal principles cut in the same way as in the use of the diaries; the document just does not pass 803(6) muster.

 Not only does the document not qualify as a business record, but it does not qualify under the other asserted exceptions for statements against interest and the residual exceptions, for the same reasons as in the case of the diary of another Hitachi employee, Yamada. Nor can plaintiffs prevail in their statement that they

> "rely upon the entire ambience created by the protocols that there was a recording system evidenced within companies in which reports were made to people who were not present in meetings in order to inform them of the content of the meetings."

Plaintiffs just have not established the fact they assert, by "ambience" or otherwise. Even if they had established the existence of a recording system generally, it would

not establish foundation for any particular entry, in view of the legal precepts we have so extensively set forth in Part II.

[131] Finally, the memorandum is not an admission of Hitachi because we know nothing of the authority of the writer. In the absence of evidence of export authority, in particular, the document is not admissible for any export references.[126] Nor can most of the language in the memorandum, which seems to be written in a kind of shorthand, be fairly characterized as "assertions."

## XI. *Toshiba Internal Memoranda—DSS 96, 97 and 98*

### A. *Introduction*

DSS's 96, 97 and 98 are documents which were seized by the JFTC during the "raids" described above. DSS 96 and DSS 97 were exhibits in the Six Company Case. DSS 98 was not marked as an exhibit therein. These documents were produced by Toshiba Corporation to plaintiffs during discovery in these proceedings and are identified by document identification numbers TJ 4502–4505; TJ 4506–4510; TJ 4511–4513. Plaintiffs offer these as internal Toshiba memoranda to prove the alleged home market conspiracy. Plaintiffs offer these documents as business records under F.R.E. 803(6), as admissions under F.R.E. 801(d)(2), as statements against interest under F.R.E. 804(b)(3), and under the residual exceptions.

### B. *Plaintiffs' Foundation for Authentication and Admissibility under one of the Exceptions to the Hearsay Rule*

(1) DSS's 96, 97 and 98 were authenticated by being identified in the protocols and in Toshiba's answers to interrogatories.

(2) The documents bear "receipt" stamps and "confidential" seals.

---

**126.** The notion that the memorandum shows an export conspiracy must also be rejected. The export figures reported make little sense. *Inter alia*, they show Hitachi as having no exports in 1965. Thus, plaintiffs' claim that a reference to Hitachi's desire to increase its market share plainly refers to the export market is baseless. If the reference were to the export market, it would be as consistent with a desire to compete as a desire to conspire. In any event, the figures shed *no* light on an export conspiracy.

(3) DSS 96 is a memo from Kamuro to Narita of Toshiba. Kamakura, in his second protocol, DSS 82, identifies DSS 96 as a document coming from Kamuro. Kamuro, in his protocol, DSS 83, admits writing DSS 96. Kamuro based this memo on information received from Narita. Narita, in his protocol, DSS 79, identified DSS 96 as an internal Toshiba memo dated April 11, 1966 referring to an April 18, 1966 Palace Group meeting.

(4) DSS 97 is a Toshiba document sent from Kamakura, Director of the TV Business Division, to Iwata, Senior Managing Director, and Narita. The document refers to a Tenth Day Group meeting. The document was identified in the list of the investigator's evidence, DSS 93. The document contains a notation that it is from the television file. DSS 97 is authenticated based on the "entire ambience created by the protocols" that there was a recording system whereby those who were not present at the Tenth Day Group meetings were informed of the contents of the meetings.

(5) DSS 98 is a Toshiba document from Kamakura, Director of TV Business Division, to Narita, Senior Managing Director. The document was written by Yajima, but Kamakura sent it under his name. Yajima in his protocol, DSS 75, identifies DSS 98 as an internal Toshiba report of the Tenth Day meeting and acknowledges that he wrote it. The reason that the memo was addressed to Narita was because "prices were decided by top level persons."

(6) The contents of DSS's 96, 97 and 98 make them business records. The subject matter of the memos is consistent with testimony concerning the meetings. They also contain the type of information that was exchanged regularly and reported regularly within the companies.

### C. Defendants' Response

(1) Certain of the memos are not authenticated, and there are differences between plaintiffs' and defendants' translations.

(2) DSS 97 is not identified as to the author, and the list reconstructed by plaintiffs' translators, DSS–93, is not proof of the author's identity.

(3) There is nothing to indicate that DSS's 96, 97 and 98 were communicated outside the company.

(4) There is no indication that the memos were kept in the regular course of business, or that there was a regular routine way of recording these documents to guarantee their trustworthiness. There is no testimony by a custodian or anyone else. The reports are unreliable, not based on first hand knowledge, and contain double hearsay.

### D. Discussion

We shall not dwell upon DSS 96–98 because they are a virtual carbon copy of the diaries.[127] Like the diaries, they also report on Tenth Day Group Meetings and the only difference is that they were communicated to someone. They suffer from precisely the same vices.

While we are satisfied that DSS's 96–98 have been authenticated, they are not business records for the reasons that the diaries are not business records. We are in the dark as to the method of preparation of the memos. We do not know if their preparation was attended by regularity or systematic checking. We know nothing of the writer's source of information. In addition, the documents are opaque and require interpretation. As with the diaries, we do not know whether the entries reflect what someone said, or what the writer thought or heard someone say, or what he thought they thought. And the memos are suffused with internal hearsay which would itself vitiate their admissibility. Once again, by not taking depositions of someone who could explain them, the plaintiffs have failed to meet their burden of establishing these three memos as business records. Neither are they admissible under the statement against interest and residual exceptions for the same reasons as

---

**127.** Indeed, DSS 98 was purportedly written by Yajima.

the diaries, i. e., plaintiffs' failure to meet the unavailability requirement; failure to meet the requirement of consciousness that the statement is against interest [804(b)(3)]; lack of trustworthiness; and failure to establish the memos as more probative than other available evidence [804(b)(5) and 803(24)]. They are not admissions for the same reasons as the diaries, principally plaintiffs' failure to demonstrate that they are assertions.

## XII. *"Minutes" of the EIAJ Officers' Meetings–DSS 1027 and DSS 1028*

### A. *Introduction*

The EIAJ Officers' Meeting "Minutes" were produced to plaintiffs during the course of this litigation by the Electronic Industries Association of Japan (EIAJ) at its offices in Japan. DSS 1027 refers to a February 16, 1963, meeting and is identified by document identification numbers EIAJ 318–321. DSS 1028 refers to a January 18, 1964, meeting and is identified by document identification number EIAJ 286.

Although plaintiffs had the opportunity to take the deposition of an EIAJ person with knowledge about the identity of the preparer or the method of preparation of the minutes or the sources of information therefor, they elected not to do so, satisfying themselves with mere production. The "minutes" purport to show attendance at the meetings of representatives of some 24 companies other than the defendants.

Plaintiffs offer the EIAJ Officers' Meeting "Minutes" in evidence against all of the defendants. The documents are offered as admissions of the EIAJ and the defendants who were attendees of the meetings under F.R.E. 801(d)(2), (C) and (D), as business records under F.R.E. 803(6), as present sense impressions under F.R.E. 803(1), as statements against interest of defendants who were attendees of the meetings under F.R.E. 804(d)(3), and as admissible under the residual hearsay exceptions, F.R.E. 803(24) and F.R.E. 804(b)(5).

### B. *Plaintiffs' Foundation for Authentication and for Admission Under One of the Exceptions to the Hearsay Rule*

(1) The rules of the EIAJ entitle each of the EIAJ members to "peruse" records of the EIAJ and to receive materials published and distributed by the EIAJ. The EIAJ Officers' Meeting Minutes are typewritten and not handwritten, which indicates that they were distributed among the EIAJ members. The Japanese defendants in this litigation who are EIAJ members have access to these minutes and, therefore, have control over these minutes.

(2) The Japanese defendants form the standing board of directors of EIAJ. Accordingly, they control positions of authority in EIAJ.

(3) Various defendants' answers to interrogatories identify the two officers' meetings referred to in DSS 1027 and DSS 1028 as having been held. The interrogatory answers also state that the Japanese defendants were represented at those meetings.

(4) Judge Higginbotham in the transcript of February 26, 1976, at 280, directed that a good faith effort be made to make EIAJ documents available to plaintiffs and that some responsible person be present when plaintiffs searched for such documents. DSS 1027 and DSS 1028 were produced in accordance with Judge Higginbotham's direction, and Hoken Seki, Esquire, counsel for Melco, was present at that production.

(5) The meetings were held monthly. Minutes were made for every meeting, and were kept at the offices of EIAJ. The format of the minutes follows a consistent pattern. Accordingly, the minutes alone show completeness and accuracy. The meetings for which the minutes were kept conform to the list of the meetings contained in Exhibit B of plaintiffs' FPS. DSS 1027 and DSS 1028 were pulled from a stack of other minutes.

(6) None of the defendants has ever withdrawn as a member of the EIAJ throughout the entire period covered in this litigation.

(7) There is no indication in the minutes that any defendant attendee left a meeting during the course of deliberations. There is also no indication in the minutes that there were any disputes or objections concerning the decisions made at the meetings. The attendees allegedly had an opportunity to object to the minutes. Accordingly, the minutes show that there was consistent unanimity among the attendees. The minutes are thus admissions by all the attendees.

(8) Defendants were receiving information concerning U.S. law, i. e. "the problem of duty appraisement," DSS 1027 [apparently a reference to the 1921 Antidumping Act] from their attorney in the United States, Mr. Tanaka. Therefore, they had knowledge of the United States laws.

## C. Defendants' Response

(1) Plaintiffs did not depose anyone from the EIAJ.

(2) Neither DSS 1027 nor DSS 1028 was signed or indicates its author.

(3) The minutes do not show completeness nor accuracy. There is no indication of the methodology of the anonymous authors to guarantee the reliability of the minutes.

(4) There has been no testimony by any keeper or custodian of the minutes or other witness to establish the foundation for admission of the documents.

(5) There is no indication in the minutes as to who said what at the meetings or what the votes were, if any. There has been no showing that the attendees had authority to act or speak on behalf of their employers. Accordingly, the minutes are not admissions by any defendant.

(6) There has been no showing that the author or custodian of the minutes or any of the attendees at the meetings are unavailable, as required under F.R.E. 804(a)(5).

(7) There is nothing to indicate that the by–laws of the EIAJ on which plaintiffs rely were the by–laws that were effective in 1963.

(8) Judge Higginbotham's direction that some defense lawyers be present when

plaintiffs search for documents does not catapult the EIAJ documents to admissible status.

(9) There has been no foundation laid for the admission of the minutes against any of the defendants who were not members of EIAJ.

(10) Nothing is shown in the minutes that would be contrary to anyone's pecuniary or penal interest. Application to a governmental agency for assistance regarding receiving tubes (that is one matter mentioned) is not a crime in Japan or the United States, nor does it subject anyone to civil liability. Regarding the check price agreements, the United States Department of Justice has reviewed them on at least two occasions and has not found anything objectionable.

(11) The minutes contain double hearsay.

## D. Authentication

 Although no one has contended that they are specious, and although the task of qualification might not have been difficult had plaintiffs bothered to take a deposition for use at trial, the fact is that plaintiffs have failed to authenticate DSS 1027–1028. As we have explained in Part II *supra*, mere production of a document from an organization's files does not authenticate it. Defendants neither produced nor vouched for the "minutes" in connection with their interrogatory answers. Rather, the "minutes" were produced by an organization which is not a party in this litigation. Unlike some of the diaries, protocols, or testimony, there is no distinguishing feature of the documents that marks them as genuine "minutes" of meetings. We, of course, cannot read the original Japanese, but we certainly cannot say that the English translation bears some indelible imprint that smacks of genuineness. In short, the plaintiffs have done nothing to establish the genuineness of these documents so as to meet the test of *U. S. v. Goichman, supra*.

## E. Business Record Status

 DSS 1027 and 1028 do not qualify as business records for a host of reasons.

Plaintiffs seem to think that there is some talismanic effect to be accorded to production by the EIAJ, but, of course, as we have explained above, there is not. This result is unchanged by the fact that there are a number of other "minutes" which were produced, suggesting that whatever was done with respect to DSS 1027 and 1028 may have been done on a regular basis. We do not have even the foggiest notion of who wrote these "minutes," whether the writer attended the meetings, where he got his information, or when he wrote the entries. We know nothing about his method of keeping records, much less whether it is careful and accurate. Indeed, nothing in these documents suggests completeness. There is no record of who said what to whom, nor do we know whether what is written is what someone said, or what the writer (or someone informing his judgment) thought. The mere fact that the writer (if it was in fact he) did the same thing on other occasions would not help establish DSS 1027–28 as a business record. In short, none of the factors which qualify something as a business record, all of which have been elaborated above, are present here. We agree with defendants' contentions and with their conclusion that these documents do not achieve business record status.

### F. Admissibility Under Other Exceptions to the Hearsay Rules

DSS 1027 and 1028 cannot come in as admissions. The documents do not attribute any statements to anyone. There is no indication as to who said what at the meeting, and if something was acted upon, there is no indication of who voted and approved it. Indeed, it is conceivable (had there been EIAJ action taken) that the representative of some defendants left the meeting early or voted contra (if the attendance record on 1027 and 1028 is accurate, the defendants were far outnumbered). Nor have the plaintiffs laid any foundation to render EIAJ the agent of any defendant for purposes of an admission. In short, the plaintiffs have not made a showing that these minutes are the assertion of any defendant and they cannot come in under Rule 801(d)(2).

By the same token, statements in the minutes cannot come in as statements against the interest of any declarant. The unavailability requirement for 804(b)(3) is not met. Furthermore, there is no showing that anything was said which the author of the "minutes" or any person present at the meeting was conscious was against his personal interest. The requirements of the residual exception are not met because the "minutes" are not more probative than other evidence which the plaintiffs could have procured, and are not trustworthy. DSS 1027 and 1028 cannot come in under any of the exceptions to the hearsay rule.

### XIII. The EIAJ Statistics Committee 1966 (or Japan Victor Document)–DSS 1029

#### A. Introduction

DSS 1029 is an internal memorandum produced from the files of Japan Victor Company ("JVC"), which is not a party in this litigation. It refers to the December 26, 1966 meeting of the Statistics Committee of the EIAJ. It was produced to plaintiffs during the course of this litigation by Victor Company of Japan, Limited at its offices in Japan, and was designated with document identification number V 3747. In plaintiffs' submission, the document shows that the manufacturers who attended a meeting of the EIAJ Statistics Committee, including defendants, agreed to modify their accounting practices to cover up the disparity between home market and export practices.

Plaintiffs offer the Japan Victor document in evidence against all of the defendants in this action. Plaintiffs offer the document as a business record under F.R.E. 803(6), as admissions of JVC and MEI under F.R.E. 801(d)(2), as present sense impressions under F.R.E. 803(1), see n. 48, *supra*, as a then existing mental, emotional, or physical condition under F.R.E. 803(3), *see* n. 48, *supra*, and as admissible under the residual hearsay exceptions, F.R.E. 803(24). Plaintiffs offer the Japan Victor document

as a non–hearsay verbal act, in which the author reported his understanding of what had been discussed and agreed upon at the December 26, 1966 meeting of the EIAJ Statistics Committee, and in which the author gave a direction to the manager of the accounting department in order to effectuate internally an agreement reached at said meeting.

Because of the great reliance which plaintiffs place on the Japan Victor document, and the amount of time devoted thereto (plaintiffs alone have filed a 46 page brief relating to its admissibility) we shall deal with it in detail.

B. *Plaintiffs' Foundation for Authentication and Admissibility Under One of the Exceptions to the Hearsay Rule*

(1) This document was produced pursuant to a subpoena served on and accepted by MEI's counsel on behalf of Japan Victor Company. It was produced at the offices of Japan Victor Company in Tokyo.

(2) The Answers of the Matsushita Defendants to Plaintiffs' Supplemental Interrogatories to Defendants, Set No. 2, dated May 29, 1979, listed JVC as a member of the EIAJ Statistics Committee. The same answers stated in Answer to Interrogatory No. 33 that the December 26, 1966 meeting of the EIAJ Statistics Committee had actually taken place, that MEI's representative had attended the meeting, and that there had been a discussion of the subject referred to in the Japan Victor document. The Answers of the Hitachi Defendants to Plaintiffs' Supplemental Interrogatories, Set No. 2, Relating to Consumer Electronic Products, dated May 25, 1979, Answer to Interrogatory No. 33, stated that the December 26, 1966 meeting had taken place, that Hitachi had been represented at the meeting, and that the subject referred to in the Japan Victor document had been discussed. The Answers of Sony Corporation to Plaintiffs' Supplemental Interrogatories to Defendants, Set No. 2, dated May 22, 1979, Answer to Interrogatory No. 33, stated that Sony's representative had attended the same meeting of the EIAJ Statistics Committee.

(3) Matsushita's Answers to Plaintiffs' Supplemental Interrogatories as mentioned above identified Mr. Oguri as one of the representatives of Japan Victor Company to attend the December 26, 1966 meeting of the EIAJ Statistics Committee. Mr. Oguri's chop appears on DSS 1029. The author of this document is Mr. Oguri, or, at the very least, if he is not the author, he reviewed the document and adopted its correctness.

(4) The document itself identifies the recipient of the document as the manager of the accounting department of the plant. "Common sense" tells the Court that the accounting department is the appropriate place for this document to be sent.

(5) This document contains the directive from the sales promotion section to the accounting department of the plant. "Common sense" tells the Court that an endorsement by the chief of a section where such directive was issued would in fact be needed in order to effectuate such a directive to the accounting department. Mr. Shiokawa was the chief of the sales promotion section. His chop appears on the document, showing this endorsement.

(6) Defendants in their answers to plaintiffs' interrogatories denied the accuracy of what was reflected in DSS 1029. Their denials amount to defendants' admissions of the fact that there was a December 26, 1966 meeting of the EIAJ Statistics Committee. The answers circumstantially evidence the authenticity of the Japan Victor document.

(7) The content of the document shows the obvious knowledge of the document's author regarding what transpired at the meeting and how JVC records the particular information.

(8) "Common sense" dictates that Mr. Oguri, who had represented JVC at the December 26, 1966 meeting, would have to report back to his superiors after the meeting in order to relay the agreement and information which resulted from the meeting. This document is an internal memo of JVC to serve this reporting purpose.

(9) The document bears the legend "confidential outside the company."

(10) The document indicates that it was prepared on January 6, 1967. This was eleven days after the December 26, 1966 meeting. The document was thus prepared in a timely fashion within the time period for effectuating the reduction of the domestic shipment price which would as agreed begin with the shipments for January 1967.

(11) MEI controls JVC by owning at least 51 percent of its shares of stock. JVC is the "alter–ego" of MEI. Accordingly, an admission of JVC which is the subsidiary of MEI is also an admission of MEI.

(12) "Common sense" tells the Court the import, probative value and high relevancy of the document.

## C. *Defendants' Response*

(1) Notwithstanding plaintiffs' proffer of this document as evidence against all defendants, the document could even if admissible constitute evidence *aliunde* only against JVC (which is not a party).

(2) There has been no evidence of the author or recipient of the document. There has been no showing of the file where this document originated. There has been no testimony or even an affidavit of a custodian or any other witness about the author, recipient or content of this document, or the practice of preparation of this kind of document. Plaintiffs consciously and willfully refused to take a deposition of Mr. Oguri or Mr. Shiokawa or any other personnel of JVC. Both Mr. Oguri and Mr. Shiokawa are still in the employ of JVC.

(3) Two chops appear on the document, Mr. Oguri's and Mr. Shiokawa's. Part of the alleged chop of Oguri is not even on the document. There has been no evidence that could show the meaning of these chops. There has been no evidence showing that Mr. Oguri, and not Mr. Shiokawa, authored this document. There has been no showing of Oguri's or Shiokawa's practice of putting their chops on a document. Chops are sometimes used to show receipt of a document as well as who authored it.

(4) There has been no showing of the meaning of the Japanese word "Kokeicho," the title of the alleged recipient. Even on the basis of the plaintiffs' translation of the document, there has been no identification of either the "Manager," the "Accounting Department" or the "plant."

(5) The document does not make sense on its face. The agreement allegedly entered into at the EIAJ Statistics Committee meeting and the measures to implement such agreement do not correlate.

(6) All defendants whose answers to interrogatories identified the December 26, 1966 meeting as actually taking place, denied the accuracy of what was stated in the document as a decision of that meeting. Plaintiffs' argument that defendants' denials that they followed the plan described in the document amount to admissions that there was a plan or agreement of the EIAJ Statistics Committee is pure sophistry.

(7) Plaintiffs failed to take any depositions of Japan Victor Company personnel.

(8) DSS 1029 is the only document produced by JVC relating to a meeting of the EIAJ Statistics Committee. The content of the document does not show anything about whether it was a regularly–prepared document.

(9) Japan Victor Company is a separate company from MEI. It is separately operated, separately managed and has separate product lines, separate distribution and separate brands, and the products are sold in competition with MEI's products both in Japan and in the United States. A 51 percent subsidiary does not make admissions that are ipso facto admissible as to the parent company.

(10) There has been no showing as to who made the statement contained in the Japan Victor document, whether he had authority to make such statement, or whether he had knowledge of the subject matter. The Japan Victor document constitutes hearsay within hearsay under F.R.E. 805.

D. *Authentication and Business Record Status*

 Because of the manner in which plaintiffs have approached this matter, we shall address authentication and business record status together. Much of what is said with respect to the "minutes" of the EIAJ Officers' Meetings applies to the Japan Victor document. We have no notion of who wrote the document, or where or on what basis. In fact, we know nothing about the document except that it was in Japan Victor's files. No defendant, including Matsushita, whose counsel was present when the document was produced, has itself either produced it (or a copy thereof) or vouched for it in answers to interrogatories or otherwise. Matsushita has disclaimed any knowledge about it and sharply disputed its accuracy.

In the absence of some documented explanation, and notwithstanding plaintiffs' hortatory references to "common sense," plaintiffs' claims about Mr. Oguri and Mr. Shiokawa, and the manager of the Accounting Department, are not only unsupported but are sheer speculation. Yet, while the plaintiffs might have taken the deposition of someone from Japan Victor when their counsel was in Tokyo to receive production of the document and thus shed some light on its origin and its genuineness, they elected not to do so.

Notwithstanding some 46 pages of argument, plaintiffs' position as to authentication and business record status of the Japan Victor document is best characterized by the following passage at pp. 40–41 of their brief:

If a corporation's own documents are not business records, admissions, evidence of corporate knowledge and state of mind or evidence of their nonverbal conduct, then there was absolutely no reason for those documents to exist and be maintained in the first instance .... *Any document created and maintained by a corporation is sufficiently trustworthy as to that corporation to make it admissible at an absolute minimum against that corporation.*

The only reason that a corporation would maintain a document in its files is because of that corporation's reliance on that document.

That this formulation is an ipse dixit and without any basis in law is plain from our discussion in Parts II–A–3 and II–B–4, *supra*, where we explained that, particularly in light of the broad sweep of the federal discovery rules, no such inference can be drawn from mere production of a document.

Unwilling to rest solely upon this proposition, plaintiffs advance what Matsushita's counsel appropriately calls several "imaginative but unavailing excuses" for their failure to make any attempt at all to establish a foundation for admission of the document. Plaintiffs' first such contention is that depositions would have been "fruitless" since such questions as who wrote the document and who received it "could never be answered" (p. 16). The possibility that no one at Japan Victor may be able to identify this document does not advance plaintiffs' cause, for it does not follow that because plaintiffs may be unable to authenticate the document they therefore should not be required to do so, or at least to attempt to do so.

Plaintiffs next argue that the Japan Victor document should be admitted because the defendants supposedly do not recall what happened at the meeting in question.[128] This is irrelevant, because the question whether or not defendants recall this specific meeting has no bearing whatsoever on the admissibility of the document. In the next breath, plaintiffs argue that it does not matter whether or not anyone can recall the meeting or identify the document because, in their view, where a witness "repudiates" a contemporaneous document the document must be believed, and not the witness. However, the cases cited by plain-

---

**128.** This is a disputed factual premise. Defendants did not all respond that they could not recall the meeting. *See* answers of Toshiba and Matsushita to interrogatory 33, attached to plaintiffs' memorandum, in which they describe

tiffs[129] have nothing to do with the refusal or inability of a witness to authenticate a document. Rather, they deal with the weight to be given to a document which has been properly authenticated and admitted into evidence, where a witness disputes the accuracy of the *contents* of the document. None of these cases holds that a document is admissible even if no one can authenticate it or lay any sort of foundation for its admissibility.[130] Plaintiffs thus have failed to meet the *Goichman* standard of authentication.

The notion that the Japan Victor document qualifies as a business record does not merit extended discussion. Not only do we know nothing of its author, but we know nothing of the circumstances of its preparation,[131] of its source or origin or when it was prepared. Thus, we do not know if there was any habit of regularity or precision or systematic checking attendant to its preparation, or whether it was maintained in the ordinary course of business, nor do we know whether the author had first hand knowledge or received information from someone with such and with a duty to report.

Plaintiffs point to the "obvious knowledge of the author." Such an argument is characteristic of the kind of bootstrapping they have used throughout these proceedings as a substitute for foundation. Plain-

tiffs also rejoin that: (1) the document was not thrown out, but remained in Japan Victor's files for 10 years; and (2) although Japan Victor produced no other documents purporting to describe the meetings of the EIAJ Statistics Committee—which plaintiffs claim met *every month*—Japan Victor did produce memoranda pertaining to other meetings of other groups (specifically, the MD group), which, plaintiffs contend, are similar in "form, content, structure and purpose" to the Japan Victor document.

As to point (1), we note that plaintiffs cite no case which holds that the failure to dispose of a document establishes that it is a business record. There is no such case, and the argument is without merit. As to point (2), the obvious rejoinder is that, using plaintiffs' own criteria, the fact that Japan Victor allegedly attended monthly meetings of the EIAJ Statistics Committee, but had only one memorandum about all these meetings, hardly suggests that Japan Victor had a regular practice of making such memoranda. Nor does the alleged similarity of the document with three other MD Group memoranda prove anything. Although we cannot read Japanese, the documents do not look all that similar to us. The fact that they all have dates on them, and a beginning, middle and end, and (according to the translations) look like memo-

---

the meeting and deny the accuracy of the Japan Victor document.

**129.** They cite, *e. g., United States v. United States Gypsum Co.*, 333 U.S. 364, 396, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *United States v. Corn Products Refining Co.*, 234 F. 964, 978 (S.D.N.Y.1916).

**130.** *United States v. American Cyanamid Co.*, 427 F.Supp. 859, 865–66 (S.D.N.Y.1977), cited by plaintiffs at p. 21 for the proposition that witnesses from distant locations need not be called to authenticate a contemporaneous document, does not support plaintiffs' argument. In that case the documents at issue were various corporate responses to government questionnaires. There was no dispute as to authenticity, and the authors of the documents, and the circumstances under which they were prepared, were known. The decision, which dealt solely with the hearsay issue, turned on the "reasonable efforts" standard of Rule 803(24).

**131.** When we inquired of plaintiffs' lead counsel, Mr. Rome, about what he knew about the circumstances of the preparation of the JVC document, he replied:

"Just by looking at the document, sir, there is contained in it a statement setting forth that the author of the document was undertaking to report an agreement which was reached at the Statistics Committee." PTO 275 at p. 38. That of course is "bootstrapping" and the defendants have all denied the existence of any "agreement." Indeed, Matsushita has argued convincingly that the "agreement" to change statistical reporting to cover up discrepancies between the home market price and the export price makes no sense (mathematically) in terms of proving plaintiffs' theory of conspiracy. PTO 224 at pp. 230–231.

randa, is hardly startling. Finally, even if there were some similarity, that would be irrelevant, since the MD Group memoranda are as lacking in foundation as the Japan Victor document itself.

In sum, plaintiffs have not met their burden of showing that the Japan Victor document is authentic, *U. S. v. Goichman, supra,* or that it is a business record.

### E. Is the Japan Victor Document an Admission of Matsushita on the Ground that Japan Victor is its Agent?

The claim that the Japan Victor document is an admission against Matsushita requires a two step analysis. First, it must be established that the document is an admission of Japan Victor Corp. Then, it must be somehow established that JVC is the agent of Matsushita. We shall not dwell upon the first part of the proposition. We have no basis for applying the strictures of Fed.R.Evid. 801(d)(2)(C) and (D), for we do not know who wrote the document and, therefore, what his authority or the scope of his employment was. Nor is there a scintilla of evidence of adoption by JVC.

Assuming arguendo that the document could be an admission of Japan Victor Corp., there is still no basis for its admissibility against Matsushita. The Rule, on its face, requires the showing of an agency relationship between Japan Victor and MEI. However, the mere fact that a parent company owns some, most, or even all of the stock of a subsidiary company is not sufficient to support a finding of an agency relationship between the parent and its subsidiary. To establish agency, and thus admissibility, plaintiffs would have to go beyond mere stock ownership, and establish that MEI "directly intervenes in the management" of Japan Victor so as to treat it

as a "mere department of its own enterprise." *Consolidated Rock Co. v. DuBois,* 312 U.S. 510, 524, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1940). We incorporate by reference the discussion in Part II–C–6, *infra.*

▮▮ Plaintiffs have adduced no evidence that Japan Victor is a "mere instrumentality" of MEI. According to the representation of defendants, management of the two companies is entirely separate; there is no dictation by MEI of Japan Victor's business policies; Japan Victor's stock is publicly traded; it has its own product lines, brand name ("JVC"), distribution and sales organizations, and research and development staff; JVC has its own representatives on industry committees, and the two companies are in fact competitors. Whether or not all of this is so, the burden is on plaintiffs. What plaintiffs have tried to do throughout these evidentiary hearings is to proffer a document, assert that it looks authentic or that it looks like a business record, and then to seek to shift the burden of going forward and the burden of proof to defendants. This they cannot do.[132]

### F. The Residual Exceptions

▮▮ The document is not admissible under the residual exceptions because of plaintiffs' failure even to attempt to procure equally probative evidence by some form of deposition, and because of the lack of trustworthiness of the document. We lack information concerning its source and manner of preparation. The document has internal problems, and as we have noted in Part II–F–3, the burden of showing equivalent guarantees of trustworthiness under the residual exception is on the proponents.

Plaintiffs' argument for admissibility under F.R.E. 803(24) includes the following statement:

**132.** Plaintiffs also argue: (1) that MEI files consolidated financial statements including Japan Victor; (2) that Matsushita's founder, K. Matsushita, was Chairman of the Board of JVC from 1966 to 1970; and (3) that another MEI director was Japan Victor's auditor (pp. 32–33). This is not even close to the required showing. The filing of joint financial statements means merely that MEI is the majority shareholder of

JVC; and the presence of one (or even more than one) common director is also insufficient, under the law, to establish agency. *See* e. g., *Matter of Bowen Transports, Inc.,* 551 F.2d 171, 178–9 (7th Cir. 1977); *Overstreet v. Southern Ry. Co.,* 371 F.2d 411, 412 (5th Cir. 1967), *cert. denied,* 387 U.S. 912, 87 S.Ct. 1700, 18 L.Ed.2d 634 (1968); *In Re Penn Central Securities Litigation,* 335 F.Supp. 1026, 1035 (E.D.Pa.1971).

plaintiffs, through interrogatories and requests for production of documents, have failed to discover anything more probative concerning the agreement reached at the meeting of December 26, 1966 (p. 30). What this means is that there is no evidence to support the statements made in the Japan Victor document. Plaintiffs, of course, do not count as "more probative" the denials of various defendants, including MEI, that there was any such agreement. Since they disdained to take the deposition of even a single Japan Victor employee, or any other person who attended the meeting in question, plaintiffs' argument is untenable. A single deposition of someone like Mr. Oguri, whose chop on the document is a fact upon which plaintiffs so heavily rely, would have been far more probative than this document. Plaintiffs should not be permitted to rely upon their own deliberate refusal to take depositions as a pretext for admission into evidence of an unauthenticated hearsay document like the Japan Victor memorandum.

The supreme irony here is that the plaintiffs attribute so much importance to the JVC document. It has been famous for years among those involved professionally in this case, and yet plaintiffs have not lifted a finger to establish its foundation.

### G. *Non–Assertive Conduct*

As one last ditch effort to seek admission of the JVC document, plaintiffs have fashioned the argument that the JVC memo is admissible as non–hearsay because it is "non–assertive conduct" of Japan Victor, i. e., it is said to be evidence of conduct that was not intended to be an assertion. Plaintiffs' argument goes:

> There can be little doubt that the Japan Victor document is evidence of the conduct of Japan Victor in reliance upon the agreement reached at the Statistics Committee of the EIAJ on December 26, 1966. This memorandum constitutes an instruction to change the statistical reporting practices of Japan Victor in accordance with the agreement reached at the Statistics Committee meeting. It is

evidence of Japan Victor's conduct in relying upon the agreement to which Japan Victor was a part. This act of Japan Victor's in reliance on this agreement is sufficient evidence of trustworthiness so as to take such conduct outside of the definition of hearsay:

> "[W]hen a person acts in a way consistent with a belief but without intending his act to communicate that belief, one of the principal reasons for the hearsay rule–to exclude declarations whose veracity cannot be tested by cross–examination–does not apply because the declarant's sincerity is not then involved. . . .
>
> [T]he underlying belief is in some cases self–verifying: 'There is frequently a guarantee of the trustworthiness of the inference to be drawn . . . because the actor has based his actions on the correctness of his belief, i. e., his actions speak louder than his word.'" (footnotes omitted). Weinstein's Evidence, ¶ 801(a)[01], p. 801–55.

This argument, conceived after the hearing, is totally at odds with plaintiffs' submission, for the past several years, that the memorandum is offered to prove the truth of the matters contained therein. Nor does the plaintiffs' newly asserted position effectively undercut their long–held view of the document. For the memorandum is not an "act," and there is no evidence in plaintiffs' preclusionary FPS that JVC ever did anything to implement any alleged agreement. To draw the inference that the "act" of requesting a change in statistical reporting procedures resulted from an agreement among manufacturers requires one first to accept–*for its truth*–the portion of the memorandum which purports to recount the alleged agreement. In short, the JVC document is inadmissible hearsay, and to the extent that it is non–hearsay it is irrelevant under Fed.R.Evid. 401. And in any event it would at most be admissible against JVC which is not a defendant, and on this record, not a co–conspirator.

**XIV.** *TV Export Council Meetings–DSS 1030–1034 (Production by Matsushita)*

A. *Introduction*

 DSS's 1030–1034 refer to meetings of the TV Export Council. The documents were produced by Matsushita and are identified by document identification numbers MIH 29097–29098, MIH 29099–29101, MIH 29103–29104, MIH 29105, MIH 29142–29143.

Plaintiffs offer DSS's 1030–1034 in evidence against all defendants. They offer DSS's 1030–1034 as business records of Matsushita under F.R.E. 803(6), as admissions of Matsushita under F.R.E. 801(d)(2), and as admissible under the residual exception, F.R.E. 803(24). These documents evidence meetings of the TV Export Council from 1969–1973. The documents allegedly evidence defendants' collective participation in responding to the U.S. dumping investigation.

B. *Plaintiffs' Foundation for Authentication and Admissibility Under One of the Exceptions to the Hearsay Rule*

(1) DSS's 1030–1034 were produced by Matsushita in 1975–76 in response to a set of interrogatory and document requests. These documents were later *referred* to in a number of interrogatory answers.[133] Plaintiffs submit that the answers show that Matsushita regularly attended meetings of the TV Export Council, took the minutes at the meetings themselves, and kept them for their own use and purposes at Matsushita.

(2) DSS 1030 is a document entitled "Minutes of TV Export Council Meeting of November 17, 1969." The chops of Morimatsu and Sonoda are on the document. The initials of Onishi are also on the document.

(3) These documents were not produced to plaintiffs in this case until after discovery had closed. Therefore plaintiffs were unable to identify the persons whose chops and initials appear in DSS 1030.

(4) Matsushita has admitted that it was a member of the TV Export Council, and that representatives of Matsushita regularly attended meetings of the TV Export Council through this relevant time period.

(5) The Japanese originals of these documents are stamped "confidential." Matsushita would not stamp a document "confidential" unless it believed it to be genuine or authentic.

(6) Several portions of these documents have been deleted pursuant to assertion of the attorney–client privilege. Defendants would not have claimed attorney–client privilege if these documents were not genuine or authentic.

(7) DSS 1031, dated November 25, 1969, which appears to be minutes of the TV Export Council of November 24, 1969, contains the seals of Isomura and Normatsu. The initials of Yamaguchi also appear on the document. (These persons are not identified in Matsushita's Answers to Interrogatories.)

(8) DSS 1034 is dated "10/26 (T–h–u) (1400)." From reading the text of the document, it is apparent that it refers to a meeting held on October 26, 1972, because the first paragraph speaks of an "extension of four months until 2/28/73." As indicated by Matsushita's Answers to Interrogatories, these documents were maintained as a regular part of the business of Matsushita. The Answer to Interrogatory No. 19 states "prior to 1971 these notes or minutes were routinely disposed of shortly after the meetings." Thus it can be inferred that "from 1971 until the future such routine destruction no longer became part of Matsushita's course of conduct." Also Matsushita would have entered into a normal business practice of retaining documents by virtue of the fact of this lawsuit.

---

**133.** *See* Amended Answers of MEI to NUE's Interrogatories to Defendants, Set No. 2, dated May 25, 1979, Interrogatory No. 51. These documents were also referred to in Answers of Matsushita Defendants to Plaintiffs' Interrogatories to Defendants Relating to Existence, Location and Destruction of Documents, Interrogatory 19, and in the Amended Answers of Matsushita Electric Industrial Company, Ltd., and Matsushita Electric Trading Co., Ltd. to Plaintiffs' Interrogatories to Defendants, Set No. 1, Interrogatory No. 37, dated May 25, 1979.

(9) DSS 1033 contains the seal of Kitaoka. Kitaoka is identified in the Answers to Interrogatories as being an executive of Matsushita who attended meetings of the TV Export Council from 1963 through 1973. This document also identifies various other persons as being in attendance at the meeting. The various Answers to Interrogatories identify many of these individuals as being participants at the meetings of the TV Export Council.

(10) The structure of the documents themselves allegedly establishes that the documents were prepared in the regular course of business in connection with the regular practice of that business. The documents allegedly list "the date, time, place, agenda, and the regular order in which they were prepared, including the summation of the response of each of the individuals who took part in the conversations and discussions at the export council meetings." Plaintiffs rely on the fact that the documents "show a continuing series of these memoranda evidencing the events before the TV Export Council," and the fact "that many of them appeared on a regular basis in the files of Matsushita." The existence of the memoranda on a regular basis, about 25 of them, shows a consistent pattern of business conduct on behalf of Matsushita to record what took place at the particular meetings and to keep them on file at Matsushita. The Matsushita answers to interrogatories state that "from time to time attendants prepared notes and minutes of TV Export Council Meetings." This answer is alleged to show that when something of consequence transpired at the meetings, there was an obligation to report them. Matsushita would not engage in a regular destruction program of something that isn't regularly maintained. A business record does not have to reflect every meeting that occurred.

(11) There is a correlation between the date of preparation of the documents and the date and time which is recorded on them.

(12) MEI acknowledged that the minutes were prepared by its attendants, thus establishing that the documents were prepared by a person with knowledge.

(13) These documents are admissions as stated by Matsushita's answers to interrogatories, "MEI believes that from time to time its attendants prepared notes or minutes." Its attendants are its agents. These documents represent an assertion of what went on during the meetings. The documents were reviewed by others within Matsushita as evidenced by the chops and initials of various persons.

C. *Defendants' Response*

(1) Notwithstanding plaintiffs' proffer of these documents as evidence against all defendants, the documents could, even if admissible, constitute evidence *aliunde* only against MEI.

(2) The identities of the persons whose chops and initials appear on DSS 1030 are not known. DSS's 1033 and 1034 do not contain chops.

(3) These documents contain the headings "TV Export Council *Meeting*" not as plaintiffs assert "TV Export Council *Minutes*." Plaintiffs have not established that these documents are genuine records of TV Export Council meetings.

(4) DSS's 1030 and 1031 appear to be memoranda, but it is not clear to whom or from whom they were sent. DSS 1032 appears to be a memorandum in that it says "to division director." DSS 1033 appears to be an internal Matsushita document. DSS 1034 could be either a memorandum or a minute or some other type document. But there is no identification of who prepared any of the documents. There are seals on these documents of people who were not identified anywhere in this record as having attended the meeting. The documents are not in the form of minutes of meetings. There really is no information concerning these documents.

(5) Plaintiffs misread Matsushita's Answers to Interrogatories. The end of Matsushita's Answer to Interrogatory No. 19 states "To the extent that notes of "minutes" covering the period prior to 1971 have

been located, they have been produced for plaintiffs' inspection." This answer does not show any regular practice of keeping the documents. The language in Matsushita's Answers to Interrogatories, "MEI *believes* that from time to time attendance prepared notes or "minutes" of TV Export Council Meetings," does not import regularity of preparation of the notes.

(6) The mere fact that the documents were produced from Matsushita's files and the fact that MEI attended meetings do not establish that the documents are authentic or business records.

(7) The fact that parts of a document have been designated as falling within the attorney–client privilege does not make the document authentic.

(8) As plaintiffs admit, as the result of a strategic or tactical decision plaintiffs did not take depositions of the Japanese defendants. Therefore plaintiffs' argument that they received the documents after the close of discovery is irrelevant.

(9) There is no testimony of a witness or of a custodian of these documents to establish that they are business records. There is no indication who wrote the documents. There is no indication that the scrivener had any personal knowledge of what was contained in the documents because it is unknown whether the scrivener went to the meeting. If the scrivener did not have personal knowledge, it is not known who was the source of the information. There is no indication whether DSS's 1033 and 1034 were prepared in a timely fashion. There is no showing that these documents were regularly prepared, whether the documents were prepared during the regular course of business, why the documents were prepared, or whether they were ever sent to anyone. There is further no indication whether these are notes of meetings by a Matsushita employee or minutes of meetings. The documents were retyped from Japanese to English, so that on their face it is not possible to ascertain whether they look like business records. Further, there is nothing

to show that the documents accurately reflect what happened at the meetings.

(10) It is pure speculation that these documents represent admissions of Matsushita. Since there is no showing who wrote the documents, there is no way to conclude that it was a person authorized by the company to go to the meeting and take notes.

(11) The confidential stamp was placed on the documents during the course of discovery and does not connote authenticity.

(12) The documents contain hearsay within hearsay.

### D. *Discussion*

Because of our desire to move on, we will assume authentication and address the question of admissibility of these documents under Article VIII of the F.R.E.

For the reasons set forth in defendants' contentions # (4), (5), (6) and (9),[134] these documents are not admissible under 803(6). We add only that neither the structure of the documents nor their sheer number nor their retention in MEI's files satisfies the "regular practice" requirement as we have explicated it, *supra.* Insofar as plaintiffs argue that because of late production they were unable to lay foundation by taking depositions a procedure they have not otherwise used in this litigation—we note that plaintiffs failed to avail themselves of that provision of P.T.O. 154 which permitted re-opening of discovery for good cause shown. *See* 478 F.Supp. at 948. Good cause shown is expressly stated therein to include late production of documents, thus this excuse is unavailing. Similarly, the memos are not admissible as statements against interest under Rule 804(b)(3) since there has been no showing that their author, whoever that may be, was conscious that they were against his interest, or had any reason whatever to think so. Neither are the documents admissions of MEI. We do not know the identity, hence the authority or scope of employment of the writer of the

---

**134.** We do not, however, rely upon the "custodian" requirement. See Part II.E.3, *supra.*

documents; indeed, we do not know if he was a Matsushita employee.[135] Thus we cannot say that any Matsushita employee made any statement or assertion.[136]

## XV. Conclusion

The foregoing represents our evidentiary rulings on disputed issues relating to the critical documents generated in Japan. We may consider other Japan–generated documents in our opinion on the motion for summary judgment on plaintiffs' conspiracy claims. The legal principles we have enunciated herein will also be applied in that opinion to additional documents. Because this opinion, which will be filed of record, memorializes a plethora of orders as to the admissibility of various documents, we need not append a formal Order hereto.

**135.** Plaintiffs make much of a Matsushita interrogatory answer which states that MEI "believes" that from time to time MEI employees made notes of TV Export Council Meetings. P.T.O. 275, pp. 156–65. That, however, does not link the documents in question to Matsushita. Again, the plaintiffs rely on speculation rather than the careful laying of foundation.

**136.** We shall not deal separately with DSS 1035, which is the same type of document as DSS's 1030–34 except that it was produced by MELCO instead of Matsushita. Again, we do not know who authored the document, the source of his knowledge, the method of preparation of the document, et cetera. It suffers from the same vices as DSS's 1030–34 and the diaries and is inadmissible under 803(6), 804(b)(3), 803(24) and 801(d)(2) for the same reasons. This is still another document for which plaintiffs, despite the availability for depositions of persons with knowledge, made no attempt to lay foundation.

DSS 1036 is also a memo purportedly reporting events transpiring at a TV Export Council meeting. Unlike DSS 1030–1035, DSS 1036 is asserted by plaintiffs to have been authored by an *identifiable* person (Mr. Kumano) who attended the meeting which was the subject matter of the memorandum. We will assume authenticity. However, the status of DSS 1036 under F.R.E. 803(6), 804(b)(3) and 803(24) is precisely the same as DSS's 1030–1034; it does not pass muster and for the same reasons. We note too that the supposed author of DSS 1036, Mr. Kumano, is not only alive and well and has always been available for depositions, but, according to the representation of Melco's counsel, he even speaks fluent English! While it is possible to infer that DSS 1036 was written by a Melco employee, Mr. Kumano or someone else, it is not an admission of Melco for the same reason as in the case of the diaries.